UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 22-1882, 23-1315, 23-1322
_____

_____

UNITED STATES,
Appellee,

v.

LOUIS D. COLEMAN III,
Defendant-Appellant.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
_____

BRIEF OF DEFENDANT-APPELLANT
LOUIS D. COLEMAN III
_____

Christine DeMaso
Assistant Federal Public Defender
Federal Public Defender Office
District of Massachusetts
51 Sleeper Street, 5th Floor
Boston, MA 02210
(617) 223-8061
Identification No.: 1168061

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES.............................................................. vii

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT .....................................................3

ISSUES PRESENTED FOR REVIEW .................................................4

STATEMENT OF THE CASE...............................................................5

   I.   Overview. ...................................................................................5

   II.   Trial. .........................................................................................9

      A.   Government case. ...............................................................10

      B.   Defense case. ......................................................................19

      C.   Closings, instructions, verdict, and sentencing. ...............22

SUMMARY OF ARGUMENT ............................................................24

ARGUMENT ....................................................................................... 28

I.   Coleman was convicted based on allegations that were not
     presented to the grand jury, and the indictment was constitutionally
     insufficient ................................................................................. 28

     A.  The purposes of an indictment ............................................. 28

     B.  The admission of evidence that Coleman kidnapped Correia for
         sexual gratification violated the Fifth Amendment's presentment
         clause. ................................................................................... 31

         i.    Standard of review ........................................................ 32

         ii.   An accused can only be tried based on an indictment returned
               by a grand jury ............................................................. 33

         iii.  Allegations of sexual gratification and sexual assault were not
               presented to the grand jury. ......................................... 34

         iv.   The introduction of evidence of sexual gratification violated
               Coleman's constitutional rights. .................................. 36

     C.  The indictment was constitutionally insufficient. The court
         erroneously denied the motion to dismiss and the motion for a bill
         of particulars. ...................................................................... 37

         i.    Standard of review ........................................................ 38

         ii.   The indictment was constitutionally insufficient ......... 38

         iii.  The court erroneously denied the motion for a bill of
               particulars. .................................................................. 41

II.   Warrant affidavits did not establish probable cause that a kidnapping occurred or that evidence would be found in the places to be searched. ........................................................................42

  A.   Standard of review. ................................................................43

  B.   The warrant affidavits did not provide probable cause to believe that Coleman kidnapped Correia. ......................................44

  C.   Some of the warrant affidavits did not provide probable cause to believe that evidence of kidnapping would be found in the places to be searched. ........................................................46

  D.   The good-faith exception cannot save these warrants. ...................49

III.  The court committed various errors related to the government's case. ........................................................................50

  A.   The court erroneously denied a mistrial when the medical examiner opined that Correia was alive when Coleman brought her into his building. ...........................................................50

    i.   Standard of review. ...........................................................51

    ii.  Vershvovsky's testimony caused extreme prejudice requiring a mistrial. ........................................................52

  B.   The court erroneously permitted the government to use the term "sexual assault." .................................................................54

    i.   Standard of review. ...........................................................55

    ii.  The term "sexual assault" violated Coleman's constitutional rights to due process and a fair trial. ...............................56

C.   The court erroneously admitted prejudicial testimony about
     Correia's plans for the days after the 24th..........................................57

     i.   Standard of review...............................................................................58

     ii.  Correia's statements to her child's grandmother and shelter
          employee were more prejudicial than probative. .........................59

IV.  The government did not present sufficient evidence to sustain
     Coleman's conviction..............................................................................60

     A.   Standard of review................................................................................61

     B.   There was insufficient evidence to satisfy the seizure
          element.....................................................................................................62

     C.   There was insufficient evidence that Coleman held Correia
          against her will for an appreciable time. ...........................................64

     D.   There was insufficient evidence that Coleman held Correia for
          ransom, reward, or otherwise. .............................................................67

     E.   There was insufficient evidence that Coleman intended to
          kidnap Correia. .......................................................................................68

V.   The court erroneously prevented Coleman from adequately
     presenting his theory of defense.............................................................68

     A.   See the sealed supplemental brief.......................................................69

     B.   See the sealed supplemental brief.......................................................69

C.  The court erred in not giving the jury instructions Coleman
    requested............................................................................70

    i.   Standard of review.........................................................70

    ii.  The court erroneously failed to sufficiently inform the jury that it
         could not consider evidence that had been struck.......................71

    iii. The seizure-element instructions were erroneous....................73

    iv.  Holding-element and purpose-element instructions were
         erroneous......................................................................76

    v.   Consciousness of guilt instruction was erroneous.......................77

    vi.  Other errors....................................................................79

    vii. Taken together, the instructional errors require reversal.........80

VI. Issues of structural racism were not appropriately addressed,
    resulting in an unfair trial. ....................................................81

    A.  The court incorrectly denied Coleman's motion to show jurors a
        video discussing implicit bias. .............................................83

        i.   Standard of review.........................................................84

        ii.  The importance of educating jurors about implicit bias.............85

        iii. The court erroneously refused to show the venire a video
             about implicit bias.........................................................87

B.    The court improperly excluded expert testimony explaining the impact of negative encounters with police on Black men...............90

   i.    Standard of review...............................................................93

   ii.   Coleman's expert disclosure was sufficient. ..................................94

   iii.  Fagan's testimony was admissible under Rules 702 and 703............................................................................................96

VII.    The court improperly calculated Coleman's guidelines range. ..................................................................................100

A.    Standard of review ............................................................101

B.    The court abused its discretion by determining that the facts of this case constituted first-degree murder. ........................................102

VIII.    Cumulative error. .................................................................103

CONCLUSION ....................................................................105

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) ..............................106

CERTIFICATE OF SERVICE ..........................................................107

# TABLE OF AUTHORITIES

**Page**

## Cases

*California v. Trombetta,*
    467 U.S. 479 (1984) ....................................................................69

*Chadwick v. WellPoint, Inc.,*
    561 F.3d 38 (1st Cir. 2009) ........................................................93

*Chatwin v. United States,*
    326 U.S. 455 (1946) ...................................... 38, 39, 45, 62, 64, 75

*Commonwealth v. Warren,*
    475 Mass. 530 (2016) ................................................................78

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) .............................................................91, 96

*Gooch v. United States,*
    297 U.S. 124 (1936) ...................................................39, 44, 45, 76

*Government of Virgin Islands v. Berry,*
    604 F.2d 221 (3d Cir. 1979) ................................................64, 65

*Hamling v. United States,*
    418 U.S. 87 (1974) ....................................................................30

*Hattaway v. United States,*
    399 F.2d 431 (5th Cir. 1968).....................................................75

*Hunter v. State of New Mexico,*
    916 F.3d 595 (10th Cir. 1990)...................................................33

*Jeffers v. United States,*
    392 F.2d 749 (9th Cir. 1968).................................................29, 33

*Lee v. Howard Hughes Medical Institute,*
   607 F.Supp.3d 52 (D.Mass. 2022) ............................................86

*Levin v. Dalva Brothers, Inc.,*
   459 F.3d 68 (1st Cir. 2006) ......................................................96

*Martínez v. United States,*
   33 F.4th 20 (1st Cir. 2022) ...............................................95, 96

*Mitroff v. Xomox Corp.,*
   797 F.2d 271 (6th Cir. 1986)....................................................57

*Muskat v. United States,*
   554 F.3d 183 (1st Cir. 2009) .............................................93, 94

*NAACP v. City of Myrtle Beach,*
   504 F.Supp.3d 513 (D.S.C. 2020) ............................................98

*Peña-Rodriguez v. Colorado,*
   580 U.S. 206 (2017) ................................................................82

*Regents of Univ. of Cal. v. Bakke,*
   438 U.S. 265 (1978) ................................................................81

*Rosario–Urdaz v. Rivera–Hernández,*
   350 F.3d 219 (1st Cir.2003) ..............................................93, 94

*Russell v. United States,*
   369 U.S. 749 (1962) .................................... 28, 29, 30, 31, 36, 41

*Steagald v. United States,*
   451 U.S. 204 (1981) ................................................................44

*Stirone v. United States,*
   361 U.S. 212 (1960) ................................................................29

*Students for Fair Admissions v. President and Fellows of Harvard College*,
    600 U.S. 181 (2023) ................................................................81, 99

*Tyus v. Urban Search Management*,
    102 F.3d 256 (7th Cir. 1996)..........................................................98

*United States v. Acevedo*,
    824 F.3d 179 (1st Cir. 2016) ....................................................44, 45

*United States v. Amaro-Santiago*,
    824 F.3d 154 (1st Cir. 2016) ..........................................................79

*United States v. Apicelli*,
    839 F.3d 75 (1st Cir. 2016) .......................................................51, 52

*United States v. Ayala-Vazquez*,
    751 F.3d 1 (1st Cir. 2014) ..............................................................51

*United States v. Baird*,
    712 F.3d 623 (1st Cir. 2013) ..........................................................71

*United States v. Bartelho*,
    129 F.3d 663 (1st Cir. 1997) ..........................................................69

*United States v. Beers*,
    189 F.3d 1297 (10th Cir. 1999)......................................................75

*United States v. Boone*,
    959 F.2d 1550 (11th Cir. 1992)......................................................73

*United States v. Brandao*,
    539 F.3d 44 (1st Cir. 2008) ............................................................29

*United States v. Brown*,
    510 F.3d 57 (1st Cir. 2007) ............................................................55

*United States v. Brunette,*
    256 F.3d 14 (1st Cir. 2001) ...........................................................49

*United States v. Bucci,*
    525 F.3d 116 (1st Cir. 2008) ........................................................32

*United States v. Cameron,*
    699 F.3d 621 (1st Cir. 2012) ........................................................38

*United States v. Carta,*
    592 F.3d 34 (1st Cir. 2010) ..........................................................32

*United States v. Casanova,*
    886 F.3d 55 (1st Cir. 2018) ..............................................84, 87, 88

*United States v. Cecil,*
    608 F.2d 1294 (9th Cir. 1979)......................................................31

*United States v. Chancey,*
    715 F.2d 543 (11th Cir. 1983).....................................................75

*United States v. Coombs,*
    857 F.3d 439 (1st Cir. 2017) ..................................................43, 44

*United States v. Cordero-Rosario,*
    786 F.3d 64 (1st Cir. 2015) ....................................................44, 46

*United States v. Corralez,*
    61 M.J. 737 (A.F.Crim.App. 2005)..............................................66

*United States v. Cruikshank,*
    92 U.S. 542 (1875) ................................................................29, 30

*United States v. Falcón-Nieves,*
    79 F.4th 116 (1st Cir. 2023) ...................................................61, 62

x

*United States v. Ferguson,*
    65 F.4th 806 (6th Cir. 2023) .......................................................65

*United States v. Figueroa-Lugo,*
    793 F.3d 179 (1st Cir. 2015) ......................................................71

*United States v. Fisher,*
    3 F.3d 456 (1st Cir. 1993) ........................................................32

*United States v. Gamache,*
    156 F.3d 1 (1st Cir. 1998) ........................................................71

*United States v. Garza-Robles,*
    627 F.3d 161 (5th Cir. 2010)......................................................74

*United States v. Gelin,*
    712 F.3d 612 (1st Cir. 2013) .................................................84, 85

*United States v. Gemma,*
    818 F.3d 23 (1st Cir. 2016) .......................................................69

*United States v. Gillis,*
    938 F.3d 1181 (11th Cir. 2019)...................................................73

*United States v. Hall,*
    974 F.Supp. 1198 (C.D.Ill. 1997) ........................................96, 97, 98

*United States v. Henry,*
    848 F.3d 1 (1st Cir. 2017) ........................................................97

*United States v. Hernández-Albino,*
    177 F.3d 33 (1st Cir. 1999) .......................................................79

*United States v. Higgs,*
    353 F.3d 281 (4th Cir. 2003).....................................................73

*United States v. Hillie*,
227 F. Supp. 3d 57 (D.D.C. 2017) ..............................................................33

*United States v. Hitt*,
249 F.3d 1010 (D.C. Cir. 2001) ............................................................29, 33

*United States v. Jackson*,
58 F.4th 541 (1st Cir. 2023) .......................................................................93

*United States v. Jackson*,
24 F.4th 1308 (9th Cir. 2022) ..............................................................65, 66

*United States v. Jadlowe*,
628 F.3d 1 (1st Cir. 2010) ..........................................................................70

*United States v. Kilmartin*,
944 F.3d 315 (1st Cir. 2019) .........................................................58, 59, 60

*United States v. Krivoi*,
80 F.4th 142 (2d Cir. 2023) .......................................................................65

*United States v. Leon*,
468 U.S. 897 (1984) ...................................................................................49

*United States v. Lowe*,
145 F.3d 45 (1st Cir. 1998) ........................................................................62

*United States v. Marchena-Silvestre*,
802 F.3d 196 (1st Cir. 2015) ...................................................................101

*United States v. McLellan*,
959 F.3d 442 (1st Cir. 2020) ......................................................................71

*United States v. Meises*,
645 F.3d 5 (1st Cir. 2011) ........................................................................103

*United States v. Morillo*,
    158 F.3d 18 (1st Cir. 1998) .......................................................... 62

*United States v. Moss*,
    936 F.3d 52 (1st Cir. 2019) .......................................................... 43

*United States v. Mulinelli-Navas*,
    111 F.3d 983 (1st Cir. 1997) ........................................................ 69

*United States v. Murphy*,
    762 F.2d 1151 (1st Cir. 1985) ................................ 30, 31, 33, 34, 39, 40, 41

*United States v. Nance*,
    533 F.2d 699 (D.C. Cir. 1976) ..................................................... 31

*United States v. Nelson-Rodriguez*,
    319 F.3d 12 (1st Cir. 2003) .......................................................... 38

*United States v. Padilla-Galarza*,
    990 F.3d 60 (1st Cir. 2021) .................................................... 51, 103

*United States v. Pagán–Ferrer*,
    736 F.3d 573 (1st Cir. 2013) .................................................... 51, 52

*United States v. Paiva*,
    892 F.2d 148 (1st Cir. 1989) ........................................................ 41

*United States v. Parker*,
    872 F.3d 1 (1st Cir. 2017) .................................................. 84, 87, 88

*United States v. Pirro*,
    212 F.3d 86 (2d Cir. 2000) ...................................................... 31, 33

*United States v. Powell*,
    226 F.3d 1181 (10th Cir. 2000) .................................................... 75

*United States v. Ranney,*
    298 F.3d 74 (1st Cir.2002) ...........................................................................70

*United States v. Roberts,*
    978 F.2d 17 (1st Cir. 1992) .........................................................................55

*United States v. Rodríguez-Rodríguez,*
    663 F.3d 53 (1st Cir. 2011) ....................................................................29, 33

*United States v. Rodríguez-Martinez,*
    778 F.3d 367 (1st Cir. 2015) ..................................................................61, 62

*United States v. Roman,*
    942 F.3d 43 (1st Cir. 2019) ....................................................................44, 48

*United States v. Rosario-Pérez,*
    957 F.3d 277 (1st Cir. 2020) ..................................................................32, 69

*United States v. Ruiz-Huertas,*
    792 F.3d 223 (1st Cir. 2015) ......................................................................101

*United States v. Sanabria,*
    645 F.3d 505 (1st Cir. 2011) .......................................................56, 57, 103

*United States v. Sandoval,*
    6 F.4th 63 (1st Cir. 2021) ...........................................................................97

*United States v. Santa-Manzano,*
    842 F.2d 1 (1st Cir. 1988) ..........................................................30, 33, 34, 40

*United States v. Sepúlveda,*
    15 F.3d 1161 (1st Cir. 1993) ............................................38, 41, 52, 53, 103

*United States v. Sheehan,*
    70 F.4th 36 (1st Cir. 2023) .............................................................43, 44, 49

xiv

*United States v. Silva,*
554 F.3d 13 (1st Cir.2009) ...........................................................70

*United States v. Simpkins,*
978 F.3d 1 (1st Cir. 2020) ............................................................44

*United States v. Spinney,*
65 F.3d 231 (1st Cir.1995) ...........................................................62

*United States v. Tomasetta,*
429 F.2d 978 (1st Cir. 1970) ........................................................30

*United States v. Torres,*
162 F.3d 6 (1st Cir. 1998) ............................................................52

*United States v. Trinastich,*
354 F. Supp. 54 (W.D. Mo. 1973) ................................................31

*United States v. Vigeant,*
176 F.3d 565 (1st Cir. 1999) ........................................................44

*United States v. Vizcarrondo-Casanova,*
763 F.3d 89 (1st Cir. 2014) ....................................................33, 77

*United States v. Walsh,*
194 F.3d 37 (2d Cir. 1999) .....................................................29, 33

*United States v. Ward,*
747 F.3d 1184 (9th Cir. 2014).................................................33, 77

*United States v. Wright,*
340 F.3d 724 (8th Cir. 2003)........................................................75

*United States v. Woodward,*
149 F.3d 46 (1st Cir. 1998) ..........................................................61

xv

*United States v. Young,*
    916 F.3d 368 (4th Cir. 2019).................................................97, 98

*United States v. Zaccaria,*
    240 F.3d 75 (1st Cir. 2001) .........................................................72

*Wong Sun v. United States*,
    371 U.S. 471 (1963) ...............................................................46, 49

## Constitutional Provisions

U.S. Const. Amend. IV .................................................................43

U.S. Const. Amend. V............................................................*passim*

U.S. Const. Amend. VI ..................................... 29, 31, 37, 38, 54, 69

## Statutes

18 U.S.C. §1111................................................................100, 102

18 U.S.C. §1201..........................................................1, 9, 28, 62, 80

18 U.S.C. §3231..................................................................................3

18 U.S.C. §3742..................................................................................3

28 U.S.C. §1291..................................................................................3

## Rules and Guidelines

Fed.R.Crim.P. 7 .................................................................29, 36, 37, 38, 41

Fed.R.Crim.P. 16 ......................................................................91, 93, 94

Fed.R.Evid. 403 ...............................................................................59, 93

Fed.R.Evid. 702 ...............................................................................93, 96

Fed.R.Evid. 703 ......................................................................................96

USSG §2A1.1 .........................................................................................100

USSG §2A4.1 ...............................................................................100, 102

## Articles

Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4. Harv. L. & Pol. Rev. 149, 149 (2010) .......................85, 87, 88

Gary Blasi, *Advocacy Against the Stereotype*, 49 UCLA L. Rev. 1241, 1243 (2002).................................................................................................86, 87

Sean Phillip Cotter and Laurel Sweet, *Prosecutor files federal charges against Louis Coleman III in death of Jassy Correia*, available at https://www.bostonherald.com/2019/03/03/prosecutors-coleman-charged-federally-in-jassy-correias-death/ .....................................34, 35

Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias: Scientific Foundations*, 94 Cal. L. Rev. 945, 951 (2006).......................................85, 86

Elizabeth Hinton, et al., *An Unjust Burden*, Vera Evidence Brief (May 2018), available at https://www.vera.org/downloads/publications/for-the-record-unjust-burden-racial-disparities.pdf .............................81, 82

Jerry Kang & Kristen Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. Rev. 465, 473 (2010)....................................85, 86, 87

The Honorable Cherron Payne, *All Cases Matter: Mitigating Bias in the Administrative Law Judiciary*, 43 J.Nat'l Ass'n Admin.L.Jud. 1 (2023)...........................................................................................................86

Anna Roberts, *Victims, Right?*, 42 Cardozo L.Rev. 1449 (2021)......................79

Angela Onwuachi-Willig, *Roberts's Revision: A Narratological Reading of the Affirmative Action Cases*, 137 Harv.L.Rev. 192, 197 (2023).....................86

**Implicit Bias Videos**

https://www.wawd.uscourts.gov/jury/unconscious-bias ..............83, 88, 89

https://www.youtube.com/watch?v=ge7i60GuNRg...............................83, 89

https://www.courts.oregon.gov/how/Pages/jury.aspx..............................83

https://www.cand.uscourts.gov/attorneys/unconscious-bias-video-for-potential-jurors/ ..........................................................................................83

**Other**

*Merriam-Webster*, available at https://www.merriam-webster.com/dictionary/inveigle..........................................................74

## INTRODUCTION[1]

Louis Coleman met Jassy Correia outside a Boston club in the early morning on February 24, 2019. Videos showed them walking to his car and her getting in willingly. JA.VIII.1.21-1.26, 9.15-9.23. Two hours later, videos showed him returning to his apartment in Rhode Island and carrying her body inside. JA.VIII.11.01-11.15.

The government did not charge Coleman with homicide. JA.I.63-64. It charged him with kidnapping resulting in death, requiring it to prove, inter alia, that Coleman inveigled or decoyed Correia, held her against her will for an appreciable period, and did so to get some benefit. *Id.*; 18 U.S.C. §1201(a)(1). This charging decision gave the two unrecorded hours between their meeting and his return to his building critical importance. There was evidence that Coleman and Correia had sexual intercourse and an altercation resulting in her death. JA.IV.2312-13, 2332-36. There was no

---

[1] Citations are as follows: JA.X and SA.X refer to volume X of the joint appendix and sealed appendix; Add. and S.Add. to the addendum and sealed addendum; and DE to a district court docket entry. JA.VIII and SA.IV contain audio and video media; the citations in these volumes correspond to exhibit numbers as listed on the drives.

evidence of what Coleman and Correia said, whether the intercourse was consensual, or where or why the struggle occurred.

The indictment recited the elements of kidnapping without particularizing the seizure, holding, or purpose elements. JA.I.63-64. The government filled this void with allegations that were not presented to the grand jury; that Coleman lured Correia to his car to sexually assault her, did so, and killed her when she struggled. JA.IV.2312-15. Coleman was prevented from adequately presenting his theory of defense, which is discussed in the Sealed Supplemental Brief. He argued that Correia accompanied him willingly, had consensual sex with him, and died when "a sudden and unexpected argument" she initiated turned violent. JA.IV.2326-27. He did not contest that he caused her death. *Id.* Even if the government could have proved homicide, it did not establish kidnapping. Coleman was convicted and sentenced to life imprisonment without the possibility of parole. Add.125-26.

Many of the errors fall into four categories. First, Coleman was convicted based on allegations that were not presented to the grand jury, and the indictment was insufficient. Second, the court made erroneous rulings related to the government's case. Third, the court prevented

Coleman from adequately presenting his theory of defense. Fourth, the court rebuffed Coleman's efforts to make explicit the potential impact of racial bias on his conduct and the judicial process. Each of the errors detailed below requires reversal. This conclusion is strengthened when the errors are considered cumulatively.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231, which grants the district courts exclusive jurisdiction over all federal offenses.

This Court has jurisdiction pursuant to 28 U.S.C. §1291, which confers jurisdiction to review final district court decisions, and 18 U.S.C. §3742, which provides jurisdiction to review a sentence.

The court entered judgment on November 4, 2022, and a timely notice of appeal was filed on November 10, 2022.[2] JA.VII.4257-58.

---

[2] The court entered a restitution order on March 16, 2023, and amended the judgment on March 31, 2023, and April 6, 2023. Coleman filed notices of appeal on March 30, 2023, March 31, 2023, and April 8, 2023. JA.VII.4259-61.

## ISSUES PRESENTED FOR REVIEW

1. Whether admitting evidence of sexual assault to fulfill the purpose element of kidnapping violated the Fifth Amendment presentment clause where these allegations were not submitted to the grand jury?

2. Whether the indictment was constitutionally insufficient and the court erred by not dismissing it or ordering a bill of particulars?

3. Whether the court erroneously concluded that warrant applications for media devices and accounts provided probable cause to believe that a kidnapping occurred and that evidence would be found in these locations?

4. Whether the court erroneously denied a mistrial after the medical examiner gave unnoticed, unreliable, and prejudicial testimony?

5. Whether the court erroneously permitted the use of the term "sexual assault" where there was no direct evidence of an assault and the facts were contested?

6. Whether the court erroneously admitted prejudicial testimony about Correia's plans after February 24th?

7. Whether the government presented sufficient evidence to establish the elements of kidnapping?

8. See the sealed supplemental brief.

9. See the sealed supplemental brief.

10. Whether the court erroneously denied Coleman's requested jury instructions?

11. Whether, in this trial of a Black man whose defense raised issues of race, the court erred by not educating the jury about implicit bias?

12. Whether the court improperly excluded testimony from an academic explaining research into the impact of negative encounters with police on Black men?

13. Whether the court improperly calculated the guidelines by applying a cross-reference based on a finding that the conduct constituted first-degree murder?

14. Whether these errors, taken cumulatively, require reversal?

## STATEMENT OF THE CASE

**I.      Overview.**

In February 2019, Louis Coleman was a 32-year-old Raytheon engineer living in Providence, Rhode Island. JA.III.1303-13. He had been sick, but felt better and decided to go out in Boston on the 23rd. JA.III.1312-13; JA.VI.3418-19. He texted friends, but when no one could come, he went

alone. JA.III.1780-84. He arrived in Boston around 1:00am on the 24th, parked his car, and went to Club Venu. JA.VIII.009.01-009.06.

At Venu, Coleman met Lorna Horace, who was there celebrating her birthday. JA.VI.3389-90; JA.VIII.71.1-71.8. Horace led Coleman around by the hand; they danced, kissed, and exchanged truthful personal information. *Id*. When the club closed, Horace's brother and his friend told Coleman it was time for her to leave. JA.III.1701-06, 1713-16. Coleman agreed, was not violent or threatening, and he and Horace continued to exchange text messages. *Id*.; JA.VI.3285-90.

Jassy Correia was also celebrating her birthday at Venu that night with three friends, Yvania Mondesir, Aja Hiltz, and Reginald Thomas. JA.II.872-73, 964; JA.III.1250-52. At Venu, they shared champagne, took some shots, and danced. JA.II.877-79, 969-70; JA.III.1254-55. At some point, Mondesir and Correia began to fight. JA.II.886-87. Outside, after Venu had closed, Correia took off her shoes and told Hiltz "F this, I'm going to fight [Mondesir]." JA.II.948. Correia and Mondesir had a physical altercation that attracted onlookers. JA.II.895-97, 926-28. Hiltz and Thomas left. JA.II.928-30, 974. Mondesir walked away. JA.VIII.1.20. Correia was left with no jacket and no shoes in the cold on the street. *Id.*

6

Correia approached an Uber, banged on the window, and threatened to call the police, but the driver would not let her in. *Id.*; JA.II.1116-20. Finding the door open, Correia got in. *Id.* The driver pushed her out onto the pavement. *Id.* Correia got up, yelled at the driver, and threw something at the car as onlookers watched. *Id.* After the driver ejected her, Coleman approached her. *Id.* This is when Coleman and Correia met for the first time. JA.VIII.1.20.

After some conversation, Correia walked away with Coleman. *Id.* They walked five blocks to Coleman's car. JA.VIII.1.21-1.26, 9.15-9.23. After walking some distance without shoes, Correia jumped on Coleman's back and rode piggyback. *Id.* When they reached his car, she slid off and got in the passenger door while he got in the driver's side. *Id.* Coleman began driving. *Id.* He parked a short distance away on Tremont Street for approximately 12 minutes before driving on. JA.II.835, JA.III.1808, JA.IV.2311, JA.VIII.9.24. He arrived at his apartment in Providence around 4:00am. JA.VIII.11.01-11.15. He walked to and from his car a few times before taking Correia's body out of his car and carrying it inside. *Id.*

Correia's father and Mondesir reported her missing on February 26th. JA.III.1261-62. Surveillance videos led officers to Coleman. JA.II.1012-

7

30. Officers found his apartment vacant on February 28th. JA.II.1132-36.

Building surveillance videos showed Coleman bringing Correia's body into

the building on the 24th and a suitcase on the 27th. JA.II.1164-98; JA.VIII.11,

14, 15, 20, 21. The suitcase appeared to be heavy when he put it in his trunk

on the 28th. *Id.*

After finding video showing Coleman's license plate number, officers

had OnStar activate the car's tracking device. JA.III.1358-65. OnStar

tracking placed the car in Delaware. *Id.* Around 2pm on the 28th, the

Delaware State Police pulled Coleman over. JA.III.1367-75. Coleman

complied and followed instructions. *Id.*, JA.III.1379, 1381-85, 1554-57. He

told officers she was dead and in the trunk. JA.III.1377, 1548. He said that

injuries to his face were from "the girl." JA.III.1574-75. There was a suitcase

in the trunk containing Correia's body. JA.III.1563-66. An autopsy

determined that Correia died by strangulation. JA.III.1443, 1463. She had

alcohol, cocaine, and THC in her system. JA.III.1459; JA.IV.2090-98. There

were no signs of sexual assault during the autopsy, but later DNA analysis

found Coleman's semen in Correia's vagina and his DNA in her rectum.

JA.III.1457-58, 1482, 1485, 1493, 1930-32.

8

## II.    Trial.

The grand jury returned an indictment charging Coleman with kidnapping resulting in death in violation of 18 U.S.C. §1201(a)(1) on April 4, 2019. JA.I.63-64. This charge carries the possibility of the death penalty or life imprisonment. §1201(a). On November 4, 2021, the government gave notice that it would not seek the death penalty. DE163.

The parties filed pretrial motions, some of which form the basis for appellate claims and are discussed below.

In opening, the government argued that Coleman "lured [Correia] into his car, confined her there, sexually assaulted her, strangled her to death, and transported her across state lines into Rhode Island, all against her will." JA.II.846. Coleman reminded the jury that he was charged with kidnapping, not murder, manslaughter, or rape. JA.II.852. He explained that he caused Correia's death during an altercation but argued he did not kidnap her. JA.II.853. He said he approached Correia to help, she joined him voluntarily, and his behavior was not consistent with a planned kidnapping. JA.II.861-63, 867.

A.    **Government case.**

Hiltz, Thomas, and Mondesir, the friends who went to Venu with

Correia, testified. Correia spent the 23rd with Mondesir. JA.III.1250-52,

1268-72. They went shopping and may have smoked some marijuana. *Id.*

Correia planned to go out with Hiltz and Thomas that night. JA.II.872-73,

964-66; JA.III.1250-52. After a miscommunication about directions, Hiltz

and Thomas arrived at Mondesir's house. *Id.* Mondesir did not know Hiltz

or Thomas but decided to join them. JA.II.872-73, 967; JA.III.1251. Hiltz left

a gift and balloons for Correia at Mondesir's house. JA.II.873-74;

JA.III.1252-53.

Thomas drove everyone to Boston. JA.II.874-75. At Venu, they shared

a bottle of champagne, took some shots, and danced. JA.II.877-79, 969-70.

Mondesir did not remember anything after this. JA.III.1255-58. Hiltz

explained that Mondesir became agitated, yelled, and acted aggressively

toward Correia. JA.II.886-87. Thomas said their dispute escalated to an

"intense argument." JA.II.971-79. Before leaving, Correia gave the

bartender the finger. JA.II.946-47, 988-90. As the club was closing,

Mondesir pushed Correia down. JA.II.888-91, 947. Correia told Hiltz "F

this, I'm going to fight [Mondesir]." JA.II.948. Correia and Mondesir

continued to fight outside, Mondesir pushed Correia repeatedly, and Correia kicked off her shoes and backed Mondesir against the wall. JA.II.893-97, 947-57; JA.VIII.1.17. After a few minutes, Hiltz and Thomas left, abandoning plans to take Correia to Mondesir's house. JA.II.928-30, 952-53, 974. Mondesir also walked away. JA.VIII.1.20. None of them saw Coleman that night. JA.II.953, 980-81.

Tamer Alquasir was driving an Uber on the 24th. JA.II.1116-20; JA.VIII.1.20. Correia approached, said she wanted an Uber, and tried to get in. *Id.* When he rolled down his window and told her no, she tried to force it down and said she would call the police if he closed it. *Id*. He said he would call the police. *Id*. He put the car in park, the doors unlocked, and Correia got in. *Id.* Alquasir pushed her out. *Id.* Correia fell and threw snow at the car. *Id*. Alquasir saw a man approach her and say that it was not her Uber. *Id*. The man seemed calm and helpful. JA.II.1130. Correia walked away with him. *Id.*

Hiltz testified that Correia had bipolar disorder, did not like her prescribed medication, and used marijuana instead. JA.II.958-60. Coleman was precluded from asking Hiltz and Mondesir questions about Correia

11

that supported his theory of defense. SA.I.323-42, 348-52. This evidence is discussed in the sealed supplemental brief.

Loveth Anumele, an employee of the shelter where Correia lived, gave Correia a pass to be away until 5pm on the 24th. JA.II.998-1000. Correia planned to meet with Anumele on the 25th, and said her daughter was staying with her grandmother over the weekend. *Id*. Correia's daughter's grandmother picked up Correia's daughter on the 22nd. JA.II.1005-06. They had no plan as to when Correia would get her daughter. *Id.* Correia's manager said she was scheduled to work on February 25th. JA.II.1007. Correia's father and Mondesir reported her missing. JA.III.1261-62.

Ismael Henriquez, a Boston Police Department (BPD) detective, took the report of Correia's disappearance. JA.II.1009-11. He described videos officers gathered from the 24th. JA.II.1012-58, 1074-114. Officers followed Coleman's movements and got his identification. JA.II.1012-30. Videos showed Coleman's car leave, park on Tremont for a short time, turn onto a one-way street (Aguadilla), reverse back up Aguadilla which was blocked by police cars, and get onto the highway. JA.II.1052-58; JA.VIII.9.24, 9.25.

12

The Providence Police Department (PPD) and BPD investigated at

Coleman's apartment. When officers got there and banged on the door, it

opened. JA.II.1132-36. There was no one in the apartment, the windows

were open, it smelled like cleaning solution, and the shower curtain and

some pillow covers were missing. *Id*. The apartment was clean, and the

search team did not look for trace evidence or believe that a struggle took

place there. JA.II.1213-15. Officers reviewed videos from in and around the

building, including footage of Coleman carrying Correia's body inside,

taking items, including a suitcase, in and out, and eventually rolling that

suitcase out and putting it in the trunk. JA.II.1147-51, 1159-98. One officer

noted visible cracks in Coleman's windshield in these videos. JA.II.1169.

Officers searched nearby dumpsters and found items including jeans, a

belt, a Tyvek suit, plastic sheeting, duct tape, bandaids, face masks, odor

eliminators, goggles, and a baking soda box. JA.II.1200-07. Officers

collected receipts, videos, and photos showing that Coleman bought

pelletized limestone, candles, Tyvek suits, a surgical mask, goggles, tape,

three boxes of baking soda, a hand truck, a suitcase, a gas can, and cleaning

items. JA.II.1218-28. An FBI forensic accountant's review of Coleman's

financial records showed purchases at Venu, purchases of the items

13

described above, and deposits from Fidelity on the 27th and 28th. JA.IV.1317-49.

A BPD sergeant detective testified about the efforts to find Coleman. Officers asked T-Mobile to "ping" Coleman's phone, but the results yielded limited location information. JA.III.1354. When officers got Coleman's license plate number, they had OnStar activate the car's GPS, which indicated that Coleman was in Delaware. JA.III.1358-65.

Soon after, the Delaware State Police (DSP) stopped Coleman's car. JA.III.1367-75. Coleman pulled over before the trooper activated his lights and was compliant. *Id.*; JA.III.1379, 1381-85, 1554-57. When asked if anyone else was in the car, Coleman said she was dead and in the trunk. JA.III.1377, 1547-48. Officers found Correia's body inside the suitcase. JA.III.1563-66. Officers gathered Coleman's clothes and belongings, took samples, and documented his injuries. JA.II.1570-71, 1581-95. When asked about the injury on his face, Coleman responded that it was "from the girl." JA.III.1574-75. Coleman was cooperative throughout. JA.III.1554, 1571, 1590, 1594, 1647-48.

Roger Cresto, a DSP crime scene investigator, photographed and searched Coleman's car. JA.III.1597-614. The things he found included a

cell phone, computer tower, gas can, charcoal, lighter, air fresheners, ski mask, duffle bag, gloves, pliers, hedge clippers, and a flashlight. *Id.* He took DNA swabs inside the car. JA.III.1626-28. An FBI agent measured and photographed Coleman's car. JA.III.1649-60. He observed that if the car was locked, pulling the interior, passenger-side handle once unlocked it and twice opened the door. JA.III.1654-55, 1663-64. The passenger door had functional controls to lock and unlock the doors. JA.III.1663.

Jennie Vershvovsky, a medical examiner in Delaware, conducted the autopsy. She determined that Correia died from strangulation. JA.III.1443, 1463. She opined that unconsciousness would result after 20-30 seconds of strangulation, brain injury after a minute, and death sometime after that. JA.III.1450-51.  She observed abrasions and contusions on Correia's head and body. JA.III.1437-43, 1451-56. Some of these injuries were postmortem, and some could have resulted from falls at Venu. JA.III.1491-93. She did not find any injuries to Correia's internal or external genitalia. JA.III.1457-58, 1493. She did not find sperm or semen. JA.III.1482, 1485.  She collected a sexual assault kit and toxicology samples. JA.1422-27, 1458-59. She opined that Coleman's injuries could be consistent with scratches and bite marks. JA.III.1498-1501.

Vershvovsky unexpectedly stated that Corria was "intoxicated but alive" when Coleman carried her into his building because she did not see injuries on Correia's body in the videos. JA.III.1462-63. The court overruled Coleman's contemporaneous objection. *Id*. Before cross-examination, counsel explained that this opinion was inconsistent with the expert disclosure that said she would testify that she could not tell when Correia died. JA.III.1467-72. The court denied a motion for mistrial, but instructed the jury to disregard Vershvovsky's testimony about whether Correia was alive when Coleman carried her into the building. JA.III.1471-72.

Two chemists and the chief forensic toxicologist in Delaware said Correia's toxicology tests were positive for alcohol, cocaine, and THC. JA.III.1691-93; JA.IV.1893-1908.

An FBI agent who examined Coleman's computer tower described searches made after the 24th for, inter alia: hardship withdrawals from a Fidelity account, renter's insurance and front door damage, air fresheners, sanitizing products, IPVanish, IRS audits, turkey basters, RV parks, how to pull a tooth that is not loose, embalming, TOR, and whether a person can fit in a suitcase. JA.III.1738-60.

16

An FBI forensic examiner who searched Coleman's cellphone described texts, including messages: between Coleman and Horace; to Coleman's mother on February 24th asking to borrow $150; with friends and family on the 27th and 28th in which Coleman said he was going to be in Washington D.C. that weekend; and from the 23rd asking people to come to Boston with him. JA.III.1768-84.

An FBI agent performed a historic cell site analysis of Coleman and Correia's cellphones. JA.III.1787-1800. This data showed that Coleman's phone was near Venu between 12:52am and 2:10am. JA.III.1799-800. It indicated that Coleman and Correia moved toward his parked car between 2:16am and 2:25am. JA.III.1802-04. The car moved before stopping between 2:32 and 2:44am. JA.III.1804-09. The car then got on 93 going toward 95 south. JA.III.1809-12. It turned north for a few minutes at 3:17am before traveling to Rhode Island. *Id*. In the following days, the data showed Coleman going from his apartment to stores and carwashes. JA.IV.1847-55.

An FBI forensic examiner testified that DNA testing revealed semen and DNA consistent with Coleman on the vaginal swab. JA.IV.1930-32. It showed DNA consistent with Coleman, but no semen, on the rectal swab. *Id*. The oral swab contained only Correia's DNA. JA.IV.1923. There was

17

DNA consistent with Coleman and Correia on the inside of the passenger windshield and door. JA.IV.1932-34. Scrapings from Correia's fingernails contained DNA consistent with Coleman. JA.IV.1940-41. Only Coleman's DNA was found in his fingernail scrapings. *Id*.

Coleman's next-door neighbor heard banging and a door slam early on the 24th. JA.III.1295-99. She heard banging and a sound like "something was being dragged across the floor" early on the 28th. JA.III.1299-1300. That week she noticed a faint smell that faded when she opened her windows. JA.III.1300.

Coleman's supervisor described his work at Raytheon. JA.III.1308-11. On February 19th, Coleman emailed to say he would be out sick. JA.III.1305. On February 25th, Coleman said he was still sick and would be out for a few days. JA.III.1305-07.

Ednel Horace was the brother of the woman, Lorna Horace, Coleman met at Venu. JA.III.1695-1702. He saw Coleman and his sister dancing and talking during the night. *Id*. As the club closed, he decided it was time to go and separated Coleman and his sister. JA.III.1702-07, 1713-16. Coleman agreed and was not violent or threatening. JA.III.1715. The parties stipulated that: videos and messages accurately reflected Coleman's

contact with Lorna Horace; she led him through the club; they kissed; and

he gave her truthful personal information. JA.III.1717-19; JA.VI.3389-90.

The property manager who rented Coleman his apartment testified

about socializing with him. JA.III.1720-31. She described Coleman as

friendly and had never seen him behave inappropriately. JA.III.1730-31.

Coleman filed a Rule 29 motion at the close of the government's case.

JA.III.1814-15, JA.IV.1949-50. The court denied this motion. JA.IV.1950-53.

He renewed this motion after the close of the evidence, and the court

denied it without comment. JA.IV.2271, 2297.

### B.    Defense case.

A defense investigator discussed additional videos from the 24th.

JA.IV.1960-68, 2032-38. She described records and video documenting

police officers assaulting Coleman in 2013. JA.IV.1968-74, 2020-22;

JA.VI.3392-3417, 3430-40; JA.VIII.101. After arresting Coleman for public

intoxication and urination, officers took him to a detoxification center. *Id.*

During check-in, Coleman repeatedly reached for his cellphone on a

counter before officers pulled him to the ground and began to hit him. *Id.*

Hospital records documented his injuries. JA.IV.2022-22; JA.VI.3392-3417.

The investigator read from records showing that Correia suffered from

substance abuse, depression, anxiety, bipolar disorder, and was not consistent with medication. JA.IV.2022-32. She added some data points to the cell-site map that suggested that Coleman did not drive directly to Providence. JA.IV.2044-54. She photographed damage to the exterior body of his car and marks on the interior roof. JA.IV.2054-62; JA.VI.3441-64.

A forensic toxicologist explained that Correia's toxicology results showed cocaine, alcohol, and past marijuana use. JA.IV.2089-97. He described the effects of these substances, noting that combining alcohol and cocaine can cause violence, paranoia, extreme strength, and increased homicidal ideation. *Id*. He hypothesized that Correia ingested a recreational amount of cocaine one to five hours (most likely two to three hours) before her death. JA.IV.2097-99.

Midtrial, the court decided to permit Mondesir to testify that Correia "engaged in acts of prostitution as needed." JA.IV.2003-06; SA.III.1400-01. Coleman recalled Mondesir. JA.IV.2117-26, 2215-66; SA.III.1420-33. She told the jury that Coleman's questions had "nothing to do with nothing" because "he killed her." JA.IV.2118. When counsel asked "Was [Correia] working as a prostitute on the days immediately before she died?" Mondesir responded "Are you kidding me?" and asked Coleman "What

20

the fuck you looking at." JA.IV.2118-19. Counsel repeated the question. JA.IV.2119. Mondesir responded "No." *Id*. Mondesir gave nonresponsive answers, spoke over the court, described her trauma, and said the question "has nothing to do with why she's dead." JA.IV.2119-20. The court instructed counsel to "wrap this up." JA.IV.2120. Mondesir stated: "Yes. Hurry up. Don't ask me anything stupid, please." *Id.* Counsel asked: "Did you tell Detective Schroeder in your interview on March 1 of 2019 that Jassy was working as a prostitute on an as-needed basis, mostly on the weekends?" *Id*. Mondesir responded "I plead the Fifth," and her examination ended. *Id.* The government declined the opportunity to cross-examine her. *Id.*

The court instructed that Mondesir's prior statement could be used to assess her credibility, but could not be considered for its truth. JA.IV.2120-21. Coleman objected to the court's instruction, offered the statement under Rule 807, and renewed his motion for a mistrial. JA.IV.2121-22; SA.III.1408-18. The court denied both motions. JA.IV.2215-26; SA.III.1420-33. The court excluded evidence related to Correia that is discussed in the sealed supplemental brief.

## C.    Closings, instructions, verdict, and sentencing.

In closing, the government argued that Coleman decoyed and inveigled Correia on Tremont Street. JA.VI.2311. It said Correia fell "into [Coleman's] lap" after he was "shut down" from "getting together with Lorna Horace." JA.IV.2306-08. It argued that Correia wanted to go home and Coleman "wanted to have sex." JA.IV.2308-10. It argued that Correia was held against her will because Coleman must have lied and said he would take her home. *Id*. It said "the holding or detention began at the same time as the inveigling and decoying." JA.IV.2311. It argued that the detention took a different form—force, threats, or coercion—during the 12 minutes the car was parked on Tremont. JA.IV.2311-13. It asserted that the windshield cracks showed that Correia kicked the windshield and that the DNA on the inside passenger door showed "a struggle over her getting out of the car." *Id*. It described Coleman's semen in Correia's vagina and his DNA in her rectum as "consistent with there being a sexual assault there in the car." JA.IV.2313. It described this struggle, assault, and Correia's death as taking "a significant period of time." JA.IV.2314-15. It said this timeline was corroborated by Coleman backing up on Aguadilla Street when he saw police cars. JA.IV.2315.

22

It noted that the interstate-commerce element could be satisfied if
Correia was moved after she died, and she had been in Massachusetts and
Rhode Island. JA.IV.2319. It argued that there was evidence that Coleman
acted knowingly and willfully because he strangled her to death.
JA.IV.2319-20. It said the evidence of Coleman's actions after Correia died
showed consciousness of guilt. JA.IV.2320-24.

The defense closing did not contest that Coleman's actions caused
Correia's death, but argued that he did not kidnap her. JA.IV.2326-27. It
argued that Correia went with Coleman willingly, they had consensual sex,
and Correia's death resulted from "a sudden and unexpected argument"
that "turned violent." JA.IV.2326. It argued that Coleman's actions after
Correia's death showed fear, panic, and distrust of police, not
consciousness of guilt. JA.IV.2328-31. It highlighted the two-hour gap that
the government could not fill. JA.IV.2331-32. It noted that despite evidence
of a violent struggle, there were no injuries to Correia's genitalia,
suggesting consensual sex. JA.IV.2334-35. It said that while video showed
Coleman's car parked for 12 minutes on Tremont, it did not show it
moving, shaking, or the windshield cracking. JA.IV.2335. It argued that
Correia started the fight. JA.IV.2335-38. It noted that Coleman did not drive

23

Correia to a remote area and that his two-hour drive from Boston to Providence showed confusion, not a planned attack. JA.IV.2338-39. It contrasted Coleman's normal behavior that night with Correia's erratic and violent actions. JA.IV.2342-55. It noted that Correia's "original plan had gone out the window" before she met Coleman. JA.IV.2348-49.

After closings, the court instructed the jury. JA.IV.2364-86. Coleman reiterated his objections to the instructions, and the jury retired to deliberate. JA.IV.2386-96. It returned a guilty verdict the next day. JA.IV.2412.

At sentencing, the court imposed the sentence required by the statute: life imprisonment without the possibility of parole. Add.125-26.

## SUMMARY OF ARGUMENT

This case began with a broad, vague indictment that allowed the government to pursue any theory, whether presented to the grand jury or not. JA.I.63-66. For example, it did not specify what ransom, reward, or other benefit Coleman sought. *Id.* At trial, the government argued that Coleman sexually assaulted Correia for sexual gratification. JA.II.846; JA.IV.2309-13. These allegations could not plausibly have been presented to the grand jury because the government did not have evidence of sexual

24

assault when the indictment was returned. The reliance on allegations not ratified by the grand jury to satisfy a core element of the offense violated the Fifth Amendment presentment clause. The vague indictment violated Coleman's constitutional rights, impaired his trial preparation, and permitted the government to proceed on any theory. The court erroneously denied a motion to dismiss or for a bill of particulars. (Arg.I.)

The indictment errors repeated in warrant applications for Coleman's electronics and related accounts. JA.I.67-243. These applications did not provide probable cause to believe that a kidnapping occurred or that the evidence sought would be found in the devices or accounts. (Arg.II.)

The court made a variety of errors related to the government's case. The indictment gave no details as to when, where, or how Correia died. JA.I.63-66. The government's opening argued that Coleman strangled Correia in his car before driving to his apartment. JA.II.846. The medical examiner unexpectedly testified that she believed Correia was alive at Coleman's apartment. JA.III.1462-63. The court wrongly denied a motion for a mistrial based on this prejudicial and unreliable testimony. JA.III.1467-72. (Arg.III.A.) The indictment did not reference sexual intercourse. JA.I.63-66. There was no direct evidence of whether the

intercourse was consensual. The court erroneously permitted the government to use the term "sexual assault," which assumed critical facts relevant to the purpose element. (Arg.III.B.) The court erroneously admitted testimony from Correia's child's grandmother and a shelter employee about Correia's plans after the 24th. JA.II.998-1006. Their testimony was more prejudicial than probative. (Arg.III.C.) Ultimately, the evidence was insufficient to sustain a kidnapping conviction. (Arg.IV.)

The court violated Coleman's constitutional rights by preventing him from adequately presenting his theory of defense. Two related issues are discussed in the sealed supplemental brief. (Args.V.A.&B.) The court erroneously failed to give Coleman's requested jury instructions, which sought to present his theory of defense and to mitigate errors. (Arg.V.C.).

Coleman, a Black man, was convicted by a jury with no Black jurors. JA.IV.2402. The government argued that Coleman's efforts to conceal Correia's death showed consciousness of guilt. JA.IV.2320-24. Coleman countered that his behavior was explained by his fear of police; he was assaulted by officers in 2013. JA.IV.2328-31. Coleman sought to bring the potential impact of race on his case to light in two ways. He asked the court to show potential jurors a video explaining implicit bias to mitigate its

harm. JA.I.403-14, 534; Add.17-22. He offered testimony from an academic about published, peer-reviewed research documenting the impact of negative police encounters on Black men. JA.I.457-65; JA.IV.1839-41, 1981-91; SA.I.110-56, 221-30. The court erroneously failed to educate prospective jurors about implicit bias and excluded this expert testimony, incorrectly labeling these efforts as contradictory and offensively race-based. Add.17-22; JA.IV.1988-91; SA.I.282-84. (Arg.VI.)

The court miscalculated the guidelines by applying a cross-reference based on its erroneous conclusion that the circumstances of this case amounted to first-degree murder. Add.121-24. This issue is raised for preservation. (Arg.VII.)

Even if these errors do not require reversal individually, their cumulative impact does. These interconnected errors occurred throughout the case, and the government's circumstantial case that Coleman committed *kidnapping* was far from overwhelming. (Arg.VIII.)

# ARGUMENT

I.    **Coleman was convicted based on allegations that were not presented to the grand jury, and the indictment was constitutionally insufficient.**

The indictment stated:

> On or about February 24, 2019, in the District of Massachusetts, and elsewhere, the defendant, LOUIS D. COLEMAN, III, did unlawfully seize, confine, inveigle, decoy, kidnap, abduct, and carry away and hold, for ransom and reward and otherwise, Jassy Correia, when Ms. Correia was willfully transported in interstate commerce, and when Louis D. Coleman, III traveled in interstate commerce in committing and in furtherance of the commission of offense, resulting in the death of Ms. Correia.
>
> All in violation of Title 18, United States Code, Section 1201(a)(1).

JA.I.63-66. Providing no additional information about the crime alleged, it allowed the government to pursue any theory, whether presented to the grand jury or not. *See Russell v. United States*, 369 U.S. 749, 766 (1962). The court erroneously denied Coleman's motions to preclude evidence of sexual assault that was not presented to the grand jury, to dismiss, and for a bill of particulars.

## A.    The purposes of an indictment.

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury…."

U.S.Const.Amend.V. Indictments also protect citizens from double

jeopardy and satisfy the Sixth Amendment's notice requirement. *Stirone v.*

*United States*, 361 U.S. 212, 218 (1960); *Russell*, 369 U.S. at 763-64. This Court

explained:

> "[A] court cannot permit a defendant to be tried on charges that are
> not made in the indictment against him." To do otherwise would fail
> "to preserve the defendant's Fifth Amendment right to indictment by
> grand jury, to prevent re-prosecution for the same offense in
> violation of the Sixth Amendment, and to protect the defendant's
> Sixth Amendment right to be informed of the charges against him."

*United States v. Rodríguez-Rodríguez*, 663 F.3d 53, 58 (1st Cir. 2011) (quoting

*Stirone*, 361 U.S. at 217 and *United States v. Brandao*, 539 F.3d 44, 57 (1st Cir.

2008)); *see also United States v. Hitt*, 249 F.3d 1010, 1015 (D.C. Cir. 2001);

*United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (indictment must

"contain some amount of factual particularity to ensure that the

prosecution will not fill in elements of its case with facts other than those

considered by the grand jury"); *Jeffers v. United States*, 392 F.2d 749, 752-53

(9th Cir. 1968).

An indictment "must be a plain, concise, and definite written

statement of the essential facts constituting the offense charged."

Fed.R.Crim.P.7(c)(1). It must "inform the court of the facts alleged, so that it

may decide whether they are sufficient in law to support a conviction…." *United States v. Cruikshank*, 92 U.S. 542 (1875). Inclusion of the statutory language is permissible but not always sufficient. *Hamling v. United States* 418 U.S. 87, 117 (1974); *Russell*, 369 U.S. at 765. If the statute uses broad terms, the indictment must "descend to the particulars" and provide "a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Russell*, 369 U.S. at 765 (internal citations and quotations omitted); *Cruikshank*, 92 U.S. at 558 ("A crime is made up of acts and intent; and these must be set forth in the indictment, with particularity of time, place, and circumstance.").

An indictment that uses broad statutory language without specific factual allegations is constitutionally insufficient. *See Russell*, 369 U.S. at 763-771; *United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir. 1970) (dismissing indictment accusing defendant of threatening unnamed person on particular day in particular city without specifying means); *United States v. Santa-Manzano*, 842 F.2d 1, 2-3 (1st Cir. 1988) (reversing as plain-error indictment that failed to identify what property was object of charged fraud); *United States v. Murphy*, 762 F.2d 1151, 1153-55 (1st Cir. 1985)

(dismissing on plain-error review indictment charging witness intimidation without specifying official proceeding); *United States v. Nance*, 533 F.2d 699, 701-703 (D.C. Cir. 1976) (dismissing indictment that did not specify false pretenses); *United States v. Cecil*, 608 F.2d 1294 (9th Cir. 1979) (dismissing indictment that tracked statutory language without facts or circumstances of conspiracy); *United States v. Trinastich*, 354 F. Supp. 54, 55 (W.D. Mo. 1973) (dismissing kidnapping indictment that stated victim was "unlawfully seized, confined, inveigled, decoyed, kidnapped, carried away and held…for reward or otherwise, that is for the purpose of sexual gratification"). Indictments must plead "the very core of criminality." *Russell*, 369 U.S. at 764; *see also United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) ("An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments.").

### B. The admission of evidence that Coleman kidnapped Correia for sexual gratification violated the Fifth Amendment's presentment clause.

This insufficient indictment permitted conviction based on "facts not found by, and perhaps not even presented to, the grand jury…." *Russell*, 369 U.S. at 770. Coleman moved to preclude evidence that he acted for sexual gratification because this allegation was not presented to the grand

31

jury. SA.I.99-109. The government responded that the indictment was "broad enough to include sexual gratification as one of the purposes of the holding." SA.I.231-32. It argued that there was "significant evidence" of a sexual motive and of sexual assault, but did not assert that this evidence was presented to the grand jury. SA.I.233-34; JA.IV.2183-84. The court concluded the presentment clause was not violated. S.Add.2.

    i. *Standard of review.*

  This claim is analogous to a pretrial motion raising a constructive amendment. "A constructive amendment occurs when the difference between the indictment and the proof at trial is so great that the defendant was essentially convicted of a charge for which he was not indicted…." *United States v. Rosario-Pérez*, 957 F.3d 277, 289-90 (1st Cir. 2020). "A constructive amendment is considered prejudicial *per se* and grounds for reversal of a conviction." *United States v. Fisher*, 3 F.3d 456, 463 (1st Cir. 1993). This Court reviews preserved constructive-amendment and constitutional claims de novo. *United States v. Bucci*, 525 F.3d 116, 131 (1st Cir. 2008); *United States v. Carta*, 592 F.3d 34, 42 (1st Cir. 2010). De novo review applies to this preserved claim. SA.I.99-109; JA.I.244-53, 1532-34, 2179-85.

ii.    *An accused can only be tried based on an indictment returned by a grand jury.*

The admission of evidence that Coleman sexually assaulted Correia violated the Fifth Amendment presentment clause. *See United States v. Hillie*, 227 F. Supp. 3d 57, 78 (D.D.C. 2017); *Rodríguez-Rodríguez*, 663 F.3d at 58; *United States v. Vizcarrondo-Casanova*, 763 F.3d 89, 99 (1st Cir. 2014) (explaining rule against constructive amendments protects presentment right); *United States v. Ward*, 747 F.3d 1184, 1189-92 (9th Cir. 2014) (finding constructive amendment where indictment named identity-theft victims, trial discussed named and unnamed victims, and instructions permitted conviction for theft of identity of unspecified "real person"); *Hitt*, 249 F.3d at 1015; *Pirro*, 212 F.3d at 93-94 ("[F]or an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime."); *Walsh*, 194 F.3d at 44; *Hunter v. State of New Mexico*, 916 F.3d 595, 598-600 (10th Cir. 1990); *Jeffers*, 392 F.2d at 752-53.

In *Murphy* and *Santa-Manzano*, this Court considered cases involving insufficient indictments where the trial evidence differed from what was

presented to the grand jury. The *Santa-Manzano* indictment did not "specify what property was the object of the charged scheme to defraud." 842 F.2d at 2-4. It alleged that the defendants sold fake certificates of deposit. *Id.* The trial evidence showed that they took money from the victim, failed to pay him in exchange, and used fake certificates of deposit to placate him. *Id.* In *Murphy*, the witness-tampering indictment gave the date of the offense and named the victim but did not specify the proceeding the defendants sought to influence. 762 F.3d at 1153-54. At trial the government "kept its options open" and argued that the defendants tried to influence the witness's testimony in either of two cases. *Id.* There was no way to tell "what official proceeding the grand jury had in mind." *Id.* This Court reversed both convictions on plain-error review. *Santa-Manzano*, 842 F.2d at 3; *Murphy*, 762 F.2d at 1155.

> iii.   *Allegations of sexual gratification and sexual assault were not presented to the grand jury.*

After Coleman's arrest, the then-U.S. Attorney said, "It does not appear Correia was sexually assaulted," Sean Phillip Cotter and Laurel Sweet, *Prosecutor files federal charges against Louis Coleman III in death of Jassy Correia*, available at

https://www.bostonherald.com/2019/03/03/prosecutors-coleman-charged-federally-in-jassy-correias-death/. The autopsy did not reveal genital injuries, sperm, semen, or other evidence of sexual assault. JA.III.1457-58, 1482, 1485, 1493. The indictment did not allege that Coleman sexually assaulted Correia or sought sexual gratification. JA.I.63-64.

At trial, the government argued that Coleman sexually assaulted Correia. JA.II.846; JA.IV.2309-13. It based this theory on evidence that semen and DNA consistent with Coleman were found in Correia's vagina and DNA consistent with him was found in her rectum. JA.IV.2309-13. This testing could not plausibly have been complete on April 4th at 11:30am when the grand jury returned the indictment. *See* JA.I.54. The sexual assault kit was collected in Delaware. JA.III.1422-27. A DSP evidence technician gave the sexual assault kit to an FBI agent in Delaware on April 4, 2019. JA.1630-31. The testing lab, located in Quantico, Virginia, received the DNA samples from the FBI Boston field office sometime in April. JA.IV.1916; JA.VI 3518. The samples could not realistically have traveled from Delaware to Boston to Quantico, been tested, and the results relayed to the grand jury before 11:30am on April 4th. *See also* JA.VI.3518 (stating DNA report dated August 14, 2019); DE65-1 at 3 (noting defense had not

35

received results as of October 5, 2019); DE65-2 at 3-4 (asserting DNA

analysis done but report not finalized on October 21, 2019); DE65-1 at 7

(indicating DNA report disclosed on November 8, 2019). This timeline

shows that evidence of sexual assault was not presented to the grand jury.

The government did not argue to the contrary. SA.I.231-38; JA.IV.2183-84.

> iv.   *The introduction of evidence of sexual gratification violated Coleman's constitutional rights.*

The indictment did not specify what ransom, reward, or other benefit

Coleman sought. The government did not present the theory that Coleman

sought sexual gratification to the grand jury. It nonetheless used

allegations of sexual assault to satisfy the purpose element at trial, making

them "essential facts" as contemplated by Rule 7(c)(1). This theory was not

ratified by the grand jury, and its use at trial violated Coleman's Fifth

Amendment rights. Coleman was "convicted on the basis of facts not

found by, and perhaps not even presented to, the grand jury which

indicted him." *Russell*, 369 U.S. at 770. The court's erroneous admission of

allegations not presented to the grand jury requires reversal of the

conviction and dismissal of the indictment.

**C.     The indictment was constitutionally insufficient. The court erroneously denied the motion to dismiss and the motion for a bill of particulars.**

Even apart from the question of what was presented to the grand jury, this indictment violated the Fifth and Sixth Amendments and Fed.R.Crim.P.7(c)(1). JA.I.244-53. Coleman asked the court to dismiss the indictment or to grant a bill of particulars. *Id.* The court denied both motions. JA.I.399-401. It held that the indictment gave "sufficient notice" because it identified the charge, date of the crime, place, and victim. *Id.*

The indictment left the government free to pursue almost any theory, whether or not presented to the grand jury. *See supra* Arg.I.B. It could have argued that Coleman seized, confined, inveigled, decoyed, kidnapped, abducted, or carried Correia away; that he held Correia in any manner for any appreciable period; and that he did so hoping for a reward, ransom, or another benefit. The government argued that Coleman should be ready to meet all these theories. JA.I.284. The indictment violated Coleman's constitutional rights to notice and double jeopardy and required dismissal or a bill of particulars.

i.    *Standard of review.*

"The sufficiency of an indictment is a question of law" that this Court reviews de novo. *United States v. Cameron*, 699 F.3d 621, 635 (1st Cir. 2012).

It reviews the denial of a motion for a bill of particulars for abuse of discretion. *United States v. Sepúlveda*, 15 F.3d 1161, 1192-93 (1st Cir. 1993). To prevail, Coleman must identify "a concrete instance of inability to prepare, untenable surprise, or other cognizable prejudice stemming from the trial court's refusal to mandate further particulars." *Id.* at 1193; *see also United States v. Nelson-Rodriguez*, 319 F.3d 12, 31 (1st Cir. 2003).

Coleman preserved these claims. JA.I.244-53, 310-18, 399-401. When the insufficiency of the indictment arose at trial, Coleman reasserted the issue. SA.I.99-109; JA.III.1532-34; JA.IV.2179-85.

ii.    *The indictment was constitutionally insufficient.*

This indictment violated the Fifth and Sixth Amendments and Rule 7(c)(1) by alleging broad statutory language without providing factual specificity. *See supra* Arg.I.A. Its omissions go to the core elements of kidnapping. Kidnapping entails "holding a kidnapped person for a proscribed purpose," which "necessarily implies an unlawful physical or mental restraint for an appreciable period." *Chatwin v United States* 326 U.S.

38

455, 460 (1946). The proscribed purpose includes any benefit to the accused.

*Gooch v. United States*, 297 U.S. 124, 128 (1936). This indictment provided no

specificity related to these elements. It did not describe how or when

Coleman seized, confined, inveigled, decoyed, kidnapped, abducted, or

carried away Correia. It did not allege how or when he held her

involuntarily for an appreciable period. It did not state what ransom,

reward, or other benefit he sought.

It is not sufficient that the indictment provided Correia's name, date,

and an indefinite location ("Massachusetts and elsewhere").[3] Unlike the

omitted elements, the time and place do not go to the core of the

kidnapping charge. *See Murphy*, 762 F.2d at 1153 (finding witness-

intimidation indictment naming victim and date insufficient because it did

not identify "official proceeding the grand jury had in mind or the

defendants must be prepared to meet"). This information did not enable

Coleman to foresee the government's theory sufficiently to adequately

prepare a defense or the court to evaluate the sufficiency of the allegations.

---

[3] For example, the indictment permitted conviction on the theory that
Correia died in Rhode Island. JA.IV.2187-88. ("It has never been clear to
[the court] what the government's theory was as to where she was killed
except there was a struggle in the car and the windshield was cracked….").

*See* JA.I.284 (government argued that "given that the means of committing the kidnapping are pleaded in the indictment in the conjunctive, the defendant is on notice that he must be prepared to defend against them all"). This Court has found indictments identifying the victim and time but lacking key factual specifications insufficient and plainly erroneous. *See supra* Arg.I.B.

The insufficient indictment caused problems at trial, including errors discussed here. It led to the violation of the presentment clause. *See supra* Arg.I.B. It left room for the medical examiner's prejudicial and unreliable testimony that Correia was alive when Coleman brought her into his apartment. *See Murphy*, 762 F.2d at 1154-55. *Cf.* JA.IV.2187-88. Had the indictment alleged when and how Coleman held Correia, he would have expected this testimony and been prepared to meet it, or it would not have been elicited. This highly prejudicial testimony required a mistrial. *See infra* Args.III.A&V.B.v.

This constitutionally insufficient indictment parroted broad statutory language without indicating how the government intended to prove the core elements or essential facts of the charge. *See Santa-Manzano*, 842 F.2d at 4; *Murphy*, 762 F.3d at 1153-55. It improperly left the government free to fill

40

these gaps with any theory as the case progressed. The court's erroneous decision to allow the case to proceed requires reversal of the conviction and dismissal of the indictment.

> iii.   *The court erroneously denied the motion for a bill of particulars.*

Coleman sought a bill of particulars in the event the court denied his motion to dismiss. JA.I.244-53. "[A] bill of particulars cannot save an invalid indictment." *Russell*, 369 U.S. at 770; *see also Murphy*, 762 F.2d at 1154. One should be granted "if the accused, in the absence of a more detailed specification, will be disabled from preparing a defense, caught by unfair surprise at trial, or hampered in seeking the shelter of the Double Jeopardy Clause." *Sepúlveda*, 15 F.3d at 1192-93; *see also United States v. Paiva*, 892 F.2d 148, 154 (1st Cir. 1989); Fed.R.Crim.P.7(f).

The court's denial of a bill of particulars caused unfair surprise and prejudice. *See supra* Arg.I.C.ii. Coleman faced trial without knowledge of the government's theory. The court abused its discretion by denying Coleman's motion for a bill of particulars, and reversal is necessary.

II.   **Warrant affidavits did not establish probable cause that a kidnapping occurred or that evidence would be found in the places to be searched.**

Coleman moved to suppress the fruits of warrants authorizing searches of his cellphone; records associated with the cellphone; Google records from his cellphone and email account; a laptop and computer tower; and a vehicle information module. JA.I.67-243. He argued that the affidavits did not provide "substantial factual bases" to support probable cause for kidnapping or to conclude that there was a nexus between this crime and the places to be searched. *Id.* For all nine warrants, "the issues are essentially the same and intertwine and overlap to a great extent." Add.6.

The court denied this motion. Add.6-15. Despite noting that the evidence of kidnapping was "circumstantial," it concluded that the "magistrate judge could have reasonably inferred" that Correia "was held for some period of time, even if relatively fleeting, against her will in the automobile." Add.7-8. It concluded that the magistrate "could have reasonably inferred…that there was a fair probability that the crime in question occurred." *Id.*

The court said these devices might contain: "GPS movements; text messages, e-mails or similar communications; photos or video; and Internet search information." *Id.* It stated that because Coleman had a phone when he was arrested, it was "an obvious and reasonable inference" that he had it during "the relevant times." *Id.* It held that "common sense and reasonable inferences" supported a conclusion that evidence of kidnapping could be found on the phone. Add.9-14. It noted that the nexus was particularly strong with connection to the computer tower because it was "not something that someone would normally take on a road trip." Add.13. The court held that even if the warrants were defective, officers relied on them in good faith. Add.14-15.

## A.    Standard of review.

"When reviewing the denial of a motion to suppress, [this Court] examine[s] the district court's 'factual findings for clear error and its legal conclusions, including its ultimate constitutional determinations, de novo.'" *United States v. Sheehan*, 70 F.4th 36, 43 (1st Cir. 2023) (quoting *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019)).

Warrants must be supported by probable cause. U.S.Const.Amend. IV. "[P]robable cause 'demands proof sufficient to support a fair

43

probability that a crime has been committed and that evidence of that crime is likely to be found within the objects to be searched.'" *Sheehan*, 70 F.4th at 44 (quoting *United States v. Coombs*, 857 F.3d 439, 446 (1st Cir. 2017)); *see also Steagald v. United States*, 451 U.S. 204, 213 (1981); *United States v. Simpkins*, 978 F.3d 1, 7 (1st Cir. 2020); *United States v. Roman*, 942 F.3d 43, 50 (1st Cir. 2019). While "probability is the touchstone" of probable cause, "suspicion, rumor, or strong reason to suspect wrongdoing are not sufficient." *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999). In "assessing whether such a finding is justified," this Court considers "the totality of the circumstances as they are set forth in the warrant application." *Id.*

### B. The warrant affidavits did not provide probable cause to believe that Coleman kidnapped Correia.

The "probable cause inquiry is shaped by the specific crime for which the police sought evidence." *Sheehan*, 70 F.4th at 45; *see also United States v. Cordero-Rosario*, 786 F.3d 64, 69 (1st Cir. 2015). These affidavits said the investigation concerned kidnapping resulting in death. JA.I.118-19. This offense requires proof that someone was: "unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away," and held for

"an appreciable period against the person's will" for ransom, reward, or other benefit. *Chatwin*, 326 U.S. at 459; *United States v. Acevedo*, 824 F.3d 179, 184 (1st Cir. 2016); *Gooch*, 297 U.S. at 128; JA.IV.2376-79.

These affidavits do not provide a substantial basis to conclude that there was probable cause supporting these elements. They describe a consensual encounter in which Coleman and Correia walked to and entered his car together. JA.I.110-11. They include no information about what happened between this encounter at 2:16am and Coleman's 4:15am arrival at his building. JA.I.110-16. They do not support the conclusion that Coleman seized Correia or that she was held against her will for an appreciable time. *Id.* The court cited Coleman's injuries, Correia's death, and a broken windshield as evidence that Correia was held. Add.7. None of these factors suffices. Correia's death and Coleman's injuries are evidence of a struggle. They do not suggest the nature of this fight or indicate a seizure or holding. The affidavit did not assert that the windshield was broken from the inside.[4] JA.I.116. Without this

---

[4] At trial, the government used evidence that Correia's DNA was found near the cracks in the windshield to suggest that it was broken from the inside. JA.IV.2312-13. This evidence had not been found at the time of the warrants. *See supra* Arg.I.B.

information, the cracks do not suggest that Correia was held in the car. Nor do the affidavits provide a substantial basis to conclude that Coleman held Correia to secure a benefit for himself.

The affidavits do not provide probable cause to support the elements of kidnapping. The magistrate judge did not have a substantial basis for issuing the warrants, and the fruits of these searches must be suppressed. *Wong Sun v. United States*, 371 U.S. 471 (1963).

### C.    Some of the warrant affidavits did not provide probable cause to believe that evidence of kidnapping would be found in the places to be searched.

Warrant affidavits must provide probable cause to believe that the "enumerated evidence of the offense will be found at the place to be searched." *Cordero-Rosario*, 786 F.3d at 69 (internal citation and quotations omitted). These affidavits did not provide probable cause to believe that evidence would be found on Coleman's cellphone, associated records, Google records, laptop, or computer tower.

The court noted that Coleman had this cellphone when he was arrested, making it fair to infer that he had it throughout. Add.8. However, there are no facts in the affidavit from which to infer that Coleman had *this* cellphone, or any cellphone, with him during the alleged crime. JA.110-16.

46

Nor are there facts suggesting that he used the laptop or computer tower in connection with it. *Id.* The affidavits made conclusory statements that the cellphone "was used to send or receive relevant e-mails or text messages; to set up or access relevant websites; and/or to communicate with witnesses" and the laptop and tower were used "to communicate with others…to access the internet for the purpose of planning his route…to research various means of cleaning, transporting, and disposing of a human body and trace evidence." JA.I.118, 173. They did not describe messages, e-mails, voicemails, internet searches, calls, or chats that Coleman made or sent. They did not reference anyone other than Correia communicating with Coleman, and their interaction was in-person. They supplied no facts suggesting that Coleman searched the internet, set up or accessed websites, or communicated with witnesses. There was no probable cause that the items the government sought would be found in the phone, records, laptop, or computer tower.

The affidavits made general statements about phones and computers, including that people "carry out, communicate about, and store records regarding their daily activities on equipment like cellular phones," smartphones "function essentially as small computers," and the items the

government sought "are commonly stored" in smartphones. JA.I.117, 148, 173-74. These general inferences do not link smartphones or computers to kidnapping generally or the allegations here. This Court has "expressed skepticism" that general observations can establish probable cause. *Roman*, 942 F.3d at 51, 54 (concluding statement "that [drug traffickers] commonly store relevant evidence in their homes" and observations of "large scale of the [drug] operation," did not provide probable cause to believe evidence would be found in defendant's home). "[T]he inquiry is not whether the owner of the property is suspected of a crime but rather whether there is reasonable cause to believe that the specific things to be searched for and seized are located on the property…." *Id.* at 50 (internal quotations omitted).

The generalized observations here add less value than those in *Roman*. There are not even statements that officers understood that most people have and travel with cellphones or that kidnappers use cellphones, computers, or the internet in connection with their crimes. Although insufficient under *Roman*, such statements would show an effort to tie these devices to kidnapping. These affidavits made no such attempt.

48

The court erred in concluding that the affidavits provided probable cause to believe that evidence of the alleged kidnapping would be found in Coleman's cellphone, its records, Google records, laptop, or computer tower. The fruits of these searches must be suppressed. *Wong Sun*, 371 U.S. at 471.

### D.     The good-faith exception cannot save these warrants.

The good-faith exception provides that evidence need not be suppressed "if the officer who conducted the search acted in reliance upon the defective warrant and that reliance was objectively reasonable." *Sheehan*, 70 F.4th at 51. "[T]he good-faith exception is not a panacea for every invalid warrant." *Id.* It does not apply "when the supporting affidavit is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)). "'The government bears the burden of showing that its officers acted with objective good faith.'" *Id.* (quoting *United States v. Brunette,* 256 F.3d 14, 17 (1st Cir. 2001)).

The fact that these warrants lacked probable cause should have been immediately obvious. They did not contain probable cause to support the core elements of kidnapping. Nor did they contain facts, generalized or

specific, providing probable cause to believe that evidence of the crime would be found on Coleman's phone, computers, or related records. The court erroneously applied the good-faith exception. The evidence should have been suppressed, and reversal is required to correct this error.

## III.  The court committed various errors related to the government's case.

### A.  The court erroneously denied a mistrial when the medical examiner opined that Correia was alive when Coleman brought her into his building.

The government's expert disclosure said Vershvovsky, the medical examiner, would testify that Correia's "death resulted from strangulation, and that the manner of death was homicide" and "that it is not possible to determine with precision the date or time of…death." JA.VI.3515. At trial, the government asked: "When you viewed the video of Ms. Correia being dragged inside the building, were you able to make a determination as to whether she was alive or dead at that point?" JA.III.1462-63. Vershvovsky replied that Correia was "intoxicated but alive" because she did not see injuries on Correia's body in the video. *Id.* The parties expected Vershvovsky to testify that she could not tell when Correia died. JA.III.1467-72.

50

The court overruled Coleman's contemporaneous objection. JA.III.1462-63. When the government finished its direct, counsel asked to be heard. JA.III.1467-72. Coleman explained that this testimony was contrary to the expert disclosure, unscientific, unreliable, and prejudicial. *Id.* Coleman had consulted an expert who believed it was not possible to tell whether Correia was alive in that video. *Id.* He was not under subpoena because Vershvovsky's testimony was unexpected. *Id.* Coleman argued that striking the testimony and instructing the jurors was insufficient and moved for a mistrial. *Id.* The court denied the motion and told jurors to disregard Vershvovsky's "statement concerning whether [Correia] was alive or dead at the moment that she was taken out of the car and into the apartment." *Id.* Coleman renewed his motion for a mistrial. *Id.*; *see also infra* Arg.V.B.v. The court later prohibited the government from arguing that Correia was alive when Coleman brought her inside. JA.IV.2185-88.

i.      *Standard of review.*

"Appellate review of the denial of a mistrial motion is for abuse of discretion." *United States v. Padilla-Galarza*, 990 F.3d 60, 80 (1st Cir. 2021). The inquiry surveys the entire record. *United States v. Ayala-Vazquez*, 751 F.3d 1, 23 (1st Cir. 2014). This Court considers "three factors: '1) whether an

appropriate curative instruction was issued, 2) whether the judicial response was timely, and 3) whether appellants successfully rebutted the presumption that the jury followed the judge's instructions.'" *United States v. Apicelli*, 839 F.3d 75, 86 (1st Cir. 2016) (quoting *United States v. Pagán–Ferrer*, 736 F.3d 573, 586 (1st Cir. 2013)). "When 'a curative instruction is promptly given, a mistrial is warranted only in rare circumstances implying extreme prejudice.'" *Id.* (quoting *United States v. Torres*, 162 F.3d 6, 12 (1st Cir. 1998)). "Declaring a mistrial is a last resort, only to be implemented if the taint is ineradicable, that is, only if the trial judge believes that the jury's exposure to the evidence is likely to prove beyond realistic hope of repair." *Sepúlveda*, 15 F.3d at 1184.

Coleman preserved this claim and argued that striking the testimony was insufficient and a mistrial was necessary. JA.III.1462-63, 1467-72. He renewed his motion for a mistrial when later testimony strengthened his argument. JA.IV.2130-33, 2215-26; *infra* Arg.V.B.v.

     ii.    *Vershvovsky's testimony caused extreme prejudice requiring a mistrial.*

In opening, the government argued that Coleman "lured [Correia] into his car, confined her there, sexually assaulted her, strangled her to

death, and transported her across state lines into Rhode Island….”

JA.II.846. It argued that Coleman planned to sexually assault Correia from

the moment he saw her and that he purposefully killed her. JA.IV.2307-15.

Nothing in the indictment bound the government to this theory. Had the

court permitted it, the government could have argued that Coleman

struggled with Correia in the car and then brought her, intoxicated and

incapacitated, to his apartment to kill her.[5]

Vershvovsky’s testimony introduced the specter of a substantially

more premeditated and disturbing encounter between Coleman and

Correia. It suggested that Coleman incapacitated Correia and confined and

killed her in his apartment. The judicial response was insufficient. The

court overruled a contemporaneous objection to this testimony. JA.III.1462-

63. The court’s instruction to disregard this testimony came after a break.

JA.III.1462-72. *Cf. Sepúlveda*, 15 F.3d at 1185 (“Swiftness in judicial response

is an important element in alleviating prejudice once the jury has been

exposed to improper testimony.”). The court gave no information about

---

[5] The court prohibited this argument because the government represented
that “[w]e pretty much all agree that the murder occurred inside the car.”
JA.IV.1838, 2185-88.

why it struck this testimony. This sequence of events may have given the

jury the impression that this testimony was being excluded for formalistic

reasons.

The court said it would give additional instructions, but later denied

Coleman's request for such instructions. JA.IV.2215-16, 2387-88. The jury

had to find that Coleman held Correia for an appreciable amount of time.

JA.IV.2378. Vershvovsky's testimony indicated that Coleman held Correia

during the car ride and in his apartment. Without this testimony there was

insufficient evidence of a holding of an appreciable length. *See infra*

Arg.III.D. The testimony caused extreme prejudice that was not cured by

the court's instruction, and Coleman's conviction should be reversed.

### B. The court erroneously permitted the government to use the term "sexual assault."

Coleman sought to preclude the government from using the terms

"rape" and "sexual assault." DE246. He explained that although there was

evidence that he and Correia had sex, there was no evidence that it was

nonconsensual. *Id*. He argued that the term "sexual assault" was

speculative and invaded the province of the jury in violation of his rights to

due process and a fair trial under the Fifth and Sixth Amendments. *Id*. The

government responded that there was evidence of nonconsensual sex—

DNA, Correia's injuries, damage to the car, and Correia's high blood

alcohol content. DE278. It explained that prejudice could be "managed" by

instructing "the jury that it is for them to decide whether a sexual assault

has occurred."[6] *Id.* The court concluded that "sexual assault" was not

unfair or inflammatory. JA.I.453.

     *i.*    *Standard of review.*

    This Court reviews a ruling "on whether to admit or exclude

evidence, including rulings on motions *in limine,* for abuse of discretion."

*United States v. Brown*, 510 F.3d 57, 66 (1st Cir. 2007). "[A] district court

abuses its discretion when a relevant factor deserving of significant weight

is overlooked, or when an improper factor is accorded significant weight,

or when the court considers the appropriate mix of factors, but commits a

palpable error of judgment in calibrating the decisional scales." *United

States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992). Coleman preserved this

---

[6] The court instructed that "otherwise" can include sexual gratification.
JA.IV.2379. It did not state that it was up to the jury to decide if a sexual
assault occurred.

55

argument. DE246; JA.I.453. *Cf.* SA.I.99-109; JA.I.244-53; JA.III.1532-34; JA.IV.2179-85.

> ii.   The term *"sexual assault" violated Coleman's constitutional rights to due process and a fair trial.*

A critical question at trial was what happened between the time Coleman and Correia got in his car and when he arrived at his building. There was evidence that they had sex and that there was a struggle in Coleman's car. There was no direct evidence that the sex was nonconsensual or about the cause of the struggle. Although Correia had injuries, she had none to her genitalia.[7] JA.III.1457-58, 1493. The evidence was equivocal, or even favored Coleman, and the court erred by permitting the government to use the term "sexual assault."

Allowing the government to characterize what happened as "sexual assault" was unfairly prejudicial and invaded the province of the jury. The government argued that sexual assault satisfied the purpose element of kidnapping. It is up to the jury to decide the ultimate issues. *Cf. United*

---

[7] The autopsy did not reveal that Coleman and Correia had sex. The ME saw no semen or injuries. JA.III.1457-58, 1482, 1485, 1493. The government did not allege sexual gratification until receiving DNA results post-indictment. *See supra* Arg.I.B.

*States v. Sanabria*, 645 F.3d 505, 516 (1st Cir. 2011) ("[L]ay opinion testimony on the ultimate issue in a case must satisfy Rule 701's helpfulness requirement, and 'seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness'[s]....'" (quoting *Mitroff v. Xomox Corp.*, 797 F.2d 271, 276 (6th Cir. 1986))). Allowing the government to characterize what happened as "sexual assault" likely predisposed jurors to believe that Coleman seized and held Correia against her will. Permitting use of the term "sexual assault" removed the issue from the jury and presented nonconsensual sex as a fact. This error requires reversal.

### C. The court erroneously admitted prejudicial testimony about Correia's plans for the days after the 24th.

The government offered Correia's statements to her child's grandmother and to a shelter employee about her plans for the weekend of February 23-24 and after as nontestimonial non-hearsay showing her "intent and state of mind" on the 24th. DE234. In opposition, Coleman argued that the statements were irrelevant because they did not make it more or less likely that Correia went with him willingly or that he lied to her. DE267. He said there was "no reason to doubt" that Correia intended

to return home and that her statements could be consistent with going with

Coleman willingly. *Id.*; JA.II.622. He explained that this testimony would

be prejudicial because it would introduce information about the

"challenging circumstances" Correia faced "as a single mother and a

survivor of domestic violence." *Id.*

       i.    *Standard of review.*

This Court has explained the standard of review:

> Where, as here, objections to evidentiary rulings are preserved,
> review is for abuse of discretion. Although this standard of review is
> deferential, it "does not render trial court decisions impervious to
> scrutiny." As we have observed, abuse of discretion "sounds worse
> than it really is." It simply means that "when judicial action is taken
> in a discretionary matter, such action cannot be set aside by a
> reviewing court unless it has a definite and firm conviction that the
> court below committed a clear error of judgment in the conclusion it
> reached upon a weighing of the relevant factors."

*United States v. Kilmartin*, 944 F.3d 315, 335 (1st Cir. 2019) (internal citations

and quotations omitted).

Coleman preserved his objection to the admission of this testimony

about Correia's weekend plans. DE267; JA.II.618-23, 875, 996-97.

      *ii.*    *Correia's statements to her child's grandmother and shelter employee were more prejudicial than probative.*

"Evidence is relevant as long as it has some tendency to make a fact of consequence more or less probable." *Kilmartin*, 944 F.3d at 335. Evidence should be excluded "if its probative value is substantially outweighed by a danger…unfair prejudice." Fed.R.Evid.403. Courts must "strike a delicate balance between the government's need for the evidence (that is, its probative value) and the risk that the evidence will inflame the jurors' passions (that is, its unfairly prejudicial effect)." *Kilmartin*, 944 F.3d at 336. "[A] lack of dispute or concession of a central allegation may significantly reduce the probative value of particular evidence and, thus, call its admissibility into question." *Id.* at 335.

The defense agreed that Correia intended to return home after the weekend of 24th. DE267; JA.II.622. Going with Coleman, taking a ride from him, and having consensual sex with him, could all be consistent with her plans to stay with Mondesir for the weekend before returning home. Testimony from Hiltz, Mondesir, and Thomas indicated that Correia planned to return home after celebrating her birthday. JA.II.875, 929, 972-73. The testimony from Correia's child's grandmother and the shelter

59

employee caused unfair prejudice by informing the jury that Correia had a young child, was living in a shelter, and was working to improve her life. This information had no relevance but was calculated to make Correia more sympathetic.[8] *See Kilmartin*, 944 F.3d at 337 ("Just because evidence may have a smidgen of probative value, that bare fact does not give the government free rein to capitalize upon its emotionally laden content, particularly where, as here, the government can easily prove its case without fanning the flames of unfair prejudice."). *Cf.* JA.IV.2308-09. The court abused its discretion in admitting these statements, and their admission requires reversal.

## IV. The government did not present sufficient evidence to sustain Coleman's conviction.

When the government rested, Coleman moved for a judgment of acquittal. JA.III.1814-15; JA.IV.1949-50. The court denied the motion because it concluded that it was a "reasonable inference" that Coleman "intended to confine [Correia] and commit a sexual assault either from the very beginning or soon after." JA.III.1950-53. It believed that these actions

---

[8] In contrast, the court excluded testimony about Coleman's future. JA.III.1307-09.

occurred while the car was stopped briefly on Tremont Street. *Id.* The court

noted that the windshield was cracked. *Id.* It speculated that the absence of

Coleman's DNA in Correia's mouth indicated that there had not been "a

lengthy romantic kissing interlude." *Id*. It noted that she may have been

"confined to prevent her from reporting something to the authorities." *Id*. It

said jurors could reasonably infer that she was "held or detained in the

automobile for an appreciable period of time prior to her sexual assault,

prior to her murder or both." *Id.* Coleman renewed this motion at the close

of evidence. JA.IV.2271-72, 2297. The court denied the renewed motion

without additional findings. JA.IV.2297.

## A.    Standard of review.

This Court's "review of preserved sufficiency challenges is de novo."

*United States v. Falcón-Nieves*, 79 F.4th 116, 123-24 (1st Cir. 2023). "In

reviewing a sufficiency challenge, 'the relevant question is whether, after

viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt.'" *Id.* (quoting *United States v. Woodward*, 149

F.3d 46, 56 (1st Cir. 1998)). During this inquiry, this Court "draw[s] all

reasonable evidentiary and credibility inferences in favor of the verdict.

61

*United States v. Rodríguez-Martinez*, 778 F.3d 367, 371 (1st Cir. 2015). It "must 'reject those evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" *Id.* (quoting *United States v. Spinney,* 65 F.3d 231, 234 (1st Cir.1995)). "If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction." *United States v. Morillo*, 158 F.3d 18, 22 (1st Cir. 1998) (internal quotations omitted); *see also Falcón-Nieves*, 79 F.4th at 126 (finding evidence insufficient on plain-error review).

Coleman preserved the argument that the government presented insufficient evidence. JA.III.1814-15; JA.IV.1949-50, 2271-72, 2297.

## B.     There was insufficient evidence to satisfy the seizure element.

The statute lists diverse actions that can satisfy the seizure element. 18 U.S.C. §1201; *Chatwin*, 326 U.S. at 460; *United States v. Lowe*, 145 F.3d 45, 52 (1st Cir. 1998). Seize, confine, kidnap, abduct, and carry away require proof of the physical taking of a victim. JA.IV.2376. Inveigle and decoy are nonforcible takings involving enticement by deceit or fraud. JA.IV.2377.

The government did not present sufficient evidence to establish this element. There was no evidence of a physical taking. Videos showed Correia accompanying Coleman and getting in his car voluntarily. JA.VIII.1.21-1.26, 9.15-9.23. Nor was there direct evidence of what Coleman said to Correia or why she went with him. There was circumstantial evidence that she joined him because he offered her a ride home. It is not incompatible with Correia's desire to return home to believe that she also agreed to have sex with Coleman. There is no evidence that Coleman made false representations, tricked Correia, or intended to sexually assault her.

The court's statement that jurors could infer that Coleman intended to confine and assault Correia from early in the encounter was not supported by the evidence. JA.IV.1950-51. Coleman began the night asking friends to join him in Boston. JA.III.1780-84. He acted appropriately towards Horace, separating calmly from a willing partner when her companions asked him to do so. JA.III.1703-06, 1713-16; JA.IV.2342-55; JA.VI.3389-90. The interactions with Correia show no evidence of planning or forethought. JA.IV.2338-39. Viewing the evidence in the light most favorable to the verdict, it is at least equally likely that Coleman intended

to offer Correia a ride home, had consensual sex with her, and that her

death resulted from a sudden struggle.

### C. There was insufficient evidence that Coleman held Correia against her will for an appreciable time.

There was insufficient evidence for the jury to conclude that Coleman

held Correia for "an appreciable period." JA.IV.2378 The Federal

Kidnapping Act was passed to address an "epidemic" of "[r]uthless

criminal bands" that chose wealthy victims, preplanned "seizures and

detentions," and crossed state lines to obtain ransom payments while

avoiding detection. *Chatwin*, 326 U.S. at 462-63. "The principal danger of

overzealous enforcement" of this statute "is that persons who have

committed such substantive crimes as robbery or assault which inherently

involve the temporary detention or seizure of the victim will suffer the far

greater penalties prescribed by the kidnapping statutes." *Government of

Virgin Islands v. Berry*, 604 F.2d 221, 226 (3d Cir. 1979). A holding inherent

in another crime is not kidnapping. *Id.* Courts have identified factors to

determine whether a holding was inherent in another crime:

> (1) the duration of the detention or asportation; (2) whether the
> detention or asportation occurred during the commission of a
> separate offense; (3) whether the detention or asportation which
> occurred is inherent in the separate offense; and (4) whether the

64

asportation or detention created a significant danger to the victim independent of that posed by the separate offense.

*Id.* at 227; *see also United States v. Jackson*, 24 F.4th 1308, 1311-14 (9th Cir. 2022); *United States v. Ferguson*, 65 F.4th 806, 811, 815 (6th Cir. 2023); *United States v. Krivoi*, 80 F.4th 142, 153-54 (2d Cir. 2023).

The government argued that Correia was held during the commission of assault, sexual assault, and homicide. JA.IV.2311-15. To ensure that these crimes were not improperly converted into kidnapping, the government had to prove that any holding lasted longer than the restraint inherent in those offenses. It did not do so. Videos showed that Correia went with Coleman willingly. JA.VIII.1.21-1.26, 9.15-9.23. The passenger door could not be locked to keep her in the car. JA.III.1655, 1663-64. There was no evidence of a holding that lasted longer than the time required for the alleged sexual assault. Correia died from strangulation, which necessarily entailed a holding. There was no evidence that it lasted longer than this inherent restraint. *See Jackson*, 24 F.4th at 1314-15. *Cf.* Add.7-8 (ruling on motion to suppress court noted magistrate could infer Correia "was held for some period of time, even if relatively fleeting, against her will in the automobile.").

The court's inference that the sexual assault, holding, and fatal struggle occurred during the stop on Tremont Street[9] is not supported by the record. JA.IV.1951. Tremont Street was well-lit, and Correia could have opened the passenger door. JA.III.1655, 1663-64. The stop is on tape. JA.VIII.9.24. There is no indication that the car is moving, that doors open, or that the windshield cracks during this time. Coleman drove away at a normal speed. It is equally plausible that Coleman and Correia had consensual sex during this time, and the struggle resulting in her death happened later, during the unrecorded hours. Even if the court were correct, this set of facts does not support the conclusion that Coleman held Correia for an "appreciable period." *Cf. Jackson*, 24 F.4th at 1314 (finding insufficient evidence of kidnapping and describing "seven-minute holding" as "quite brief on the spectrum of possible kidnappings"); *United States v. Corralez*, 61 M.J. 737, 749 (A.F.Crim.App. 2005).

---

[9] The court said this stop lasted 14 minutes. JA.IV.1951. Evidence showed that it was approximately 12 minutes. JA.II.835; JA.III.1804-09; JA.IV.2311; JA.VIII.9.24.

**D.    There was insufficient evidence that Coleman held Correia for ransom, reward, or otherwise.**

The government was required to prove that Coleman held Correia for ransom, reward, or otherwise. JA.IV.2379. It argued that Coleman held Correia for sexual gratification or to prevent her from reporting a sexual assault to the police. JA.IV.2310-15. Both theories depend on accepting that a sexual assault occurred. There was insufficient evidence of sexual assault. Correia's injuries indicated that a struggle occurred. However, she had no injuries to her genitalia, suggesting that the struggle did not happen at the same time as the intercourse and that the sex was consensual. JA.III.1457-58, 1493; JA.IV.2334-35.

The court stated that it was possible to infer that the sex was not consensual because Coleman's DNA was not found in Correia's mouth. JA.IV.1951. There was no evidence about how long DNA stays in someone's mouth or suggesting that one would expect to find Coleman's DNA in Correia's mouth if they had kissed. Nor would an encounter without kissing indicate a lack of consent. It is just as consistent with a commercial sex transaction or with a quick but consensual encounter between relative strangers. Further, evidence of sexual assault should have

67

been excluded because these allegations were not presented to the grand jury. *See supra* Arg.I.B.

### E.    There was insufficient evidence that Coleman intended to kidnap Correia.

The government had to prove that Coleman *intended* to kidnap Corriea, including that he intended to seize her and hold her against her will for an appreciable time for personal benefit. JA.IV.2376, 2380-81. The government did not introduce sufficient evidence for the jury to infer that Coleman had this intent. Even if it showed that he intended to assault Correia, there was no evidence that he forcibly took her or lied to confine her for an appreciable time to sexually assault her. It is equally plausible to believe that he offered to help Correia, she accepted his help, and their encounter took turns that neither one expected. This evidence cannot sustain a kidnapping conviction and Coleman's conviction should be vacated.

## V.    The court erroneously prevented Coleman from adequately presenting his theory of defense.

The court permitted the government to present a factual theory not presented to the grand jury while excluding evidence vital to Coleman's defense. Coleman's theory of defense was that he offered to help Correia,

she accepted, they had consensual sex, and she died when "a sudden and unexpected argument" she initiated turned violent. JA.II.861-63, 867; JA.IV.2326-27. The court excluded evidence related to other aspects of his defense, as described in the sealed supplemental brief. SA.I.75, 81, 108-09; SA.III.1420; *see* Args.V.A&B. The court violated his constitutional rights by preventing him from fully presenting his defense.

"The Sixth Amendment guarantees criminal defendants the right to present a defense…." *United States v. Bartelho*, 129 F.3d 663, 673 (1st Cir. 1997); *see also United States v. Mulinelli-Navas*, 111 F.3d 983, 992 (1st Cir. 1997). The Fifth Amendment "guarantees the right to a fair trial, and courts have 'long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *United States v. Gemma*, 818 F.3d 23, 34 (1st Cir. 2016) (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)). The accused must be allowed to rebut the government's case. *Rosario-Pérez*, 957 F.3d at 294. The court deprived Coleman of these rights and misapplied the rules of evidence.

**A.    See the sealed supplemental brief.**

**B.    See the sealed supplemental brief.**

69

**C.    The court erred in not giving the jury instructions Coleman requested.**

Both parties filed proposed jury instructions. JA.I.496-527. The court prepared draft instructions and held a charge conference. JA.IV.2134-2230. Coleman objected to the draft instructions at the conference, in writing after the conference, and after the court instructed the jury but before the jury retired to deliberate. JA.IV.2134-2270; 2386-2395. Some of the instructional errors compounded the errors discussed above. Others prevented the jury from adequately considering his theory of defense. Whether taken singly or as a whole, these errors require reversal.

> *i.    Standard of review.*

"Preserved claims of instructional error are reviewed under a two-tiered standard: we consider de novo whether 'an instruction embodied an error of law,' but 'we review for abuse of discretion "whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues."'" *United States v. Jadlowe*, 628 F.3d 1, 14 (1st Cir. 2010) (quoting *United States v. Silva,* 554 F.3d 13, 21 (1st Cir.2009)(quoting *United States v. Ranney,* 298 F.3d 74, 79 (1st Cir.2002))).

70

"A district court's refusal to give a requested instruction is reviewed de novo." *United States v. Figueroa-Lugo*, 793 F.3d 179, 191 (1st Cir. 2015). "The initial threshold determination we must make is whether the evidence, viewed in the light most favorable to the defense, 'can plausibly support the theory of the defense.'" *Id.* (quoting *United States v. Gamache*, 156 F.3d 1, 9 (1st Cir. 1998)). "If the evidence is sufficient, we then move onto a three-part test where the district court is reversed only if the proffered instruction was '(1) substantively correct as a matter of law, (2) not substantially covered by the charge as rendered, and (3) integral to an important point in the case so that the omission of the instruction seriously impaired the defendant's ability to present his defense.'" *United States v. McLellan*, 959 F.3d 442, 467 (1st Cir. 2020) (quoting *United States v. Baird*, 712 F.3d 623, 628 (1st Cir. 2013)).

Coleman preserved the claims raised here. JA.IV.2386-95; *see also* JA.IV.2134-2270. He prevails under either standard of review.

> ii.    *The court erroneously failed to sufficiently inform the jury that it could not consider evidence that had been struck.*

Coleman identified three places that he wanted the court to instruct that "[t]estimony or other evidence that has been struck is not evidence,

71

and it cannot be considered by you": an instruction that the verdict must be based solely on the evidence, one about what is evidence, and one about what is not evidence JA.IV.2238-40, 2387-88. The court added it to the instruction about what is not evidence, but not the other two, because it seemed "exceedingly redundant." JA.IV.2279, 2367-71.

The instruction Coleman requested was a correct statement of law; juries cannot consider stricken evidence. *See, e.g., United States v. Zaccaria*, 240 F.3d 75, 82 (1st Cir. 2001) (noting that evidence court did not strike was before jury). It was critically important that this jury understand that it could not consider testimony the court struck. Vershvovsky gave prejudicial and unreliable testimony that Correia was alive when Coleman carried her into his building. *See supra* Arg.III.A. The court struck this testimony and gave a midtrial curative instruction but denied two mistrial motions. *See id.*; *supra* Args.III.A&V.B.v. While denying the second mistrial motion, the court said it would give curative instructions. JA.IV.2215-16. Coleman requested these instructions in an effort to mitigate the uncurable taint of Vershvovsky's testimony. JA.IV.2387-88. Given the extreme prejudice resulting from Vershvovsky's testimony, the instruction about

72

disregarding stricken evidence was insufficient. Whether reviewed de novo or for abuse of discretion, this error requires reversal.

    *iii.*  *The seizure-element instructions were erroneous.*

  Coleman identified several errors in the seizure-element instructions. He asked the court to explain that to prove inveigling or decoying, the government had to prove that he "had the willingness and intent to use physical force to complete the kidnapping if the deception failed." JA.IV.2257, 2389, 2392. This instruction supported Coleman's argument that he did not kidnap Correia and that any use of force was part of a mutual struggle. This instruction was a correct statement of law. *See United States v. Boone*, 959 F.2d 1550, 1556-57 (11th Cir. 1992) ("To determine whether a kidnapping by inveiglement has occurred prior to transportation, a fact finder must ascertain whether the alleged kidnapper had the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception failed."); *United States v. Gillis*, 938 F.3d 1181, 1207-09 (11th Cir. 2019); *United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003) (noting defendant tricked victims and "was prepared to confine them at gunpoint if necessary"). The requested

instruction was integral to Coleman's defense and the court did not convey this information.

The court instructed that inveigle "means to entice, cajole or tempt a victim" and "may include deceitful means, such as false promises or representations, although such false promises or representations are not required." JA.IV.2377. Coleman asked it to explain that inveigle means "to entice, cajole, or tempt a victim by false promises, false representations, or other deceitful means." JA.IV.2257, 2389-90.; *see United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010) (defining "inveigle" as "to lure, or entice, or lead the person astray by false representations or promises, or other deceitful means"). The court misstated the law by instructing that "inveigling" does not require deceit or falsehoods. Colloquially, inveigling can mean coaxing, flattering, or winning someone over by wiles. *Merriam-Webster*, available at https://www.merriam-webster.com/dictionary/inveigle. To support a kidnapping conviction, however, inveigle must include deception or falsehoods. Without deception, the inveigled person gave valid consent.

Coleman asked the court to clarify that the government had to prove that he seized, confined, inveigled, or decoyed Correia without consent.

74

JA.IV.2256-58, 2388-90. He requested the same addition to the overview kidnapping instruction. *Id*. Lack of consent is a fundamental element of kidnapping. *Chatwin*, 326 U.S. at 464; s*ee also United States v. Wright*, 340 F.3d 724, 731 (8th Cir. 2003); *United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999); *United States v. Powell*, 226 F.3d 1181, 1194 (10th Cir. 2000); *United States v. Chancey*, 715 F.2d 543, 545–547 (11th Cir. 1983); *Hattaway v. United States*, 399 F.2d 431, 433 (5th Cir. 1968). The court did not convey this information to the jury.[10] This instruction was integral to Coleman's defense because he argued that Correia went with him willingly.

The court explained that the fact that Correia went with Coleman "voluntarily at first does not necessarily mean that a kidnapping did not occur." JA.IV.2377. Coleman objected to the inclusion of "factual scenarios." JA.IV.2258, 2390. This instruction improperly bolstered the government's case and denigrated Coleman's argument that Correia joined him willingly by implying that even if this was true, it did not matter. The court inappropriately suggested the verdict.

---

[10] The court explained that the government had to prove that Coleman *held* Correia against her will. It never instructed that the seizure had to be nonconsensual.

Whether reviewed de novo or for abuse of discretion, the seizure-element instruction failed to convey the theory of defense and may have led to a conviction on improper grounds.

> iv.    *Holding-element and purpose-element instructions were erroneous.*

Coleman identified errors in the holding-element and purpose-element instructions. JA.IV.2259-61, 2390-93. Following the statutory language, the court instructed that the government had to prove that Coleman held Correia "for ransom or reward or otherwise." JA.IV.2281-82. As with the general kidnapping instruction, Coleman asked the court to replace "otherwise" with "other benefit" to Coleman. JA.IV.2259-61, 2388, 2390-93. The requested instruction is consistent with the law. *Gooch*, 297 U.S. at 128 ("Congress intended to prevent transportation in interstate or foreign commerce of persons who were being unlawfully restrained in order that the captor might secure some benefit to himself."). The court explained that "otherwise" *could* include the government's theories without defining its limits. JA.IV.2379. The instruction bolstered the government's case and permitted a conviction if the jury found that Coleman acted for any reason, including anger, confusion, or fear.

76

The court stated that "otherwise" could include "sexual gratification." JA.IV.2379. In an effort to address the insufficient indictment and presentment violation, Coleman asked the court to instruct that "otherwise" cannot include "sexual gratification." JA.IV.2261, 2393; *see supra* Arg.I.B. The court's refusal to give the requested instruction violated Coleman's constitutional rights by permitting a conviction based on a theory that was not presented to the grand jury. *Supra* Arg.I.B; *see Vizcarrondo-Casanova*, 763 F.3d at 99 (noting instructions can cause constructive amendments and constructive amendments "are forbidden" in part to protect presentment right); *Ward*, 747 F.3d at 1191 (describing "jury instructions as a reflection of the indictment" in finding constructive amendment).

Whether reviewed de novo or for abuse of discretion, these instructions failed to convey the theory of defense and may have led to a conviction on improper grounds.

   v. *Consciousness of guilt instruction was erroneous.*

The court told the jury that it could consider Coleman's actions after the alleged crime in assessing his intent. JA.IV.2380-81. It said these actions might indicate that he believed he was guilty, but that "[m]ere flight,

without more, is not necessarily indicative of feelings of guilt." *Id.* Coleman

requested three additions to this consciousness-of-guilt instruction: 1) that

his post-event behavior could indicate that he thought he was guilty of "the

crime charged" instead of "one or more crimes"; 2) that it was possible that

a "fleeing person is innocent but believes that contact with police could be

dangerous"; and 3) that "'consciousness of guilt' evidence is never enough

by itself to convict a person of a crime." JA.IV.2264, 2393-94.

These requests are consistent with the law. *See Commonwealth v.*

*Warren*, 475 Mass. 530, 540 (2016) ("[F]light is not necessarily probative of a

suspect's state of mind or consciousness of guilt. Rather, the finding that

black males in Boston are disproportionately and repeatedly targeted for

FIO encounters suggests a reason for flight totally unrelated to

consciousness of guilt."). Coleman argued that his post-event behavior was

driven by fear of the police, not by guilt. He introduced evidence that his

fear of police derived in part from his experience being assaulted by

officers in San Diego. JA.IV.1968-74, 2020-22; JA.VI.3392-3417, 3430-40;

JA.VIII.101. The court excluded his proffered expert testimony about the

impact negative encounters with police have on Black men. *See infra*

Arg.VI.B. The alleged consciousness-of-guilt evidence was inflammatory.

78

*See* DE247; JA.I.453-55. It was important to inform the jury that he could

not be convicted based solely on this evidence. Whether reviewed de novo

or for abuse of discretion, these errors require reversal.

> vi.    *Other errors.*

Coleman objected to calling him the defendant and Correia the

victim. JA.IV.2255, 2388. This language assumed Coleman's guilt, endorsed

the government's theory, and depersonalized Coleman and Correia. *See,*

*e.g.*, Anna Roberts, *Victims, Right?*, 42 Cardozo.L.Rev. 1449 (2021).

The court told jurors that it was "important" to reach a verdict and

that they should "reconsider" their views if they believed it was

appropriate. JA.IV.2382. Coleman objected on the grounds that this

instruction was similar to an *Allen* charge. JA.IV.2268, 2395. An *Allen*

charge may be appropriate when a jury is deadlocked. *See United States v.*

*Amaro-Santiago*, 824 F.3d 154, 162-63 (1st Cir. 2016). "An *Allen* charge, by its

nature, 'can have a significant coercive effect….'" *Id.* at 163 (quoting *United*

*States v. Hernández-Albino*, 177 F.3d 33, 38 (1st Cir. 1999)). "[T]o militate

against the inherently coercive nature of an *Allen* charge," it must do three

things: 1) suggest that the majority and minority reconsider their positions;

2) reiterate that the government bears the burden of proof; and 3) tell the

jury it may not reach unanimity." *Id.* The court's instruction carried the risks of an *Allen* charge without doing these three things. The court abused its discretion by giving this instruction before the jury started deliberating.

The court instructed that the government had to show that Correia's death resulted from Coleman's acts or conduct. JA.IV.2265, 2394. Coleman asked the court to say that it had to prove that her death resulted from *kidnapping*. *Id*. The requested instruction is consistent with the law. After listing the elements, the kidnapping statute requires a penalty of death or life imprisonment "if the death of any person results." 18 U.S.C. §1201. It requires a link between the death and these elements. *Id.* This distinction was important to Coleman's defense. He did not contest that his actions caused Correia's death, but argued they were not kidnapping. JA.II.853; JA.IV.2326-27. The court's instructions blurred this distinction and impaired the jury's consideration of his defense. Whether reviewed de novo or for abuse of discretion, these errors require reversal.

> vii.    *Taken together, the instructional errors require reversal.*

Whether reviewed de novo or for abuse of discretion, each of these errors requires reversal. Looking at all the instructions together strengthens this conclusion. The instructions misstated the law, had the potential to

confuse or mislead the jury, and/or failed to convey accurate law integral

to the theory of defense.

## VI. Issues of structural racism were not appropriately addressed, resulting in an unfair trial.

As Justice Thurgood Marshall wrote nearly 50 years ago:

> Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. It was unlawful to teach him to read; he could be sold away from his family and friends at the whim of his master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave.

*Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 387–388 (1978). The legacy of

slavery, the Civil War, and Reconstruction continue today: "The race-based

gaps that first developed centuries ago are echoes from the past that still

exist today. By all accounts, they are still stark." *Students for Fair Admissions*

*v. President and Fellows of Harvard College*, 600 U.S. 181, 393 (2023) (Jackson,

J., dissenting); *see also* Elizabeth Hinton, et al., *An Unjust Burden*, Vera

Evidence Brief (May 2018), available at

https://www.vera.org/downloads/publications/for-the-record-unjust-

burden-racial-disparities.pdf ("[O]verview of the ways in which America's

history of racism and oppression continues to manifest in the criminal justice system.").

The Supreme Court has emphasized the role of courts in ensuring "that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017). "Racial discrimination in the jury system pose[s] a particular threat both to the promise of the [Fourteenth] Amendment and to the integrity of the jury trial…." *Id.* at 222. "The duty to confront racial animus in the justice system is not the legislature's alone. Time and again, this Court has been called upon to enforce the Constitution's guarantee against state-sponsored racial discrimination in the jury system." *Id.* at 222. "[S]ociety can and must move forward by achieving the thoughtful, rational dialogue at the foundation of both the jury system and the free society that sustains our Constitution." *Id.* at 229.

Coleman, a Black man, asked the court to show prospective jurors a video about implicit bias and offered expert testimony describing the impact of negative police encounters on Black men. Both motions sought to recognize the impacts of race so that they did not affect the trial under the

surface. JA.I.403-14, 457-65, 534; JA.IV.1839-41, 1981-91; Add.17-22;

SA.I.110-156, 282-85. The court erroneously denied both motions. Add.17-

22; JA.IV.1981-91.

### A. The court incorrectly denied Coleman's motion to show jurors a video discussing implicit bias.

Coleman asked the court to show prospective jurors a video

discussing implicit bias. JA.I.403-14. He cited studies showing that people

have biases of which they are unaware. *Id.* He suggested a video used in

the Western District of Washington or one called "What Would You Do."[11]

*Id.* The court denied the motion and explained that "the basic concept

underlying the video is important, that is, the need for jurors to attempt to

be aware of their biases and prejudices." Add.17-22. It called the videos

"distracting," "smug and condescending," and "not worth it on balance."

*Id*. It said the case was not "particularly racially charged." *Id.*

---

[11] The videos are available at:

https://www.wawd.uscourts.gov/jury/unconscious-bias;
https://www.youtube.com/watch?v=ge7i60GuNRg. *See also*
https://www.courts.oregon.gov/how/Pages/jury.aspx;
https://www.cand.uscourts.gov/attorneys/unconscious-bias-video-for-potential-jurors/

The court told prospective jurors that voir dire was meant to ensure that the jurors selected could decide the case free from bias and prejudice. JA.I.575, 582. It said Coleman and Correia were Black, that Coleman could not be judged based on "his ethnicity or race," and asked whether these facts would prevent any jurors from being fair and impartial. JA.II.635-36. Once the jury was selected, it instructed:

> [T]he defendant should be judged based on the evidence, not on his race or gender. But each of you should take extra care to make sure you're doing exactly that, that you're being as honest as you can with yourselves. If you hear yourself thinking inwardly that's what a typical man would do under these circumstances or, worse, a typical black man or a typical woman would do this or a typical black woman, stop yourself, catch yourself, think about what you're doing. Are you making a decision based on the evidence or something else?
> I'm not saying it's easy to overcome your assumptions, again, the ones that you're not even thinking about, but it is your duty and responsibility to be as fair as you can and to decide the case based on the evidence and not according to generalized assumptions that you may have.

JA.II.815-16. The court denied Coleman's request for an implicit bias instruction at the end of trial. JA.IV.2196-97.

### i.    Standard of review.

This Court reviews voir dire procedures for abuse of discretion. *United States v. Parker*, 872 F.3d 1, 6 (1st Cir. 2017); *United States v. Casanova*, 886 F.3d 55, 60 (1st Cir. 2018). "The dispositive question [is]…whether our

review of the record leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Gelin*, 712 F.3d 612, 621 (1st Cir. 2013) (internal quotations omitted).

   ii.   *The importance of educating jurors about implicit bias.*

Research shows that racial bias is not always overt. Nearly all humans have implicit biases—subconscious stereotypes and attitudes that shape their reactions without their awareness. *See, e.g.,* Jerry Kang & Kristen Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L. Rev. 465, 473 (2010) ("Implicit biases…are both pervasive (most individuals show evidence of some biases), and large in magnitude, statistically speaking."); Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection*, 4. Harv. L. & Pol. Rev. 149, 149 (2010) ("Implicit biases are the plethora of fears, feelings, perceptions, and stereotypes that lie deep within our subconscious, without our conscious permission or acknowledgement. Indeed, social scientists are convinced that we are, for the most part, unaware of them. As a result, we unconsciously act on such biases even though we may consciously abhor them."); Anthony G. Greenwald & Linda Hamilton Krieger, *Implicit Bias:*

*Scientific Foundations*, 94 Cal. L. Rev. 945, 951 (2006) ("Implicit biases are discriminatory biases based on implicit attitudes or implicit stereotypes. Implicit biases… can produce behavior that diverges from a person's avowed or endorsed beliefs or principles."); Gary Blasi, *Advocacy Against the Stereotype*, 49 UCLA L. Rev. 1241, 1243 (2002) ("The behavior of real human beings is often guided by racial and other stereotypes of which they are completely unaware."); The Honorable Cherron Payne, *All Cases Matter: Mitigating Bias in the Administrative Law Judiciary*, 43 J.Nat'l Ass'n Admin.L.Jud. 1 (2023); *Lee v. Howard Hughes Medical Institute*, 607 F.Supp.3d 52, 65 (D.Mass. 2022) ("It has been 'long recognized' that unlawful discrimination can spring not only from conscious animus but also from stereotypes and unconscious bias."); *see also* JA.I.403-14.

One way to mitigate the impact of implicit bias is to educate people— implicit bias exists, it is normal, and it operates without awareness. *See, e.g.* Angela Onwuachi-Willig, *Roberts's Revision: A Narratological Reading of the Affirmative Action Cases*, 137 Harv.L.Rev. 192, 197 (2023) ("Implicit bias research reveals that making race salient in the assessment of people…may be a necessary precursor to reducing the effects of nonconscious racial bias."); Kang & Lane at 500 ("[B]eing aware of potential biases, being

motivated to check those biases, and being accountable to a superior (as a

jury feels toward a judge) should have some effect on the translation of bias

to behavior."); *Blasi* at 1275 ("Awareness by targets of these paths to

prejudice is generally a condition precedent to reducing their effects.").

One federal judge wrote:

> [E]fforts can be made to educate attorneys and potential jurors of the
> possible impact of implicit biases. For example, I now include a slide
> about implicit bias in the PowerPoint presentation that I show before
> allowing attorneys to question potential jurors. As some of the
> "shooter bias" studies and the recent study of unconscious racial bias
> in trial judges have demonstrated, such information may mitigate the
> effect of the bias. Beyond informing various participants at the start
> of trial, jury instructions could include a brief discussion of implicit
> bias and urge jurors to attempt to control or eliminate them. Many of
> my colleagues are unreceptive to this idea, fearing that implicit biases
> will only be exacerbated if we call attention to them. However, the
> positive outcomes of studies attempting to teach actors about their
> implicit biases leave me undeterred.

Bennett at 169.

> iii.    *The court erroneously refused to show the venire a video about
>         implicit bias.*

Courts must ask voir dire questions about racial prejudice in cases

raising related concerns. *Parker*, 872 F.3d at 6-7. This voir dire need not be

individual; group voir dire is sufficient. *Id.* at 8; *Casanova*, 886 F.3d at 61-62.

Coleman does not argue that particular voir dire questions were necessary

or that they had to be asked individually. Unlike in *Parker* and *Casanova*, the court did not provide a sufficient substitute for the requested implicit bias videos. The court asked potential jurors if they could set aside prejudice and told them it was important to do so. JA.I.575, 582; JA.II.635-36, 815-16. After the jurors were selected, it cautioned them to be aware of their "assumptions," but did not ask if they could do so. JA.II.815-16. These questions and instructions did not sufficiently address or explain implicit bias. *Cf.* Bennett at 160 ("[J]udges commonly ask questions such as, 'Can all of you be fair and impartial in this case?' This question does not begin to address implicit bias, which by its nature is not consciously known to the prospective juror. Thus, a trial court judge schooled in the basics of implicit bias would be delusional to assume that this question adequately solves implicit bias.").

The court's statements about the videos indicate abuse of discretion. The court dismissed and criticized these videos, calling them "distracting," "smug," and "condescending." Add.17-22. The Washington video, produced by a federal court, strikes a neutral, informational tone. *See* https://www.wawd.uscourts.gov/jury/unconscious-bias. It explains implicit bias, including the reasons it may exist, using simple, non-racially-

charged examples. *Id.* The other video is a sociological experiment showing passersby reacting to a white man, then a Black man, and then a white woman trying to cut a lock off a bike. *See* https://www.youtube.com/watch?v=ge7i60GuNRg. It illustrates, rather than explains, implicit bias. *Id.* Nothing in these videos merits the court's derision.

The court erred in stating that this was not "a particularly racially charged crime." Add.17-22. Race was a fundamental part of this case. Coleman is Black, as was Correia. Coleman was convicted by a jury that contained no Black people. JA.IV.2402. The government argued that Coleman's efforts to flee and to hide Correia's death showed consciousness of guilt. JA.IV.2320-24. Coleman argued that his reaction resulted from his experience as a Black man in America. JA.IV.2328-31. In 2013, he was beaten by officers who arrested him for public urination and intoxication. JA.IV.1968-74, 2020-22, 3392-3417, 3430-40; JA.VIII.101. A video of this assault shows that he was not threatening or belligerent and that the officers' response was out of proportion to the situation. JA.VIII.101. The court erroneously precluded expert testimony about how negative encounters with police impact Black men. *See infra* Arg.VI.B.

89

Given the history of racial bias in America and the importance of ensuring that the judicial system is as unbiased as possible, these developments in the understanding of prejudice should have been part of voir dire. People can be motivated by unknown biases, and drawing their attention to these biases mitigates their impact. Educating potential jurors about implicit bias was an important facet of Coleman's defense. The court abused its discretion by not doing it, and reversal is required.

**B.   The court improperly excluded expert testimony explaining the impact of negative encounters with police on Black men.**

Coleman offered expert testimony from Jeffrey Fagan to support his argument that he fled from the police because of fear, not consciousness of guilt. SA.I.113, 221-30. He included Fagan's CV and explained that the professor would testify that "impacts upon Black persons of involuntary police confrontation, false accusations by police, and threatening police behavior extend beyond liberty interests to include the fear of grievous bodily harm and possibly death," and "that fear, anxiety, and impaired perception and social judgment occurs so that flight may be unrelated to consciousness of guilt." SA.I.226-27. He stated that Fagan would "explain empirical studies showing that the impacts of threatening police

90

interactions extend beyond the violation of a Black person's liberty interests to include fear of bodily harm and possibly death." SA.I.113.

The government argued that these disclosures did not satisfy Rule 16 because they did not include the studies Fagan would testify about or the basis for his opinions. SA.I.226-30, 457-65. The court described this testimony as "problematic" because it was "like an expert opinion that people of a particular race or ethnic group or whatever have certain characteristics." JA.I.458. Coleman argued that he had satisfied the requirements of Rule 16 and that Fagan's opinion was based on "his years as both a professor, a researcher, and an academic on the topic." JA.I.460-63. The government said it would be "great" if Coleman could "point" "to what [Fagan] has done that is relevant to the rather brief description of the testimony he plans on giving." JA.I.463-64. The court invited supplemental filings. JA.I.464.

A few days later, the court opined that Coleman's disclosure was not sufficient under Rule 16 because "You can't just opine. You have to indicate what the basis of your opinion is." SA.I.282. It said that there might be *Daubert* issues. SA.I.282-84. It noted that this might not be a "valid subject for expert opinion" because courts generally "don't permit racial or general

propositions that black people are more likely or less likely to do this or not do that." *Id.* The court indicated it would permit argument about tension between law enforcement and Black communities, but that this testimony goes further and is "a stereotype opinion." *Id*. It suggested that this testimony ran counter to Coleman's request for the implicit bias video because it asked the jury to conclude that he was likely to have certain characteristics based on race. *Id.*

Coleman filed a supplemental expert notice. JA.VI.3523-26. It repeated the first notice and explained that Fagan would base his testimony on various articles. *Id.* It cited 11 articles that Fagan authored or coauthored and 6 other articles he relied on. *Id.* Each article described a study, including its methodology and results. Coleman provided these articles to the court and government. JA.VII.3556-4206. The court repeated its concerns:

> I have issues with the adequacy of the notice, but even putting that aside, I have lots of questions about the methodology, about the conclusion, even assuming that it's adequate social science. You know, I certainly have a problem with using, you know, what is in effect a race-based conclusion to try to prove a fact.

JA.IV.1840. Coleman responded that Fagan's testimony was based on peer-reviewed and published studies showing that "police are more likely to use

force on black people" and that anxiety results in Black men, particularly those who have had negative encounters with police. JA.IV.1982. He explained that this testimony countered the government's consciousness-of-guilt theory and provided information not typically understood by jurors. JA.IV.1981-91.

The court excluded Fagan's testimony. It described his testimony as "just a generalization based on race" and "propensity based upon…race." JA.IV.1987-91. The court stated that it was "impossible" "to assess even what the precise opinion is, what the methodology is," and that it did not know whether the studies cited were reliable. JA.IV.1988. It called the testimony "troublesome," "offensive," and "problematic in the extreme." JA.IV.1988-91. It excluded the evidence "under Rule 702 and Rule 403, and at least in part on Rule 16, for the lack of full disclosure." JA.IV.1987-91.

     *i.    Standard of review*

This Court reviews a court's decision to admit or deny expert testimony for abuse of discretion. *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 48 (1st Cir. 2009); *Muskat v. United States*, 554 F.3d 183, 193 (1st Cir. 2009); *United States v. Jackson*, 58 F.4th 541, 550 (1st Cir. 2023). A court abuses its discretion when it "'considers improper criteria, ignores criteria that

deserve significant weight, or gauges only the appropriate criteria but makes a clear error of judgment in assaying them.'" *Muskat*, 554 F.3d at 193 (quoting *Rosario–Urdaz v. Rivera–Hernández*, 350 F.3d 219, 221 (1st Cir. 2003)).

> ii. *Coleman's expert disclosure was sufficient.*

Expert disclosures must contain:

> • a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief;
> • the bases and reasons for them;
> • the witness's qualifications, including a list of all publications authored in the previous 10 years; and
> • a list of all other cases in which, during the previous 4 years, the witness has testified as an expert at trial or by deposition.

Fed.R.Crim.P.16(b)(1)(C). These disclosures are meant to give "a fair opportunity for the government to meet the defendant's evidence." Fed.R.Crim.P.16(b)(1)(C)(ii); *see also* Commentary to 1993 Amendment ("The amendment is intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination.").

Coleman satisfied these requirements. He explained that Fagan would "testify that the impacts upon Black persons of involuntary police

94

confrontation, false accusations by police, and threatening police behavior extend beyond liberty interests to include the fear of grievous bodily harm and possibly death" and that "fear, anxiety, and impaired perception and social judgement occurs so that flight may be unrelated to consciousness of guilt." JA.VI.3523-25. He explained that Fagan would base this testimony on his "training and experience." *Id.* He provided 17 articles, 11 of which Fagan wrote or cowrote, as well as citations and summaries of each article. *Id.*; *see also* JA.VII.3556-4206. Coleman provided Fagan's CV, which included cases in which he had given expert testimony. JA.VI.3527-3555.

The disclosures informed the court and government of Fagan's opinion and of the research, studies, and articles he relied on. This information gave the government a fair opportunity to cross-examine Fagan. No more was required. Each study explained its methodology. JA.VII.3556-4206. To the extent the court was nonetheless unable to assess Fagan's methodology or to determine whether the studies were reliable, these concerns go to the admissibility of the testimony, not the sufficiency of the disclosure. *See Martínez v. United States* 33 F.4th 20, 24 (1st Cir. 2022) (noting difference between unreliable opinion and one jury may deem unpersuasive). The proper mechanism to explore questions about

95

reliability is a *Daubert* hearing. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993).

> iii. *Fagan's testimony was admissible under Rules 702 and 703.*

A qualified expert may give opinion testimony if it "will help the trier of fact to understand the evidence or determine a fact in issue." Fed.R.Evid.703. "[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592. Judges play a gatekeeping role and must "determine that 'an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Martínez*, 33 F.4th at 24 (quoting *Daubert*, 509 U.S. at 597). "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." *Levin v. Dalva Brothers, Inc.*, 459 F.3d 68, 78 (1st Cir. 2006).

Fagan's testimony was reliable. He is an academic researcher with decades of training and experience. JA.VI.3527-55. "[S]ocial scientists testify from a practical standpoint about the human behavior they observe" and "write scholarly articles about their observations which are subjected to peer review by others in their profession." *United States v. Hall*, 974 F.Supp. 1198, 1203 (C.D.Ill. 1997) (admitting expert testimony about coercive

96

interrogation techniques and false confessions). One court suggested the

following parameters for evaluating social-science testimony:

> In any field of social science, an expert should have to testify, at a
> minimum, to the longevity of that particular field, the amount of
> literature written about the subject, the methods of peer review
> among its scholarly journals, the quantity of observational or other
> studies conducted in that field, the comparative similarity of
> observations obtained, the reasons why those studies are deemed
> valid and reliable, and the general consensus or debate as to what the
> raw data means. In addition, the particular expert who wishes to
> testify must establish that he is sufficiently familiar with the topics
> mentioned above to render an informed opinion about them. It
> would also be helpful, but not necessary, to show that the proposed
> expert personally contributed to the field about which he is testifying,
> either through personal observation or by publication of an article,
> book or treatise on the subject.

*Id.* Fagan had years of expertise in this area, had published many articles

on the topic, and could have testified to any of these topics.

Courts routinely admit expert testimony based on training and

experience even when unaccompanied by the scientific method or peer-

reviewed publications. *See United States v. Henry*, 848 F.3d 1, 11-12 (1st Cir.

2017) (permitting expert testimony about drug slang and quantities from

agent based on training and experience); *United States v. Sandoval*, 6 F.4th

63, 86-87 (1st Cir. 2021) (allowing agent's testimony about MS13 research);

*see also United States v. Young*, 916 F.3d 368, 379-81 (4th Cir. 2019) (admitting

professor's testimony about convergence between Nazism and radical Islam); *NAACP v. City of Myrtle Beach*, 504 F.Supp.3d 513, 517-18 (D.S.C. 2020) (allowing expert opinion that permit denial was race-based). Fagan's testimony was not based solely on training and experience; he had conducted multiple studies related to the impact of negative police encounters on Black men. JA.VI.3523-55. These studies resulted in published and peer-reviewed articles. *Id.* His testimony was reliable.

Fagan's testimony was relevant. The government argued that Coleman's flight indicated consciousness of guilt. JA.IV.2320-24. Coleman countered that it was explained by fear of the police rooted in his experiences as a Black man, including having been assaulted by officers. JA.IV.2328-31. Fagan's testimony would have helped the jury understand the evidence and decide the facts by providing a background against which to understand Coleman's defense. *See Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir. 1996) ("Social scientists in particular may be able to show that commonly accepted explanations for behavior are, when studied more closely, inaccurate. These results sometimes fly in the face of conventional wisdom."); *Hall*, 974 F.Supp. at 1202-06 (holding that social-science testimony about false confessions challenged common

98

misperceptions and would help trier of fact if defendant showed use of coercive interrogation techniques*).*

The court's belief that Fagan's testimony was offensive, race-based, or grounded in predisposition was unfounded. JA.IV.1988-91. *Cf. Students for Fair Admissions*, 600 U.S. at 334 (Sotomayor, J., dissenting) ("Ignoring race will not equalize a society that is racially unequal. What was true in the 1860s, and again in 1954, is true today: Equality requires acknowledgment of inequality."). Studies performed by Fagan and others indicate that Black men, particularly those who have had negative encounters with police, may fear grievous bodily harm and death at the hands of the police, which may manifest as flight. JA.VI.3523-3555; JA.VII.3556-4206. Coleman, a young Black man, was assaulted by police. JA.IV.1986-74, 2020-22; JA.VI.3430-40, 3392-3417; JA.VIII.101. He attempted to counter the government's consciousness-of-guilt narrative by explaining that his flight was driven by fear. JA.IV.2328-31. Fagan's testimony would have put Coleman's defense into a larger context. Standing alone, Coleman's assertion that he ran because he was afraid of the police may have seem counterintuitive or far-fetched to the nearly-all-White jury. *See* JA.IV.2402. Placing it in the context of social-science studies showing that

such fears are widespread would have helped the jury understand this important part of the case.

Fagan's testimony was reliable, relevant, and would have helped Coleman counter the government's case. Like an implicit bias video, Fagan's testimony would have made plain the ways race and prejudice manifest themselves in our society, thus providing Coleman with a fairer trial. The exclusion of Fagan's testimony was erroneous and had a substantial negative impact on Coleman's case. Some of the most disturbing and prejudicial evidence in this case related to Coleman's efforts to conceal Correia's death. *See* DE247; JA.IV.2328-31. Rebutting the government's narrative about these acts was critical. Fagan's testimony was an important part of explaining an alternate motivation. Its exclusion impaired Coleman's right to present a defense and requires reversal.

## VII.   The court improperly calculated Coleman's guidelines range.

Section 2A4.1 applies to kidnapping offenses and includes a cross-reference: "if the victim was killed under circumstances that would constitute murder under 18 U.S.C. §1111…, apply §2A1.1". U.S.S.G. §2A4.1. The PSR applied §2A1.1(a) and found a total offense level of 43. SA.III.1527-28. Coleman objected. SA.III.1541; Add.121-24. He argued that

this cross-reference should not apply because Correia's death "resulted

from sudden mutual combat that is inconsistent with the offense of first-

degree murder," making the total offense level 36. *Id.*

The court noted that this issue was "technical" because the statue

required a life sentence. Add.123. It concluded that the "actions here would

constitute first degree murder," and found a total offense level of 43.

Add.123. Counsel objected. *Id.* Coleman recognizes that the statute requires

life imprisonment irrespective of his Guidelines offense level. He raises this

issue to preserve it in case relief is available in the future.

### A.    Standard of review

A claim that the court miscalculated the Guidelines is a claim of

procedural error. *United States v. Marchena-Silvestre*, 802 F.3d 196, 200 (1st

Cir. 2015). "When mulling the procedural reasonableness of a sentence, we

afford de novo review to the sentencing court's interpretation and

application of the sentencing guidelines, assay the court's factfinding for

clear error, and evaluate its judgment calls for abuse of discretion." *United

States v. Ruiz-Huertas*, 792 F.3d 223, 226 (1st Cir. 2015). Coleman preserved

the argument that the cross-reference and higher offense level did not

apply. SA.III.1541; Add.121-24.

**B.    The court abused its discretion by determining that the facts of this case constituted first-degree murder.**

The cross-reference applies "if the victim was killed under circumstances that would constitute murder under 18 U.S.C. §1111." U.S.S.G. §2A4.1. Section 1111 provides: "Murder is the unlawful killing of a human being with malice aforethought." 18 U.S.C. §1111. It explains that murder "perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate,…kidnapping,…aggravated sexual abuse or sexual abuse,…is murder in the first degree." *Id.*

The evidence did not show that Coleman acted with malice aforethought or that he kidnapped or sexually assaulted Correia. *See supra* Arg.III.D. The evidence showed that Coleman and Correia had sex, but not that it was nonconsensual. *Id.* Correia went with Coleman willingly; he did not seize her or hold her for an appreciable time or for a proscribed purpose. *Id.* Coleman did not contest that he caused Correia's death, but argued that it resulted from a sudden and unexpected argument that turned violent. JA.IV.2326-27. The evidence did not support the conclusion

that his acts constituted first-degree murder, and the court erred in

applying the cross-reference.

## VIII. Cumulative error.

"Individual errors, insufficient in themselves to necessitate a new

trial, may in the aggregate have a more debilitating effect." *Sepúlveda*, 15

F.3d at 1195-96; *see also United States v. Meises*, 645 F.3d 5, 23-25 (1st Cir.

2011) (reversing based on cumulative error); *Sanabria*, 645 F.3d at 516-19.

"[C]laims under the cumulative error doctrine are *sui generis*." *Id.* This

Court considers them:

> [A]gainst the background of the case as a whole, paying particular
> weight to factors such as the nature and number of the errors
> committed; their interrelationship, if any, and combined effect; how
> the district court dealt with the errors as they arose (including the
> efficacy—or lack of efficacy—of any remedial efforts); and the
> strength of the government's case.

*Id.* "[S]uch claims are typically raised—as here—for the first time on

appeal." *Padilla-Galarza*, 990 F.3d at 85.

Each of the errors described above requires reversal. However, even

if none alone suffices, the cumulative-error doctrine demands reversal. The

court made errors throughout trial; the errors described here include

pretrial rulings, issues related to jury selection, evidentiary errors (of

admission and exclusion), and problems with jury instructions. The errors include two motions for mistrial based on highly prejudicial testimony and witness conduct. The errors were interconnected. As this brief explains, there are four main categories of error: 1) errors related to the insufficiency of the indictment and presentment clause violation; 2) errors made during the government's case allowing it to fill in gaps in evidence with allegations not presented to the grand jury; 3) errors connected to the court's refusal to permit Coleman to present a full defense, violating his constitutional rights; and 4) errors surrounding Coleman's efforts to mitigate the impact of racial bias on this case.

The government's *kidnapping* case was not strong; it was largely circumstantial. *Cf.* Add.7-8. Coleman did not contest that he caused Correia's death. JA.IV.2326-27. The evidence did not, however, support the conclusion that he *kidnapped* her. *See supra* Arg.III.D. On the 23rd, Coleman tried to find friends to go to Boston with, but ended up going alone. JA.III.1780-84. He danced with a woman at Venu, was respectful toward her, and said goodbye when her brother asked her to go. JA.III.1695-1719; JA.VI.3389-90; JA.VIII.71.1-71.8. Correia acted erratically that night, including fighting with a friend and giving a bartender the finger.

104

JA.II.886-97, 946-57, 971-79, 988-90. When she tried to force her way into an Uber and the driver pushed her out, she and Coleman crossed paths. JA.II.1116-30; JA.VIII.1.20. The government argued that what ensued was premeditated sexual assault and murder. JA.IV.2306-15. The evidence did not support that conclusion and is at least equally consistent with Coleman's theory: Coleman and Correia had consensual sex, and Correia died during a sudden and unexpected argument that turned violent. JA.VI.2326-38. The government's evidence is not strong enough to overcome the number of interconnected errors that occurred in this case. Reversal is required.

## CONCLUSION

For the foregoing reasons, as well as those contained in the sealed supplemental brief, Coleman asks this Court to vacate his conviction and order the court to dismiss the case or to vacate and remand for a new trial.

Respectfully Submitted,

*/s/ Christine DeMaso*
Christine DeMaso
Assistant Federal Public Defender
51 Sleeper St.—5th Floor
Boston, MA 02210
(617) 223-8061
Dated: January 5, 2024     Identification No. 1168061

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this Court issued an order, dated December 18, 2023, granting leave to file oversized briefing such that the opening brief and sealed supplemental brief, together, may contain no more than 25,000 words.

> combined, this brief and the opening brief contain 24,724 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using Microsoft Word and 14-point Book Antiqua font.

*/s/ Christine DeMaso*
Christine DeMaso

Attorney for Louis D. Coleman III

Dated: January 5, 2024

## CERTIFICATE OF SERVICE

I, Christine DeMaso, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants, including all counsel of record, specifically, Randall Kromm, as identified on the Notice of Electronic Filing on January 5, 2024.

*/s/ Christine DeMaso*
Christine DeMaso

# ADDENDUM

# <u>ADDENDUM TABLE OF CONTENTS</u>

Excerpt from 3/1/22 Motion Hearing—Denial of Motion to Dismiss or for a Bill of Particulars................................................................Add. 1

Excerpt from 3/11/22 Status Conference—Denial of Motion to Suppress Evidence .............................................................................Add. 5

Excerpt from 4/8/22 Status Conference—Denial of Motion to Show Implicit Bias Video.........................................................................Add. 16

Excerpt from 4/13/22 Status Conference—Denial of Motion to Preclude Term "Sexual Abuse" ......................................................................Add. 23

Excerpt from Trial Day 3 5/9/22—Admission of Hearsay Regarding Correia's Plans...........................................................................Add. 27

Excerpt from Trial Day 8 5/20/22—Denial of Mistrial Motion...........Add. 33

Excerpt from Trial Day 11 5/25/22—Exclusion of Work Records and Mental Health Evidence ...............................................................Add. 40

Excerpt Jury Trial Day 11 5/25/22—Denial of Motion for Judgment of Acquittal.......................................................................................Add. 46

Excerpt from Trial Day 11 5/25/22—Exclusion of Fagan's Expert Testimony.........................................................................................Add. 52

Excerpt from Trial Day 12 5/26/22—Denial of Motion to Admit Mondesir Statements Under Rule 807 ............................................................Add. 63

Excerpt from Trial Day 12 5/26/22—Exclusion of Some Mental Health Evidence ...........................................................................................Add. 74

Excerpt from Trial Day 13 5/27/22—Denial of Renewed Mistrial Motion ..............................................................................................Add. 80

Excerpt from Trial Day 14 5/31/22—Denial of Renewed Motion for
　　Judgment of Acquittal.......................................................Add. 93

Excerpt from Trial Day 14 5/31/22—Jury Instructions.......................Add. 95

Excerpt from Sentencing Transcript 10/11/22—Calculating Guidelines
　　Offense Level ................................................................Add. 119

Judgment ....................................................................Add. 125

Amended Judgment ...............................................................Add. 132

Second Amended Judgment...................................................Add. 140

```
 1                      UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
 2

 3

 4     UNITED STATES OF AMERICA,           )
                                           )
 5     vs.                                 )  Criminal Action
                                           )
 6     LOUIS D. COLEMAN, III,              )  No. 19-10113-FDS
                       Defendant           )
 7                                         )
                                           )
 8                                         )

 9

10     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                     HEARING ON MOTION TO SUPPRESS

12

13

14
            John Joseph Moakley United States Courthouse
15                      Courtroom No. 10
                        1 Courthouse Way
16                      Boston, MA 02210

17
                        March 1, 2022
18                       11:00 a.m.

19

20

21

22

23                      Valerie A. O'Hara
                        Official Court Reporter
24           John Joseph Moakley United States Courthouse
                   1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                  E-mail: vaohara@gmail.com
```

Add. 1

1    How about Monday, the 18th?

2         MR. HOOSE:  Sure.

3         THE COURT:  Did you have marathon plans that day?

4         MR. HOOSE:  No, those are well in the rearview

5    mirror.

6         THE COURT:  All right.  I apologize.  Just

7    sometimes this sort of thing happens, so let's say

8    April the 18th, and we'll say at, again, we'll say at 9:30

9    in the morning, and hopefully we can get you out of there

12:39PM 10    and have your afternoon off, perhaps.

11         All right.  The final thing I want to take up is

12    I'm going to rule from the bench on defendant's motion to

13    dismiss the indictment or in the alternative for a Bill of

14    Particulars, which is Docket Number 168.

15         I'm going to deny the motion on the papers.  As

16    I'm sure counsel is aware, the requirements of an

17    indictment are to provide sufficient notice so that

18    defendant can mount an effective defense and to permit him

19    to plead double jeopardy as a bar.

12:40PM 20         The indictment here indicates obviously the

21    charge, the crime committed identified by a statutory

22    reference, the date of the crime, which is February the

23    24th, 2019, the place, which is Boston, Massachusetts, and

24    the victim who was Jassy Correia.

25         I think there was no question that that is

**Add. 2**

1    constitutionally adequate, and I don't see that a Bill of

2    Particulars is necessary for the defendant to prepare a

3    defense, avoid surprise, or protect against double

4    jeopardy.

5          In substance, what the defendant is saying is that

6    there is not sufficient evidence that the victim was

7    confined, abducted, seized or whatever else the statute

8    requires, or that the defendant did so for a prescribed

9    purpose, ransom, reward or otherwise.

12:41PM 10          I cannot dismiss an indictment before trial for

11    lack of evidence, and if the evidence at trial proves

12    insufficient, then, obviously, we'll take it up at that

13    time, but the indictment is certainly constitutionally

14    adequate, and a Bill of Particulars is not necessary,

15    again, to help prepare a defense, avoid surprise, or

16    protect against double jeopardy, so that motion is denied.

17          And the other two motions, 161, the motion to

18    suppress, I will take under advisement, and 162, the motion

19    to suppress to warrantless realtime tracking will await the

12:41PM 20    outcome of an evidentiary hearing, which is scheduled for

21    Monday, the 7th at 9:30 a.m.

22          If that proves to be problematic, contact

23    Mr. McKillop and we'll try to find a date where everyone

24    can make it.

25          MR. ZOLYNSKI:  Just for purposes of the record, we

**Add. 3**

1    would object to the Court's denying the motion to dismiss,

2    particularly with regard to the Sixth Amendment's grand

3    jury clause.

4         THE COURT:  So noted.  All right.  Anything

5    further for the moment, Mr. Zolynski?

6         MR. ZOLYNSKI:  Judge, I think there's a Rule 17

7    motion that is under the Court's consideration right now.

8    It is under seal so I don't know that it's anything that we

9    can talk about.

12:42PM 10        THE COURT:  Yes, I noted that, and I will take

11    that up separately.

12         Anything from the government?

13         MR. RICHARDSON:  No, thank you, your Honor.

14         THE COURT:  Thank you.  We'll stand in recess.

15         THE CLERK:  All rise.

16         (Whereupon, the hearing was adjourned at

17    12:42 p.m.)

18

19

20

21

22

23

24

25

**Add. 4**

1
2                      UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
3

4
     UNITED STATES OF AMERICA,          )
5                                       )
     vs.                                )  Criminal Action
6                                       )
     LOUIS D. COLEMAN, III,             )  No. 19-10113-FDS
7                  Defendant            )
                                        )
8                                       )
                                        )
9

10
     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
11

12                     HEARING CONDUCTED BY ZOOM

13

14

15        John Joseph Moakley United States Courthouse
                      Courtroom No. 10
16                    1 Courthouse Way
                      Boston, MA 02210
17

18                    March 11, 2022
                       2:00 p.m.
19

20

21

22

23                    Valerie A. O'Hara
                    Official Court Reporter
24   John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com

**Add. 5**

1    was a trespass theory applicable to the GPS tracking?

2         THE COURT:  It does not appear to be applicable.

3    The trespass theory is this physical trespass where, you

4    know, you put a gismo on the car, it does not seem to be

5    implicated here as near as I can make out.  Again, I can't

6    guarantee that's where the law is going to wind up, but it

7    doesn't seem to me to be in play here.

8         MR. ZOLYNSKI:  That's all the questions I have,

9    your Honor.

02:22PM 10        THE COURT:  Meaning the police did not crawl

11   underneath the car and put a device on it, they didn't

12   surreptitiously enter the car or put something in the glove

13   compartment or under the hood.  Whatever else is going on

14   here, it does not seem to be physical trespass as opposed

15   to an electronic device.

16        All right.  Let me turn to the motion to suppress.

17   There's a motion to suppress nine warrants.  The government

18   says it's six, but I think however many we're talking about

19   here, I think the issues are essentially the same and

02:23PM 20   intertwine and overlap to a great extent.

21        Obviously, the probable cause standard applies.

22   There must be probable cause to believe that the

23   information in the affidavit is sufficient to warrant a

24   person of reasonable caution to believe that evidence of a

25   crime would be found in the location to be searched.

**Add. 6**

1          There has to be a sufficient nexus between the

2     location to be searched and the items sought considering

3     the totality of the circumstances, which must establish a

4     fair probability that the items sought would be found at

5     the location indicated.

6          The principal issue here is, obviously, the

7     warrant to search the cell phone itself.  It is a cell

8     phone of the defendant.  Beginning with the probable cause

9     issue, the facts of the affidavit, defendant contends it

02:24PM 10   fails to show probable cause that there was a kidnapping

11    resulting in death based on the evidence, defendant

12    contends that there was a consensual entrance to the

13    vehicle, and that there is insufficient evidence that she

14    was held against her will or that the defendant did so for

15    ransom, reward or otherwise.

16          It is true that the evidence here is certainly

17    circumstantial.  The evidence of a kidnapping is that she

18    did enter the vehicle, that she during a relatively short

19    duration of about two hours, some of which was at least

02:25PM 20   half of that taken up in a drive from Boston to Providence,

21    somewhere along the way, there appears to have been a

22    violent struggle that resulted in cracks in the windshield

23    and an injury to the defendant's face and what appears to

24    have been the killing of the victim.

25          The magistrate judge could have reasonably

**Add. 7**

1    inferred, and I'm required to give deference to her

2    judgment, that she was held for some period of time, even

3    if relatively fleeting, against her will in the automobile.

4         As far as the ransom, reward or otherwise

5    requirement, any benefit to the defendant will suffice.

6    That would include not only ransom or reward but the word

7    "otherwise" is in the statute as well, and other benefits

8    could include not only things like personal gratification

9    or sexual gratification but preventing a victim from

02:26PM 10  reporting his conduct or filing a police complaint or

11   something of that sort, and, again, the magistrate judge

12   could have reasonably inferred from all of the

13   circumstances that there was a fair probability that the

14   crime in question had occurred.

15        As far as the nexus is concerned, the issue there

16   is is there a fair probability that the cell phone contains

17   evidence of that crime?  There are four principal areas I

18   think implicated here:  GPS movements; text messages,

19   e-mails or similar communications; photos or video; and

02:26PM 20  Internet search information.

21        The defendant, of course, had the phone with him

22   when he was stopped.  It's an obvious and reasonable

23   inference that the magistrate judge was entitled to make

24   that he had his phone with him during most or all of the

25   relevant times.

**Add. 8**

1          GPS location information is obviously potentially

2     relevant, where was he at a particular point in time and

3     when.  Photos and videos may also be implicated.  The

4     government -- rather, it was a fair probability that there

5     might have been evidence concerning, for example, a

6     photograph taken in the night club, a photograph with the

7     victim.

8          The government at that point didn't know whether

9     he had met her before, whether he had met her earlier that

02:27PM 10     evening, did he have any kind of relationship with her for

11     which photographic evidence would have been quite telling,

12     indeed, and, again, it can't be judged by hindsight.  The

13     fact that such photographs did not apparently occur does

14     not mean that there was not a fair probability that such

15     evidence might be located.

16          The same applies to messages.  Did he communicate

17     with her in any way?  Did they have any kind of

18     pre-existing relationship of any kind or any connection of

19     any kind?  And Internet searches is, of course, also

02:28PM 20     implicated.  For example, was he following news stories

21     about her disappearance?  Did he conduct searches

22     concerning disposal of a body, which is not something

23     within the common knowledge of an ordinary person.

24          The magistrate judge, again, whose judgment is

25     entitled to deference, could reasonably conclude based on

**Add. 9**

1    the information in the affidavit as well as common sense

2    and reasonable inferences that there was a fair probability

3    that evidence concerning the crime of kidnapping resulting

4    in death could be found on his phone.

5            The defense also objects that the warrant was

6    overbroad.  There's an issue concerning punctuation.  The

7    suggestion is that the limitation of evidence, fruits and

8    instrumentalities applies only to tangible objects.  It is

9    true that that sentence is not punctuated properly, but a

02:29PM 10   common sense reading, as opposed to a hypertechnical

11   reading, would suggest that that limitation applies to all

12   records, not just tangible objects and would, therefore,

13   include everything on the phone.

14           There's an objection as to the temporal span of

15   February 23rd to February 28th, which appears perfectly

16   appropriate.  The defendant presumably arrived at the night

17   club or in the vicinity of the night club on February 23rd;

18   even if events occurred after midnight on February 24th,

19   and there's no unduly broad temporal scope.

02:29PM 20           In terms of the types of information requested,

21   again, getting into GPS location, messages, Internet

22   searches and so forth, I've discussed that already.  I

23   think it was all fairly encompassed by the relevant

24   standard, and, in any event, the remedy for an overbroad

25   search is not to suppress everything but to suppress the

**Add. 10**

1      evidence collected that was outside the time frame or

2      otherwise outside the proper scope of the warrant or any

3      fruits thereof, and defendant has pointed to no evidence

4      that requires suppression on that ground.

5              As far as the execution of the search itself, my

6      understanding is that the FBI made a duplicate copy of all

7      digital information on the phone and that performed data

8      extraction on that duplicated version.

9              That is not only entirely reasonable, it's the

02:31PM 10     best practice and it is to be encouraged so as not to

11     disturb or destroy the original digital information, and

12     from that point forward, the FBI was entitled to examine

13     all files on the phone.

14             Once it has a warrant to search a house can search

15     every closet or drawer.  It has the right to search all

16     files on the phone once it has the authority to enter the

17     phone and search for some evidence, and with computer

18     files, unlike physical objects, you can't tell without

19     opening the file.

02:31PM 20             There's an argument that when you're searching a

21     house, for example, and you're looking for a rifle, you

22     don't need to open up the silverware drawer because the

23     rifle couldn't possibly be in there.  There's really no

24     accurate analog of that in the digital world because

25     evidence of any kind can be found in almost any kind of

**Add. 11**

22

1    file, and so I find nothing improper about the execution of

2    the search.

3           There were warrants other than the basic cell

4    phone warrants.  They largely present the same issues.

5    There was a warrant for T-Mobile records concerning the

6    defendant's cell phone.  The time frame there is broader.

7    It's from February 17th to March 1st.

8           The affidavit indicated that law enforcement

9    wanted to investigate whether the defendant and the victim

02:32PM 10    had been in contact or at the same location.  Certainly

11    that was a reasonable inference from the evidence.  That

12    tends to show possible planning or motive.

13           The magistrate judge again exercised common sense

14    and reasonable inferences could reasonably conclude that

15    any such information could be evidence of the crime, and,

16    in any event, again, if it is overbroad, the remedy is to

17    suppress the information collected from the period that is

18    overbroad and any fruits of that portion of the search, and

19    the defendant has not identified any such evidence.

02:33PM 20           The laptop and computer towers were also the

21    subject of warrants.  To a large extent, that overlaps the

22    probable cause for the cell phone.  And, of course, the

23    government doesn't know whether electronic evidence will be

24    located on a particular piece of equipment, one or the

25    other, or both, or all of them.

**Add. 12**

1          The evidence concerning the computer tower is even

2     more compelling.  This is not something that someone would

3     normally take on a road trip.  An obvious inference from

4     the fact that the defendant took it with him on his flight

5     is that there was something on there that he wished to

6     hide, which was evidence of consciousness of guilt, and

7     suggested that something of evidentiary value was likely

8     located on the computer tower, and the laptop itself is

9     very much like the phone in terms of the kind of files that

02:34PM 10    are stored on them.

11          The Google records warrant, this is, I think, a

12     Rhode Island warrant, Google records associated with the

13     use of the cell phone.  This is, as I understand it,

14     essentially location information from February 28th, I'm

15     sorry, 23rd to February 24th, as well as web history,

16     search history and e-mails.

17          Where he traveled during the critical period was

18     obviously quite relevant evidence.  What searches he

19     conducted on the Internet, for example, a search of the

02:34PM 20    defendant by name or searches how to dispose of a body are

21     obviously potentially relevant.  The people with whom he

22     communicated are potentially relevant.

23          Again, under the circumstances, the magistrate

24     judge to whom deference is owed could reasonably conclude

25     that evidence would be found at that location, and then,

1   finally, the Buick information module would contain not

2   only evidence of the location of the vehicle but its

3   movement, things like whether or not doors were opened, the

4   ignition was turned on or off, and given the circumstances

5   here, including the obvious inference that the kidnapping

6   and killing occurred inside the vehicle, that information

7   was clearly relevant, and that there was both probable

8   cause and the relevant nexus.

9          So, under the circumstances, I conclude as to all

02:35PM 10   of the warrants that there was probable cause to believe

11   that relevant evidence would be found at the location to be

12   searched, that there was a nexus between the location to be

13   searched and the crime and the items sought, and,

14   therefore, I find all of the warrants survived scrutiny.

15         And, finally, in any event, of course, even if any

16   or all of the warrants were to prove defective, the good

17   faith standard of *Leon* would apply.  There's no issue as to

18   whether false information was supplied to obtain the

19   warrants or that the magistrate judge wholly abandoned her

02:36PM 20   role as a neutral judicial officer.

21         The warrants are not so lacking in probable cause

22   that law enforcement's belief in its validity was entirely

23   unreasonable and not so facially invalid that officers

24   could not have presumed that the warrants were valid, and

25   so, again, even if there is an issue as to any or all of

**Add. 14**

1   the warrants such as they were defective under the Fourth

2   Amendment, the police officers clearly were entitled in

3   good faith to rely on the existence of those warrants

4   within the meaning of *Leon* and its progeny, so the motion

5   to suppress will be denied.

6        All right.  Anything from the government further

7   on that?

8        MR. RICHARDSON:  Your Honor, the only thing in

9   discussing the Google warrant, I think you meant to say

02:37PM 10   there was probable cause to believe there might be a search

11   of the victim by name, and you said defendant.

12        THE COURT:  Well, actually, what I meant to say

13   inartfully was whether the defendant would be monitoring

14   new stories about her disappearance, so it's really him or

15   her or both, I think it would be a reasonable inference

16   under the circumstances.  That's the kind of thing you

17   would search for in a disappearance-type case.

18        Mr. Zolynski.

19        MR. ZOLYNSKI:  I have nothing specific other than

02:37PM 20   to permit the record to reflect our objection to the

21   Court's findings, that's all.

22        THE COURT:  All right.  While I have you here, I

23   think there's an issue about the final pretrial conference,

24   Mr. Hoose's schedule.  I'm happy to move the final pretrial

25   conference.  I'm leaving the country on April 20th.  I may

**Add. 15**

1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4   UNITED STATES OF AMERICA,           )
                                        )
5   vs.                                 )  Criminal Action
                                        )
6   LOUIS D. COLEMAN, III,              )  No. 19-10113-FDS
                      Defendant         )
7                                       )
                                        )
8                                       )

9

10  BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12            STATUS CONFERENCE CONDUCTED BY ZOOM
13

14

         John Joseph Moakley United States Courthouse
15                    Courtroom No. 10
                      1 Courthouse Way
16                    Boston, MA 02210

17

                       April 8, 2022
18                      9:00 a.m.

19

20

21

22

23                    Valerie A. O'Hara
                    Official Court Reporter
24       John Joseph Moakley United States Courthouse
                1 Courthouse Way, Room 3204
25                    Boston, MA 02210
               E-mail: vaohara@gmail.com

**Add. 16**

1    opposed to individually, but the questionnaires ought to

2    cover I think enough of the issues to take us to individual

3    voir dire.

4        Let me take up the defendant has proposed that I

5    show an unconscious bias video based on the Western District

6    singular.  There's different iterations of the video, but

7    I'm going to refer to it in the singular as a single video.

8    I'm not inclined to do this.  I think, obviously, the basic

9    concept underlying the video is important, that is, the need

09:10AM 10    for jurors to attempt to be aware of their biases and

11    prejudices and listen to all of the evidence and be as fair

12    as they can under the circumstances, that is, obviously, the

13    most important focus, I think, of the jury impanelment

14    process, and, of course, what I say to them and how I say it

15    I think is important in that respect.

16        Some of this is implicit in the structure of the

17    jury itself.  It's one reason we have 12 people, not 1, to

18    get different views and to try to cancel out some of this.

19        I don't think the video moves the needle as far as

09:10AM 20    I'm concerned very far, particularly the longer one.  There

21    are distracting things on there that I think are not

22    particularly useful or relevant.  I didn't like the tone of

23    some of it, which I found to be a little condescending.

24        The defendant's memo talks about a recent case or

25    cases where jurors had made racially-biased remarks during

**Add. 17**

8

1    deliberations, which came out later.  That's not implicit

2    bias, that's explicit bias, and I don't think this video

3    does do much for someone like that if they make it onto the

4    jury, but there it is.  It doesn't promote the cause of

5    justice.

6         I think that a common mistake that Judges make is

7    the idea that it doesn't matter how long this process takes,

8    it doesn't matter if jurors become impatient during the jury

9    impanelment process or feel that the Court is being

09:12AM 10   disrespectful to them, or to them, as the case may be.

11        I'll give a personal example.  I could give others.

12   I was on state court jury duty last summer.  The Judge did

13   individual voir dire.  I was the 16th juror called, and it

14   took till 3:30 in the afternoon to do that with no lunch,

15   and there were probably 40 of us in the beginning, and

16   people were in almost open rebellion at the end, at least by

17   the time I left, why is this taking so long, this is

18   terrible, you know, we should do something about this.

19        Everything is a balance.  If you take time to do

09:13AM 20   something, there's a cost to that, and, obviously, it is

21   time consuming, you know, but we shouldn't make it any

22   longer than necessary, so the idea like, well, this can't

23   hurt.  It's not worth it on balance.

24        I also know, for what it's worth, to the extent

25   we're talking about racial stereotyping, in a particularly

**Add. 18**

1    racially charged crime, the victim is also black.  There's

2    no issue of cross-race identification or anything like that,

3    but I think the bottom line here is how do you communicate

4    the idea among the jurors that they should not have biases,

5    including ones that are baked in, which, of course, everyone

6    has, and how do they -- how should they be reminded of the

7    importance of fairness and listening to the evidence, and I

8    think that I'm going to address concepts those orally, not

9    through this video.

09:14AM 10        I don't have a problem, I guess, with the

11   underlying idea that all of us have implicit biases, and

12   they can be dangerous under some circumstances, but I didn't

13   like the way the videos presented that, and it would

14   irritate or alienate the jurors by wasting their time.

15   There's a lot of time wasting inherent in the jury process,

16   and I am disinclined to do that unless I think it's

17   necessary, so that's how I propose to handle that.

18        MS. PEACHY:  Judge, a few words?

19        THE COURT:  Yes.

09:15AM 20        MS. PEACHY:  I obviously respectfully disagree, and

21   I'm not exactly sure what the U.S. Attorney's Office, what

22   their position is on this.  I've tried to reach out to the

23   leadership there, the new leadership there, and I don't know

24   how they feel, but I was hoping that they might join in this

25   sort of request.

**Add. 19**

1        I think any concerns about inconvenience are out.

2   We can have people who have not been educated or even heard

3   that word as lawyers.  If the jury does a training on

4   unconscious bias, we've all heard of it, but if you've never

5   heard of it, it's even harder to be aware of it, and I think

6   the point of the video is to get people to think about the

7   way unconscious bias might affect their decision-making, and

8   if you've never heard of it, then you're not going to be

9   aware of it, and routed out in a room of 12 people, I'm

09:16AM 10   sure, like you said, it's not explicit bias, it's going to

11  be localized.  It's unconscious bias that's going to

12  influence people's decision-making in other ways.

13        Again, Mr. Coleman is African-American.  He's a

14  black man, as you pointed out, and that the decedent,

15  Ms. Correia, is African-American as well, and people might

16  have biases that would affect their decision-making, that

17  would affect decision-making on both sides here, so it's a

18  common interest in this case.

19        I don't agree that a case where race is an issue --

09:17AM 20   I mean, one thing that we've raised in one of our motions is

21  Mr. Coleman's prior experiences in the U.S. in San Diego and

22  how that might help explain why as a black man with a prior

23  history of being assaulted by the police he would be

24  apprehensive about going to the police.

25        There are going to be issues, I think, if your

**Add. 20**

1    Honor allows us to introduce that type of evidence.

2         THE COURT:  Let me pause here so I can catch up and

3    respond to some of the comments.  First off, you're

4    conflating, I think, whether this is an issue that needs to

5    be addressed and whether the video is the way to address it,

6    okay.

7         I'd say it's part of the process, you know, however

8    directly the topic is approached.  I think the basic idea is

9    correct in terms of the people to address it.  That doesn't

09:18AM 10    mean the video and the thing about, well, you know, here's a

11    list of color, hello, you know, that doesn't have anything

12    to do with etiquette, and on the tone of some of this to be

13    smug and condescending, which is not the tone I want to set,

14    particularly for people who are worried about it.

15         Again, if there's an explicit racist on the jury,

16    this video is not going to do anything.  It's really more a

17    way of like reinforcing the concept of fairness with

18    ordinary people, well-intentioned people who just need to

19    consider some of these points, and I don't think the video

09:18AM 20    in my mind was very effective in doing that, and I did not

21    say that race was not any part of this in an unusually

22    racially charged case is my point, and we'll get, you know,

23    whether this thing in San Diego is admissible or not, we'll

24    get there in due course, but I'm not saying that, you know,

25    none of these issues matter.

**Add. 21**

12

1          I'm saying I didn't like the video, and I don't

2     think it was worth it, and there's a lot of stuff in there

3     that I think is just unnecessary.  You know, in the future,

4     if like a better video were produced, I don't know, we'd

5     play it, maybe that would be right, but, again, I'm using

6     the singular, but I didn't like it, and they are not at the

7     issue, and, again, you know, you can only go so far,

8     obviously, with some of these things.

9          I mean, all you can do is to try to make people

09:19AM 10    aware of, you know, that these things may be out there, and

11    that might be influencing their decisions, and that's really

12    about as far as you can take it.

13         You know, and I'll just say this is a bit of a

14    tangent, but I feel like in the impanelment process what I

15    say and how I say it is almost as important as what I ask,

16    and, again, part of it is like sort of, I don't know,

17    reminding people, stiffening their spines sometimes or just

18    pointing out what matters and making sure that they're not

19    taking any of these things casually, that they're

09:20AM 20    considering everything carefully and being as fair as they

21    can, so I certainly strongly believe that all of that is

22    important, but I'm not going to show this video.  Sorry, I

23    interrupted you.

24         MS. PEACHY:  No, that's fine.  I don't need to say

25    anything more on that subject.

**Add. 22**

1

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3

 4      United States of America,     )
                        Plaintiff,    )
 5                                     )
                                       )
 6      vs.                            )    Case No. 19-cr-10113-FDS
                                       )
 7                                     )
        Louis D. Coleman, III,         )
 8                      Defendant.     )

 9


10      BEFORE:   The Honorable F. Dennis Saylor, IV

11


12                  Video Conferenced Motion Hearing

13
                            April 13, 2022
14

15

16

17

18

19

20

21

22
                      Marianne Kusa-Ryll, RDR, CRR
23                       Official Court Reporter
                      United States District Court
24                     595 Main Street, Room 514A
                   Worcester, Massachusetts 01608-2093
25                    508-929-3399 justicehill@aol.com
                   Mechanical Steno - Transcript by Computer
```

Add. 23

1          THE COURT:  Okay.

2          MR. SHINE:  -- and forward to the Court.

3          THE COURT:  Okay.  All right.  I want to talk about

4   some of the motions.  Like I say, I don't think we're going to

5   resolve everything.  There's particularly what I'll call the

6   intersection of Rules 404, 405, and 412, which is presented in

7   a number of different ways in this case, in ways that are a

8   little bit complicated.  I want to make sure I understand

9   everything, but there are some things, I think, I can deal with

10  up front.  In fact, I'm going to resolve two of them now.  We

11  don't really need any argument on it.

12          No. 246 is defendant's motion to preclude the use of

13  certain terms during trial.  The first piece of that is use of

14  the term "victim."  I'm going to permit its use.  It is a fair

15  comment that the word "victim" can suggest guilt.  Of course, a

16  victim could be a crime victim, which is interpreted that way;

17  there's a conclusion that a crime occurred, and it could be

18  construed further to be that this crime occurred as opposed to,

19  you know, a different uncharged crime.

20          But, of course, one can also be a victim of an

21  accident or neglect or a victim of a heart attack.  There's

22  other ways in which the word can be used.  I will permit it

23  because it's a very convenient and common shorthand, but I

24  think it's fair that I'm going to -- fair for me to advise the

25  jury as to this issue that they should not conclude that any

```
 1    judgment of any kind has been made by mere anyone else that the
 2    defendant is guilty because the government is using the word
 3    "victim," or I'm using the word "victim" as a shorthand and
 4    that, you know, reminding them that that's -- you know, the
 5    basic point that the government has to prove the defendant
 6    guilty beyond a reasonable doubt, and use of the word "victim"
 7    should not be taken as a suggestion otherwise, but I don't
 8    think it's unfair or inflammatory, and the alternatives are
 9    awkward, I think, under the circumstances.  So I think I'm
10    going to permit it.  So that is the first point.
11         The second point is to preclude any suggestion that
12    witness YM was drugged.  It seems to me that if YM testifies, I
13    will permit her to say that she doesn't remember things -- you
14    know, she'll testify -- she can testify as to her physical and
15    mental condition.  I felt like I was drugged, something like
16    that; however, I will not permit any suggestion of any kind
17    that the defendant drugged her in any way, shape, or form; and
18    I will be unhappy if the witness or the government goes
19    anywhere near that.  It seems to me that her ability to
20    perceive, her ability to remember is obviously important; and
21    if there's a limitation on it because she felt drugged, I think
22    that's fair for her to say so or for someone to elicit, but I
23    want no suggestion of any kind from the witness or anyone else
24    that the defendant had anything to do with that because there's
25    no evidence of that as far as I'm aware.
```

**Add. 25**

1          The third issue raised by the defense is they're

2     seeking to preclude the use of the words "rape" or "sexual

3     assault."  I think, as I understand it, the government says

4     that there is evidence that sexual intercourse occurred; that

5     Ms. Correia had a very high level of intoxication, at least

6     measured by her alcohol blood level -- her blood alcohol level

7     and that a violent struggle took place in the car.  I think

8     under the circumstances it is not unfair for the government to

9     use the term "sexual assault."  My understanding is they do not

10    intend to use the word "rape."  I don't think it's unsupported

11    by the evidence even though, as I understand it, there's no

12    evidence of things like vaginal abrasions or similar proof of

13    forcible penetration, but I don't think the term "sexual

14    assault" is unfair or inflammatory under the circumstances.  So

15    246 is -- you'll say granted in part and denied in part.

16          And the other motion I'm going to take up front is

17    No. 247, which is defendant's motion to exclude certain

18    evidence under Rule 401, 403, and 404(b), which basically

19    relates, although not entirely to -- well, it does relate

20    entirely to we'll call it post-event behavior, Internet

21    searches, purchases, and so forth, which comes under the

22    heading of, I think, consciousness of guilt evidence.

23          The consciousness of guilt evidence requires that

24    the -- it -- that the fact finder be able to draw reasonable

25    inferences from the evidence that are probative of guilt; and,

**Add. 26**

```
 1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
 2

 3

 4   UNITED STATES OF AMERICA,         )
                                       )
 5   vs.                               ) Criminal Action
                                       )
 6   LOUIS D. COLEMAN, III,            ) No. 19-10113-FDS
                      Defendant        )
 7                                     )
                                       )
 8                                     )

 9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12                         JURY TRIAL DAY 3

13                         JURY IMPANELMENT

14

15        John Joseph Moakley United States Courthouse
                      Courtroom No. 10
16                    1 Courthouse Way
                      Boston, MA 02210
17

18                       May 9, 2022
                         8:30 a.m.
19

20

21

22

23                    Valerie A. O'Hara
                   Official Court Reporter
24        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com
```

**Add. 27**

1    requires a ruling before the opening, I will make that

2    ruling.

3              MR. RICHARDSON:  It doesn't affect the opening.  I

4    think it may affect the first couple of witnesses.

5              THE COURT:  All right.  I will come to rest on that

6    then.

7              MS. NUZUM:  Your Honor, the next issue we had to

8    raise was the Court's ruling on the government's motion in

9    limine to introduce certain statements by Ms. Correia about

08:39AM 10    her intent the evening of February 23rd.

11             Your Honor had ruled that those statements could

12    come in but had said that we should not introduce the

13    information about the child.  We're not planning to say

14    anything other than this was her daughter and her age.  We

15    won't use her name.  Your Honor also indicated that we

16    shouldn't get into detail about the shelter that she was

17    staying at.  I just wanted to clarify that.

18             One of the government's witnesses is the case

19    manager at the shelter.  We don't have any reason to get

08:40AM 20    into the reason that she was at the shelter, but we do want

21    to introduce the fact that she was at a shelter merely

22    because she had a case manager to explain that relationship.

23             She is the one who gave her the two-day pass,

24    which, again, goes back to Ms. Correia's intent to come back

25    on Sunday because she was required to come back on Sunday.

**Add. 28**

1          This witness is also expected to testify that

2     Ms. Correia had been working on a resume' for a job

3     interview that she had on Monday, that she had been

4     expecting her to pick up that resume' on Sunday, and that

5     would be yet another reason the government wants to

6     introduce these statements showing her intent to be back at

7     the shelter on Sunday.

8          THE COURT:  All right.  My view is that the fact

9     she has a child and the fact she was living at a shelter are

08:41AM 10     admissible in the sense that otherwise you can't make any

11     sense of this evidence, and it reflects on her intentions as

12     to what she might have been thinking when she got into the

13     automobile at two in the morning, but having said that,

14     there's obviously a great or a substantial, I should say,

15     possibility of unfair prejudice if we get into the details

16     here, why are you at a shelter, what happened to you.

17          Obviously, I do not want a picture of the child or

18     details of the child.  I mean, this would be grossly

19     prejudicial, and I want no more than the bare minimum

08:41AM 20     necessary for the point to be made that she had plans on

21     Sunday as opposed to spending the night in Providence and

22     coming back on Monday morning or whatever, you know, the

23     government's theory is, so I'll permit it but only the bare

24     minimum.

25          MS. NUZUM:  Thank you, your Honor.  One very

**Add. 29**

1   technical point.  Your Honor had said that when the

2   government has sub exhibits on its exhibit list that your

3   preference is for decimal points, 1.1, 1,2.  We're told that

4   under the JERS system, it needs to be a dash, and we wanted

5   to make sure that that would be okay.

6              THE COURT:  That's news to me.  Matt, you're

7   shrugging?

8              THE CLERK:  I think it's easier that way for them

9   to look at it.

08:42AM 10             THE COURT:  With a dash?

11             THE CLERK:  Yes.

12             THE COURT:  Okay.  That's fine.

13             MS. NUZUM:  Thank you, your Honor.

14             THE COURT:  The point being I guess, again, if you

15  have a mountain of records, let's say medical records of X

16  Hospital, it's just much easier to say they're all

17  Exhibit 17 and pull something out and it has a sub number as

18  opposed to numbering each one of those things individually,

19  which is cumbersome.

08:43AM 20             MS. NUZUM:  Understood, your Honor, and that is how

21  we are doing the exhibit lists.  We also did want to confirm

22  that it is okay to have exhibits that are, for example, a

23  batch of photos that all go together simply as one exhibit

24  and then we'll refer to them by page number.

25             THE COURT:  Okay.

**Add. 30**

1          MS. NUZUM:  Thank you.

2          THE COURT:  Anything from the defense?  Ms. Peachy.

3          MS. PEACHY:  On the issue of the motion in limine

4     about Ms. Correia's statements and her intent to return to

5     the shelter, I just want to make sure that the Court knows

6     our continuing objection to that.  We think it has minimal

7     probative value.  There's a cumulative amount of evidence

8     here being introduced on this topic, and it's in a way an

9     appeal to sympathy, I think, for the victim, talking about

08:43AM 10    how she's trying to get a new job, talking about how she was

11    going to go to work, how she was going to go back to the

12    shelter.

13          All of these things are kind of hammering home this

14    point that is not much -- we're not saying she had the

15    intent to, you know, run off and go live with Mr. Coleman

16    that night, so it's barely probative, I think, and is really

17    an attempt by the government to try to appeal again to the

18    jurors' sympathies, and there's a lot of it as well, and I

19    don't think we need that much.

08:44AM 20         THE COURT:  Two quick responses.  It isn't

21    cumulative yet until I see it, so I don't want it to be

22    cumulative, and I don't think we need to get into anything

23    beyond, you know, that she had a resume' she was going to

24    pick up, not that she was looking for a new job, starting a

25    new life.  All that is all unnecessary and I think would

**Add. 31**

1   fall under the heading of an unnecessary appeal to sympathy,

2   but the mere fact it was a resume' I think I will allow.

3           MS. PEACHY:  Turning to today's jury's selection,

4   your Honor, there are a few other questions that we'd like

5   you to ask of the panel.  One you already thought of was

6   since Monday have you heard or read or seen anything about

7   the case because there has been some additional publicity,

8   but also is there anything since last Monday that you would

9   like to add or change about your responses to the

08:45AM 10   questionnaire?

11          THE COURT:  Okay.  Hold on.

12          MS. PEACHY:  We already had one juror who did that.

13          THE COURT:  I think that's a fair question.  Let me

14   write it down.

15          Okay, go ahead.

16          MS. PEACHY:  Since Monday, have you spoken to

17   anybody about the case?  I know you instructed them, but

18   sometimes it's good to check.

19          THE COURT:  Okay.

08:47AM 20          MS. PEACHY:  I think both parties had proposed a

21   question of the jurors about the graphic images, video that

22   they're going to see.

23          THE COURT:  I'm going to address that as well.  I'm

24   going to sort of remind them what the nature of the charge

25   is and talk about the possibility of graphic images,

**Add. 32**

```
 1                      UNITED STATES DISTRICT COURT
                         DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA,        )
                                       )
 5    vs.                              )  Criminal Action
                                       )
 6    LOUIS D. COLEMAN, III,           )  No. 19-10113-FDS
                       Defendant       )
 7                                     )
                                       )
 8                                     )

 9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                         JURY TRIAL DAY 8

12

13

14
            John Joseph Moakley United States Courthouse
15                       Courtroom No. 10
                         1 Courthouse Way
16                       Boston, MA 02210

17
                          May 20, 2022
18                         8:45 a.m.

19

20

21

22

23                       Valerie A. O'Hara
                       Official Court Reporter
24        John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

**Add. 33**

1    that clip, could that have caused any of the injuries that you

2    described in your testimony?

3    A.    It appears as if she fell on her right side here, so maybe

4    some injuries on the right can be attributed.

5    Q.    Could any of the falls that you observed in the videos

6    that you reviewed cause the injuries that you saw on

7    Ms. Correia's neck?

8    A.    No.

9    Q.    And are any of them consistent with the injuries that you

10   saw on her head?

11   A.    No.

12              MS. NUZUM:  Could I have one moment, your Honor?

13              THE COURT:  Yes.

14              MS. NUZUM:  I have no further questions at this time.

15              THE COURT:  All right.  Why don't we take a break, and

16   as I indicated, this may take a little bit longer because of

17   the procedures I'm implementing.  We will take a break, again,

18   as close as 10 minutes as we can make it.

19              THE CLERK:  All rise.

20              (JURORS EXITED THE COURTROOM.)

21              ( A recess was taken.)

22              MR. HOOSE:  Your Honor, I'd like to be heard.

23              MS. NUZUM:  Should the witness step down, your Honor?

24              THE COURT:  Yes.  Go ahead.  Mr. Hoose.

25              MR. HOOSE:  Your Honor, I just want to elaborate on my

**Add. 34**

```
 1   objection to portions of this witness' testimony and in

 2   particular her testimony that Jassy Correia was alive when she

 3   was dragged into that apartment.  That is nowhere contained in

 4   the expert disclosure that was provided by the government, and,

 5   in fact, they stated that she was unable to give an opinion

 6   with any precision as to the date or time of Ms. Correia's

 7   death, so that is flatly contradicted by what is in her

 8   disclosure.

 9          And I'll tell you, your Honor, in preparation for this

10:55AM 10   trial, I have, of course, consulted with a medical examiner,

11   forensic pathologist, and I can tell you that had I known that

12   testimony was coming, I would have him under subpoena to

13   testify that it is not possible to determine from that video

14   whether she is dead or alive.

15          Obviously, I can't add into the witness list now or

16   bring him in on short notice, so the defense is prejudiced by

17   this, and I suggest that it also unreliable, unscientific,

18   barred by the principles of Daubert, and the Court should

19   instruct the jury to disregard that aspect of her testimony.

10:56AM 20          THE COURT:  Ms. Nuzum.

21          MS. NUZUM:  Your Honor, the government's view is that

22   what Dr. Vershvovsky testified to is not inconsistent with the

23   expert disclosure, the statement that she cannot say when the

24   death occurred is not inconsistent with her testifying today

25   that in her opinion she was not dead at that moment in time.
```

1          THE COURT:  What does it actually say in the

2     disclosure that the government made to the defense?

3          MS. NUZUM:  If I could have a moment, your Honor.

4     It's a little lengthy.  I could pass it up to you.  On this

5     particular topic, Dr. Vershvovsky will opine that it is not

6     possible to determine with precision the date or time of

7     Ms. Correia's death.  The death certificate in this case simply

8     states the date her body was recovered, as described in her

9     report, the autopsy revealed decompositional changes in the

10:57AM 10     body, and she's going to testify about several factors that can

11     affect that.  I will say the government was expecting a more

12     equivocal answer from the doctor.

13          THE COURT:  A what?

14          MS. NUZUM:  A more equivocal answer.  I was not

15     necessarily expecting her to say that.  I would say she is

16     subject to cross-examination on that topic.  If there are

17     reasons that the defense has looked into and spoken to an

18     expert about as to why that would not be a reliable

19     observation, they are with welcome to pursue that on cross.  At

10:58AM 20     this point, we expect this will continue through the end of

21     next week.  There is still time for an additional expert.

22          THE COURT:  It seems to me that this is a pretty

23     important opinion that she offered, that the victim was still

24     alive when she was being dragged into the apartment, and, you

25     know, it may not be inconsistent with her report, but it's not

**Add. 36**

1    in the report, which it seems to me is problematic.

2         I mean, you know, she could have opined that I don't

3    know -- well, I won't put up a silly hypothetical.  I mean, the

4    point is the government made a disclosure, it contained certain

5    opinions, this opinion was not one of those opinions.  It's not

6    on a minor or collateral matter, it's pretty important, and it

7    seems to me that that's a problem, and that that opinion ought

8    to be struck.

9         Do you have some other reason why I should -- why I

10:59AM 10   should not do that, Ms. Nuzum?

11        MS. NUZUM:  No, your Honor, other than the

12   opportunity, the alternative being the opportunity for the

13   defense to retain their other expert.

14        THE COURT:  All right.  I'm going to strike that, and

15   I'll instruct the jury when they return to disregard it.  All

16   right.  Thank you, we'll stand in recess.

17        THE CLERK:  All rise.

18        (A recess was taken.)

19        THE CLERK:  All rise.  Thank you.  You may be seated.

11:11AM 20   MR. HOOSE:  Your Honor, can I be heard further on the

21   issue?

22        MS. NUZUM:  The doctor is on the stand.

23        THE COURT:  Is it a legal argument?

24        MR. HOOSE:  Yes, it is.

25        THE COURT:  In other words, do we need to discharge

**Add. 37**

1    the witness?  Well, anyway, let me hear you.

2         MR. HOOSE:  I want to move for a mistrial, your Honor,

3    because I appreciate the Court's efforts at remediation here,

4    but, frankly, I think it's not going to be sufficient to remove

5    this damage to the defendant's case, and as a part of the

6    motion for mistrial, I want to offer a copy of the expert

7    disclosure to be marked for identification, if I may do that.

8         THE COURT:  Yes.  The clerk has stepped out, but I

9    will accept that for identification.  We'll give whatever

11:12AM 10   letter is up next.

11        Hold up, Matt.  We have something to mark for

12   identification.  What letter is that?  Is that A?

13        THE CLERK:  Yes.

14        THE COURT:  Yes, to be marked A for identification.

15        (Exhibit A was marked for identification.)

16        MR. HOOSE:  In short, your Honor, this is proverbial

17   trying to unring the bell.  The jury has already heard this.

18   It is damaging to defendant's case.  It is without adequate

19   basis in science in my judgment, and, again, I appreciate the

11:13AM 20   effort the Court makes in striking it from the jury's

21   attention, but it's really hard to get this out of the jurors'

22   mind, and it is difficult to know how to properly cross-examine

23   having the jury, having heard this, so for all of those reasons

24   I think the only adequate remedy is for the Court to declare a

25   mistrial as much as we all really hate to do that.

**Add. 38**

 1           THE COURT:  All right.  The motion is denied.  Okay.
 2    Matt.
 3           THE CLERK:  All rise for the jury.
 4           (JURORS ENTERED THE COURTROOM.)
 5           THE CLERK:  Thank you.  You may be seated.  Court is
 6    back in session.
 7           THE COURT:  Welcome back, ladies and gentlemen.
 8    Before we begin the cross-examination, the witness issued or
 9    made a statement concerning whether the victim was alive or
11:15AM 10    dead at the moment that she was taken out of the car and into
11    the apartment shown on the video.
12           I am going to strike that from the record and instruct
13    you to disregard it.  And when I say disregard it, that means
14    it's not part of the evidence in this case, that you may not
15    consider it in any way directly or indirectly in your
16    consideration of the evidence in this case.
17           All right.  Mr. Hoose.
18           MR. HOOSE:  Yes, your Honor, before I question, just
19    renew the motion I made earlier.
11:15AM 20           THE COURT:  Yes, it's denied.
21                      CROSS-EXAMINATION
22    BY MR. HOOSE:
23    Q.   Good morning, Dr. Vershvovsky.
24    A.   Good morning.
25    Q.   So your first time in observing the body that you

**Add. 39**

1                        UNITED STATES DISTRICT COURT
                          DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                )  Criminal Action
                                        )
6    LOUIS D. COLEMAN, III,             )  No. 19-10113-FDS
                     Defendant          )
7                                       )
                                        )
8                                       )

9

10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                          JURY TRIAL DAY 11
12

13

14
            John Joseph Moakley United States Courthouse
15                      Courtroom No. 10
                        1 Courthouse Way
16                      Boston, MA 02210

17
                        May 25, 2022
18                       8:30 a.m.

19

20

21

22
                        Valerie A. O'Hara
23                     Kathleen Mullen Silva
                       Official Court Reporters
24          John Joseph Moakley United States Courthouse
                   1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                   E-mail: vaohara@gmail.com

**Add. 40**

1          THE COURT:  Rest at the end of the day, middle, any

2     sense of that?

3          MR. SHINE:  Possibly before noon.

4          THE COURT:  Okay.  And there will be a defense case?

5          MS. PEACHY:  Yes, your Honor, and our first witness

6     would be our staff investigator, Alicia Hutton, through whom we

7     would intend to introduce several of our proposed exhibits, and

8     I understand that the government has objections to some of

9     those, so I don't know if you want to talk about that now.

08:38AM 10          THE COURT:  We probably ought to talk about that.

11          MS. PEACHY:  I guess Number 1 on the list, and I'm not

12    sure if the government objects or not, but it would be

13    excerpts, heavily redacted excerpts of Ms. Correia's medical

14    and mental health records that we tried to prepare in

15    conformance with your Honor's ruling yesterday morning, so I

16    can give your Honor a copy of what we proposed as an exhibit as

17    well.

18          THE COURT:  Okay.  Yes.

19          MR. SHINE:  We received them late last night, and we

08:39AM 20    will make every effort this morning at some point to review

21    them, but we only got them very late.  We haven't had a chance

22    to fully scrutinize them.  I'm comfortable we can come to a

23    resolution.

24          THE COURT:  Okay.

25          MS. PEACHY:  Another exhibit that we would seek to

**Add. 41**

1    introduce through Ms. Hutton is Ms. Correia's employment

2    records from Del Frisco's.  As you recall, the government

3    called the manager of Del Frisco's as a witness in their case

4    to testify that Ms. Correia was an employee there and that she

5    was expected at work on Monday morning, the 25th of February,

6    2019.

7         We've obtained her employment records from

8    Del Frisco's that contain her application for employment, her

9    hours worked, and her wages there, and I believe the government

08:40AM 10    objects to us using those as an exhibit.

11         MR. SHINE:  I don't see any possible relevancy.  The

12    manager of Del Frisco's testified and it was examined that she

13    worked there.  We agree she worked there.  The number of hours

14    she worked are inconsequential and her employment application.

15         Let me cut to the chase, I'm concerned that, twofold,

16    in her employment for application, she listed reference of

17    Aja Hiltz.  Ms. Hiltz has testified, and Ms. Correia put in the

18    record -- Ms. Correia put in the application, we believe, that

19    Aja Hiltz was a supervisor for a job she had.

08:41AM 20         Ms. Hiltz was asked did you ever supervise

21    Ms. Correia, and she said no.  That was the record.  That's

22    what stands.

23         In Jassy Correia's application, she said she was a

24    supervisor.  It doesn't go to impeach Ms. Hiltz because

25    Ms. Hiltz didn't fill out the form or anything else.

**Add. 42**

1          The second thing, which I'm very concerned about, is

2     it talks about the number of hours she works and her hourly

3     rate.  I don't want to get into a conversation that she was

4     working four to five hours per shift and she made $14 an hour.

5     I'm worried that that then could be argued down the line, well,

6     of course, she was prostituting, she didn't make enough money,

7     look how little money she made.  It's just a way of back

8     dooring in that she was working as an escort or as a

9     prostitute, so I would oppose it on relevancy grounds and on

08:41AM 10     the other two bases I just provided.

11          THE COURT:  All right.  Ms. Peachy.

12          MS. PEACHY:  Your Honor, the government has, you know,

13     attempted to overall paint this picture of Ms. Correia as a,

14     you know, employed, law-abiding, kind of innocent victim in

15     this case, and what these records --

16          THE COURT:  I don't think there's -- well...

17          MS. PEACHY:  Well, what these records show is that in

18     February of 2019, despite the testimony that we heard that she

19     was expected at work on Monday, and that would be unusual for

08:42AM 20     her not to be there, I forget exactly what the testimony was,

21     that she only worked one day in February of 2019, and she

22     earned about $52 for that one day that she worked in

23     February of 2019, and that, the amount of wages that she earned

24     at that job is also relevant because, as you know, part of the

25     defense is that she didn't have any money for a ride home from

**Add. 43**

1    the club that night, and that would give her a reason to go

2    consensually, willingly with Mr. Coleman for the purposes of

3    getting a ride that night.

4         MR. SHINE:  Again, your Honor, it's a back door way of

5    saying, therefore, she must have been prostituting that night,

6    and, therefore, it opens up the window to allege that she's

7    prostituted on other occasions.

8         There is a statement that's coming in.  The statement

9    stands by itself.  This doesn't show anything, and it's going

08:43AM 10    to be argued, and you know it's going to be argued that she

11    didn't make any money, therefore, she was hooking or

12    prostituting or setting Mr. Coleman up because she needed

13    money.  That's just not appropriate.

14         THE COURT:  Also, the application for employment, I

15    can't imagine why that would be relevant.  Her credibility is

16    not at issue.  She's not a witness, and whatever value it might

17    have if she were to take the stand, it has no relevance that I

18    can see, and as to her hours worked and her wages, I think I

19    agree with the government, it's either entirely irrelevant or

08:43AM 20    collateral at best and raises Rule 403 issues, and I'm going to

21    exclude it.

22         MS. PEACHY:  Just note our objection, your Honor.

23         THE COURT:  Yes.

24         MS. PEACHY:  The government has already put her

25    employment into play in this case.

**Add. 44**

1       THE COURT:  Well, the issue was that she was -- her

2   manager expected her to show up for work on the following

3   Monday or whatever the date was.

4       On the medical records, I've looked through them

5   quickly.  Obviously, they're heavily redacted.  I'll have to

6   wait and see if the government -- well, we'll see.  The

7   government needs to have a fair opportunity to see what's in

8   here.

9       MR. SHINE:  I promise you, we'll do it, we just

08:44AM 10   haven't had a chance to get to it.  We'll get to it this

11   morning, I promise.

12       THE COURT:  Okay.  And I take it there's no issue in

13   terms of authenticity or hearsay, the question is relevance and

14   prejudice, correct?

15       MR. SHINE:  Fair.

16       THE COURT:  Okay.  Ms. Peachy, anything else?

17       MS. PEACHY:  Your Honor, the next exhibits that we

18   would seek to introduce through Ms. Hutton in our case would be

19   records that were obtained from the City of San Diego Police

08:45AM 20   Department.  It contains a -- we've obtained certificates of

21   authenticity, which I understand, again, the government's

22   objection is not related to authenticity of these records that

23   certify that a video that was kept in the records of the City

24   of San Diego Police Department depicts Mr. Coleman having

25   interaction with the police in 2013 where the video pretty

**Add. 45**

1                   UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4      UNITED STATES OF AMERICA,          )
                                          )
5      vs.                                )  Criminal Action
                                          )
6      LOUIS D. COLEMAN, III,             )  No. 19-10113-FDS
                        Defendant         )
7                                         )
                                          )
8                                         )

9

10     BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11

12                         JURY TRIAL DAY 11

13

14                        SEALED TRANSCRIPT

15          John Joseph Moakley United States Courthouse
                        Courtroom No. 10
16                      1 Courthouse Way
                        Boston, MA 02210
17

18                        May 25, 2022
                          8:30 a.m.
19

20

21

22
                         Valerie A. O'Hara
23                     Kathleen Mullen Silva
                       Official Court Reporters
24          John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                      Boston, MA 02210
                   E-mail: vaohara@gmail.com

**Add. 46**

1    **END OF SEALED PORTION OF TRANSCRIPT**

2

3           MR. HOOSE:  Your Honor, pursuant to Rule 29 of the

4    Federal Rules of Criminal Procedure, I'm filing a motion for

5    judgment of acquittal.  I do not feel the need to be heard at

6    any great length on this, other than to say that it is our

7    contention, as is reflected in the body of the motion, that no

8    rational finder of fact could find beyond a reasonable doubt

9    the elements of kidnapping.

12:14PM 10           We have stressed from the outset that this is, in

11    fact, a kidnapping charge.

12           MR. SHINE:  Your Honor, should we reopen the Court for

13    the Rule 29 hearing?

14           THE COURT:  Yes, I think we should.  That's a good

15    point.

16           MR. SHINE:  I apologize.

17           THE COURT:  Yes.

18           (Pause.)

19           THE COURT:  Go ahead.

12:16PM 20           MR. HOOSE:  Yes, Your Honor.  Given the government's

21    announced intention to rest, we have filed a motion for a

22    judgment of acquittal pursuant to Rule 29 of Federal Rules of

23    Criminal Procedure.  In support thereof, we renew all our prior

24    objections, all our adverse rulings on motions in limine, and

25    any other adverse ruling, and request entry of a finding of not

**Add. 47**

1    guilty.

2         As we have tried to stress from the beginning of this

3    case, this is a case that alleges a federal crime of violation

4    of the Federal Kidnapping Act.  There are specific elements

5    that the government has to prove.  This is not a case about

6    whether Mr. Coleman is responsible in some way for the death of

7    this young woman.  It is not a case about whether he handled

8    himself properly after her death or whether he did things that

9    were illegal, inappropriate after that, and that, frankly, has

12:17PM 10   been where the bulk of the government's evidence has lied.

11         I would suggest that none of these things are

12    determinative on the elements of the kidnapping allegation.

13    For that reason, the Court should enter a judgment of

14    acquittal.

15         THE COURT:  All right.  I'm going to deny the motion.

16         Viewing the evidence most favorable to the

17    prosecution, and recognizing that this is a kidnapping statute

18    with very specific requirements, I think the evidence is such

19    that a reasonable jury could find that the victim was enticed

12:18PM 20   into the vehicle with the promise of a ride, but that

21    defendant's purpose was to hold or detain her for purposes of

22    sexual gratification, that it's a reasonable inference that he

23    intended from the beginning of the episode, when he approached

24    her on the sidewalk and they began talking, that he had a goal

25    to sexually assault an intoxicated and attractive young woman

**Add. 48**

1    who was separated from her friends late at night.  It is

2    possible, of course, that the requisite intent was not formed

3    before she got into the car but formed -- or rather formed

4    during the walk to the car or after she got into the car.  But

5    regardless, I think there's sufficient evidence under the

6    circumstances that that intent was formed.

7         The car, according to the evidence or a reasonable

8    inference from the evidence, it was stopped for a period of

9    about 14 minutes on Tremont Street.  We don't know exactly when

12:19PM 10    she was murdered, but the most likely scenario is that it

11    happened in the car during that time period.  The time period

12    between the initial contact between the defendant and victim

13    and the sexual episode and murder is so short, measured in

14    minutes, that I think it's a reasonable inference -- not the

15    only inference -- but a reasonable inference that the defendant

16    intended to confine her and commit a sexual assault either from

17    the very beginning or soon thereafter.

18         There was, of course -- or there is evidence of a

19    violent struggle inside the vehicle, that the victim was beaten

12:20PM 20    and therefore bruised.  The windshield was cracked in two

21    places on the passenger side, likely as a result of the victim

22    kicking it with her bare feet.  The defendant's semen is found

23    in her vagina.  There's no male DNA in her mouth, suggesting

24    there was not likely a lengthy romantic kissing interlude.

25         The defendant suffered cuts and scratches, confirmed

**Add. 49**

1    by DNA results that he was scratched by the victim, and what

2    appear to be bite marks suggesting the victim was resisting,

3    and, of course, there's evidence that she was strangled.

4           Kidnapping requires, among other things, that the

5    victim be held or detained for a prescribed purpose.  An

6    automobile certainly is a confined space.  One issue or

7    question that is obviously raised is why didn't she just get

8    out of the car rather than, for example, kicking the

9    windshield, and a reasonable inference is that she was not free

12:21PM 10   to leave the car.  The defendant weighed 200 pounds, has a

11   muscular build.  The victim weighed I think 115 pounds or

12   thereabouts, was heavily intoxicated.  For what it's worth,

13   there were automatic door locks controlled in part on the

14   driver's side.  You have to pull the handle twice or push the

15   button if you're a passenger.  It might not have been obvious

16   to her, especially in an intoxicated and panicking and

17   struggling passenger to do that.

18          I'm not sure what to make of the factor that his DNA

19   and her DNA were on the inside passenger door, but it's

12:22PM 20   certainly consistent with a struggle and consistent with his

21   body being against the door in some fashion or another.  It is

22   true we don't know exactly what happened and in what sequence.

23   The victim, of course, is not available to testify.  But there

24   is at least this 14-minute interval for the critical events to

25   have occurred.

**Add. 50**

1        There are alternative scenarios, for example, that she

2   was confined to prevent her from reporting something to the

3   authorities and so on, but a reasonable jury could draw the

4   reasonable inference that the victim was held or detained in

5   the automobile for an appreciable period of time prior to her

6   sexual assault, prior to her murder or both, and under the

7   circumstances presented here, it is sufficient for these

8   purposes to go to the jury, and therefore I deny the Rule 29

9   motion.

12:23PM 10        Let's talk, as long as the jury is out, about timing

11   from this point forward.

12        Assuming -- well, I guess we don't know what's going

13   to happen with regard to this inmate and that remains to be

14   seen, trying to locate him, interview him, possibly subpoena

15   him or bring him in.

16        I think a reasonable scenario is if you decide his

17   testimony is favorable to the defense or you want to call him,

18   that that's not likely to happen before Friday.  Right?  I

19   mean, today's Wednesday.  Tomorrow's Thursday.  It seems

12:24PM 20   unlikely you'll get it done that fast.  Fair?

21        MR. HOOSE:  Yes.

22        THE COURT:  And assuming that I exclude Mr. Fagan and

23   that the defendant does not testify, ballpark how much

24   testimony do you think you have for tomorrow for the defense,

25   enough to fill the day?

**Add. 51**

1                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2

3

4    UNITED STATES OF AMERICA,          )
                                        )
5    vs.                                ) Criminal Action
                                        )
6    LOUIS D. COLEMAN, III,             ) No. 19-10113-FDS
                     Defendant          )
7                                       )
                                        )
8                                       )

9

10   BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11                       JURY TRIAL DAY 11

12

13

14
              John Joseph Moakley United States Courthouse
15                     Courtroom No. 10
                       1 Courthouse Way
16                     Boston, MA 02210

17
                         May 25, 2022
18                        8:30 a.m.

19

20

21

22
                       Valerie A. O'Hara
23                   Kathleen Mullen Silva
                     Official Court Reporters
24          John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 3204
25                    Boston, MA 02210
                 E-mail: vaohara@gmail.com

**Add. 52**

1      It's our position, your Honor, that Mr. Fagan's

2  testimony is going to be relevant.  It's not going to be long.

3  I can explain to the Court what it is we believe the testimony

4  will be.

5      The empirical studies that Dr. Fagan will testify to

6  have been peer reviewed and publicized, so they're able to be

7  objectively tested, and they are generally accepted in the

8  scientific community.  And typically, you know, what he's going

9  to be testifying to is that once stopped, police are more

03:41PM 10  likely to use force on black people.  There are empirical

11  studies that come to that conclusion.  In fact, black people

12  are more than two times as likely to be killed by police as any

13  other racial or ethnic group if they have an interaction with

14  police officers.

15      From that flows an anxiety, and there's studies to

16  show that the more anxiety that is reported in young black men,

17  there's more anxiety reported by those who have had negative

18  impacts with the police, like Mr. Coleman has, and there's also

19  studies to show that the greater the intrusion, meaning the

03:42PM 20  greater the force that was used, the greater that the anxiety

21  that there is, and that is including symptoms associated with

22  PTSD, and that all comes to the conclusion, your Honor, that

23  unlike what the government is going to be arguing is that all

24  of those steps that Mr. Coleman took after the incident with

25  Ms. Correia, there is an alternate explanation, which is not

**Add. 53**

1    necessarily consciousness of guilt, and that alternate

2    explanation is a fear for one's physical safety or even life in

3    going to the police in this sort of situation.

4         It may seem, I think it's important, I do think that

5    it is relevant, and I think it is important for one reason that

6    maybe it may not seem apparent initially is that I think most

7    of us in this courtroom right now, our intuition would not be

8    the same as the sort of interactions that young black men or

9    black men have with police, so we tend to think that that's not

03:43PM 10    the case, and the research shows that that is the case, and I

11    think the jury should be able to learn that research and to be

12    able to apply that research as it comes before them because

13    Mr. Coleman has had that sort of experience, which they have

14    now seen.

15         It is not knowledge I think that is typically

16    understood by the common juror.  I think it's also because it

17    is against the intuition of most people, I think it would be

18    helpful to the jury on an issue having to do with consciousness

19    of guilt or fear for safety of one's life.

03:44PM 20         THE COURT:  Isn't this a race-based generalization as

21    opposed to something -- it's one thing, if, for example,

22    Mr. Coleman had a diagnosis of PTSD or, you know, something

23    like it, but isn't this just a generalization based on race

24    that black people are more likely to have a particular

25    characteristic, and is there any other context in which we

**Add. 54**

1    would even think about doing this?

2         I mean, for example, the idea that African-Americans

3    are more likely to do something bad, more likely to commit

4    violence, we would not only not allow testimony like that, it

5    would be outrageous or repugnant, and why is the inverse true?

6    If it's helpful to the defense, we get to make race-based

7    generalizations, but if it's not, we don't?

8         MR. ZOLYNSKI:  I don't think, your Honor, that it is a

9    race-based generalization.  I will agree with your Honor that

03:45PM 10    there's, of course, race-based generalization built into this,

11    and we can't deny that.  Mr. Coleman is sitting right before

12    us, and he is a black man.

13         We cannot deny the experience that that segment of the

14    population has, so I don't think that it is race-based in the

15    sense that inherently a black individual is going to fear

16    police upon birth.  It really has much more to do with the way

17    that the black community and people of color are policed in

18    those types of communities and how that sort of information is

19    then transferred through friends, through family, through

03:45PM 20    experiences in the media to a -- and then their own experiences

21    into a fear, so it's not that Mr. Coleman is born with a fear

22    because the color of his skin is darker than mine.

23         And I do think, your Honor, that it is different than

24    the instance that your Honor just spoke about where we would be

25    claiming that, you know, black men are more violent than white

**Add. 55**

1   men.

2          First of all, I don't think that you would find

3   studies to prove that, and I think the question before the

4   Court is whether this is evidence that is proper through an

5   expert, and so I don't think that it is the same thing, and I

6   don't think it is exactly race-based.

7          THE COURT:  What if it were positive?  What if he were

8   East Asian?  Could you call an expert to say East Asian people

9   are more likely to be law-abiding and respect law enforcement?

03:46PM 10   Again, no way we would allow that, right, no chance I would

11   even think about that for more than a second.

12          Even if it's true, and you probably, you know, if

13   anybody were bothered to study it or want to study it, we could

14   probably, you know, at some level or another prove that it

15   seems repugnant to me to the criminal justice system to be

16   making, again, these race-based generalizations whether they're

17   positive or negative, whether in favor of a defendant or

18   against a defendant.

19          It's different if the particular person says if he

03:47PM 20   were to take the stand and say because I'm African-American or

21   had these experiences or whatever, I, therefore, fear the

22   police, but you're saying because he's a black man, he's more

23   likely to fear law enforcement.

24          Even if that is statistically true, it still seems

25   wrong and improper.  How could we have testimony based on race

**Add. 56**

 1    if people -- you know, we talk about propensity, we've spent a

 2    lot of time talking about propensity in this case, propensity

 3    of individuals, which is troublesome enough, but propensity

 4    based upon their race.

 5        MR. ZOLYNSKI:  Your Honor, I disagree that it is based

 6    on race and especially that it is based on race solely.  The

 7    Court can't deny the fact that Mr. Coleman is a black man.

 8        THE COURT:  But that's his race.  How can you say

 9    that's not race?  I would say that is his race.

03:48PM 10        MR. ZOLYNSKI:  Indeed, indeed it is, but that doesn't

11    mean that it also factors in his experience as it occurred

12    there in San Diego and that it also --

13        THE COURT:  Which you can argue, I'm letting it in,

14    and you can argue it what happened in San Diego.

15        MR. ZOLYNSKI:  The importance of Dr. Fagan when linked

16    with the video and the photos is to show that it is consistent

17    with the research that has been done that a fear of police or

18    fear for one's safety and the fear for one's life results from

19    this sort of action.

03:48PM 20        THE COURT:  Does someone from the government want to

21    respond?

22        MR. RICHARDSON:  Your Honor, the government agrees

23    with the Court's take on this.  Beyond that, what Mr. Fagan is

24    going to testify to is not so much elusive, but it is the

25    studies that we have been -- to which we have been cited or

**Add. 57**

1    that have been cited to us, a lot of them seem to have nothing

2    whatsoever to do with the situation here.

3         This isn't a young black teenager in a park one

4    evening when the police roll up with lights flashing and runs

5    because he's scared of the police in the inner city, this is

6    somebody who didn't go to the police after having done

7    something wrong.  A lot of the studies have to do with or at

8    least one of them has to do with PTSD suffered by or the

9    effects of PTSD suffered by black males who have been subjected

03:50PM 10   to a number of intrusions by the police who end up with things

11   like low math scores.  That certainly is not this defendant.

12        We know of one incident he had, not multiple

13   intrusions, which some of these studies deal with, so I think

14   the big picture is what your Honor spoke about.  I don't think

15   it's a proper basis for expert opinion to talk about what a

16   class race, any large group, particularly race or gender or

17   something like that, does that doesn't relate to a specific

18   individual.  It's not like a psychiatric study that's been done

19   of him or anything of that nature.

03:50PM 20        THE COURT:  All right.  Let me -- I'm going to exclude

21   it, but let me start by observing I am, of course, very much

22   aware of the history of African-Americans in this country and

23   in particular the history of interactions with law enforcement,

24   both historically and at present, and I have no doubt that at

25   some level, young African-American men are more likely to fear

**Add. 58**

1    the police than say suburban white teenagers.  That, of course,

2    feels right, and I don't really have any reason to doubt it.

3            But starting at the beginning, first, it's by no means

4    clear to me that Rule 16(b)(1)(c) has been followed.  That

5    requires, if the government requests, that the defense provide

6    a written summary of expert testimony, including a description

7    of the witness' opinions and the bases and reasons for those

8    opinions and the witness' qualifications.  The witness'

9    qualifications have been provided and the opinions at a high

03:52PM 10   level of generality, but it's impossible for me to assess even

11   what the precise opinion is, what the methodology is.

12           Apparently, he's intends to summarize various studies,

13   which I don't know how to assess them.  I don't know how they

14   were conducted.  I don't know what data they're based on, what

15   principles they involved, whether they were reliable

16   principles, reliably applied and all the rest of it, but even

17   moving beyond the Rule 16 requirement, let me assume all of

18   that has been complied with, and assuming that this is

19   something that may not be known or understood by an average

03:53PM 20   Joe, that is, the basic idea that African-Americans are more

21   likely to fear the police based on their race or ethnicity, if

22   you want to call it that.

23           Again, this is the broadest form of propensity

24   evidence.  The basic argument is that a particular group of

25   people based on their race or race and gender have certain

**Add. 59**

1    characteristics or attitudes or behavior.  It is a race-based

2    generalization, which I find troublesome.  I certainly would

3    not allow the government to call an expert to testify about

4    some negative quality of African-Americans.  That would be

5    again outrageous and repugnant to our justice system, even if

6    it were supported by statistics.

7         I can't imagine permitting this, such testimony in any

8    other context for a defense witness, again, to say Asian

9    Americans are better behaved or some other racial stereotype,

03:54PM 10   even, again, if it's statistically supported it seems repugnant

11   to me.  Why would I allow it here?  I don't see any reason to

12   do so, and I think it's troublesome and offensive.

13        I could conceive hypothetically why expert testimony

14   might be appropriate to explain let's say a foreign culture to

15   United States juries, perhaps under the right circumstances to

16   provide a context that otherwise might not be available.  It's

17   not this case.

18        Even Mr. Fagan's testimony might in some context have

19   some use, for example, if it were a probable cause analysis

03:55PM 20   where probable cause was based in part on the flight of a young

21   person from a police cruiser, to use the analogy the government

22   uses, the teenage boys who scatter from the park when they see

23   the cruiser with the blue light maybe, that is not this case,

24   and, again, we don't -- to my knowledge, no court has ever or

25   ought to permit race or ethnic generalizations.

**Add. 60**

          1              I'm trying to think of other cases where flight was

          2    involved.  Whitey Bulger, I presume, would not have been

          3    permitted to call an expert to say because I'm an Irish

          4    American, I'm more likely to be mistruthful of authority, and

          5    that's why I fled.  It seems to me that that would never be

          6    permitted.

          7              Anyway, we don't have to speculate about hypotheticals

          8    where conceivably testimony along these lines might be useful

          9    to some fact-finder in some context.  This is not a group of

03:56PM  10    teenagers scattering from the police.  This is a highly

         11    educated Raytheon engineer in his 30's who did an awful lot of

         12    things over three or four days, such as buying pruning shears

         13    and pliers and all the rest of it as part of an elaborate plan

         14    to dispose of the body, which I strongly doubt was a product of

         15    his race or the experiences of black people generally in the

         16    United States.

         17              He has offered, and I've permitted, despite some

         18    misgivings, I'm permitting him to put in this evidence of what

         19    happened in San Diego, for whatever it might reflect on his own

03:57PM  20    state of mind.  If he had some PTSD diagnosis or something

         21    similar, I might permit that, but the general proposition that

         22    black people are more likely to fear the police, and,

         23    therefore, that's why he did what he did, that's why he wrapped

         24    her in duct tape and put her in a suitcase.  However you want

         25    to frame that argument it seems to me is problematic in the

**Add. 61**

1    extreme, and is, again, propensity evidence based on race or

2    racial characteristics that I think is not admissible, and,

3    therefore, I'm going to exclude it under Rule 702 and Rule 403,

4    and at least in part on Rule 16, for the lack of full

5    disclosure.

6           And if you want to mark the disclosure and his C.V. as

7    an exhibit, why don't we do that now before we forget,

8    Exhibit C.

9           THE CLERK:  Yes.

03:58PM 10           THE COURT:  We'll call the letter dated April 28th

11    Exhibit C and the CD Exhibit D.

12           (Exhibit C and D was marked for identification.)

13           MR. ZOLYNSKI:  The Court mentioned methodology and

14    reliability.  For the record, I'll also be providing for the

15    Court what I've already provided to the government, which is a

16    copy of every one of those studies that include the methodology

17    within the study, and I can do that electronically probably

18    because they are so long, if that's the Court's preference.

19           THE COURT:  Whatever works for you to preserve the

03:59PM 20    record, again, as long as the record is clear what we're

21    talking about.

22           What else do we have to talk about?  Anything from the

23    government?

24           MR. SHINE:  Nothing, your Honor, thank you very much.

25           THE COURT:  From the defense?

**Add. 62**

1                          UNITED STATES DISTRICT COURT
                           DISTRICT OF MASSACHUSETTS
2

3

4        UNITED STATES OF AMERICA,          )
                                            )
5        vs.                                ) Criminal Action
                                            )
6        LOUIS D. COLEMAN, III,             ) No. 19-10113-FDS
                             Defendant      )
7                                           )
                                            )
8                                           )

9

10       BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11
                               JURY TRIAL DAY 12
12

13

14
                  John Joseph Moakley United States Courthouse
15                          Courtroom No. 10
                            1 Courthouse Way
16                          Boston, MA 02210

17
                               May 26, 2022
18                              8:30 a.m.

19

20

21

22
                            Valerie A. O'Hara
23                         Kathleen Mullen Silva
                           Official Court Reporters
24           John Joseph Moakley United States Courthouse
                       1 Courthouse Way, Room 3204
25                          Boston, MA 02210
                       E-mail: vaohara@gmail.com

**Add. 63**

1          I think what we're going to do is use Courtroom 20 on

2     the seventh floor because it's set up for jury deliberations in

3     terms of how the tables are formatted and everything.  It means

4     that we have to have jurors on elevators or the stairs, you

5     know, as they're coming and going, which will add a slight day,

6     but I think it's the easiest of our options, so that will be

7     the deliberation room, and, of course, it will be treated like

8     any other deliberation room.  There will be a court security

9     officer outside and all of that.

08:35AM 10          It's also a little trickier in terms of access to

11     bathroom facilities and all of that, but we've been dealing

12     with this in one form or another for two years, so I think

13     that's what we'll do.

14          All right.  Let's talk about the schedule.  I'm trying

15     to figure out what the next two or three court days are going

16     to look like.  Mr. Hoose and Ms. Peachy, what do you think is

17     going to happen today in terms of the witness lineup?

18          MR. HOOSE:  Well, I can start, and Ms. Peachy can

19     chime in.  Obviously, we have to finish Ms. Hutton.  I have

08:36AM 20     Dr. Isenschmid.  I told him to be here at 9:30.

21          Again, I don't know what the government intends to do

22     on cross-examination.  I can't imagine he's going to be more

23     than an hour or so total.  The other thing that we need to deal

24     with this morning is yesterday I informed you, I think, that we

25     were attempting to negotiate a stipulation about Nia Mondesir

**Add. 64**

1   and what she would say about Jassy Correia's prostitution

2   activities.

3            Last night, the government told us, informed us, that

4   they would not stipulate to her testimony and offered to have a

5   subpoena served upon her requiring her presence here this

6   morning.

7            She is present.  She is quite hostile, as is the

8   gentleman who was accompanying her, would not talk to me.  I

9   would suggest to the Court that we really not need to do this

08:37AM 10   because what I am seeking to admit, and I think what the Court

11   has already agreed could be admitted, is the statement that she

12   made to Detective Schroeder and Evans in the wake of

13   Ms. Correia's disappearance.

14            It's a very limited statement.  The statement is

15   simply that Jassy was prostituting on an as needed basis,

16   mostly on the weekends.  I would suggest that that statement is

17   independently admissible under Rule 807, the residual clause of

18   the 800 series of rules on hearsay.

19            To me, it is sort of a classic case.  What could be a

08:38AM 20   more trustworthy statement than a statement coming from someone

21   who is trying to help the police find her best friend, who is

22   missing, and all of the other aspects of the rule that there's

23   no better way to produce the evidence, and that the government

24   has been provided notice are met, so I would offer the

25   statement under Rule 807.

**Add. 65**

1          I would simply read that to the jury that

2     Nia Mondesir, when interviewed on March 1st by Detective

3     Schroeder, she was asked the question and her answer, so I

4     think the Court could admit it that way.

5          If the Court declines to do that, we're going to have

6     to go through the process of putting Ms. Mondesir on the stand.

7     I have no idea what she will say when I ask her the question.

8     She may deny it, she may admit it, I have no idea.  She won't

9     talk to me.

08:39AM 10          THE COURT:  Mr. Richardson.

11          MR. RICHARDSON:  Well, two things, your Honor.  First,

12     she was actually talking to the police after Ms. Correia's body

13     had been found, for what that is worth.  I don't think this

14     falls under the residual clause, it's sort of double hearsay.

15     It's, I guess, perhaps for the reason that she was not trying

16     to help them find the body, she was talking to them about what

17     happened.

18          The proposed part of the statement is also incomplete

19     because if you read the entire thing, and I'm paraphrasing, but

08:39AM 20     basically what Ms. Mondesir's understanding was that she was

21     escorting with regular customers.

22          The detective suggested the as needed language.  I

23     think she adopted that, but it was regular customers.  She

24     wasn't standing on street corners meeting with random

25     strangers.

1          THE COURT:  All right.  I'm not going to admit it

2     pursuant to the residual clause of Rule 807.  It's either going

3     to come in by stipulation or by witness testimony or not at

4     all, and we'll just have to see how it goes.  Again, this

5     is -- I may be outside the rules of evidence to admit this at

6     all, so I'm going to clearly keep it limited, assuming it comes

7     in in some form or another, but we'll just have to see how that

8     goes.

9          MR. RICHARDSON:  Your Honor, two issues with respect

08:40AM 10     to that.  One is, as Mr. Hoose indicated, Ms. Mondesir is

11     present now.  If it would be possible to interrupt

12     Alicia Hutton's testimony to take her, might as well take her

13     early if she's going to be called as a witness by the defense.

14          The other thing is I do intend, if what is going to be

15     elicited from her on direct is the statement simply that she

16     was prostituting on an as needed basis, we would seek to

17     cross-examine to clarify that, that it was as I said, and in

18     our view, that would not open the door to any specific acts.

19          THE COURT:  I would agree as a general proposition.

08:41AM 20     Obviously, the devil is always in the details, but that's how I

21     view it.

22          Mr. Hoose, do you think it's a good idea to take her

23     out of order?

24          MR. HOOSE:  To be perfectly honest, your Honor, I'm

25     really not inclined to accommodate her.  I mean, she doesn't

**Add. 67**

**YVANIA MONDESIR, sworn**

THE CLERK:  Thank you.  You can have a seat.  Please speak into the mic.

DIRECT EXAMINATION

BY MR. HOOSE:

Q.   Good morning, ma'am.

Would you state your name for the record, please.

A.   Yvania Mondesir.

Q.   Could you spell your last name for the stenographer, please.

A.   M-o-n-d-e-s-i-r.

Q.   Are you the same Yvania Mondesir that testified here last week?

A.   Yes.

Q.   All right.  You are not happy to be here today, are you?

A.   What do you think?  I'm getting retraumatized again.  I'm here with my son.

Q.   You were served a subpoena; is that correct?

A.   Yes.

Q.   And that's the only reason you're here, correct?

A.   Yes.

Q.   I mean, you did not come voluntarily, correct?

A.   Obviously not.

Q.   Right.  And when I tried to speak with you this morning, you refused to speak with me?

 1    A.   Why would I want to talk to you?  Why are you dragging me

 2    back here to answer questions that has nothing to do with

 3    nothing?  He killed her.  It doesn't matter what you ask me.

 4    It doesn't matter.

 5              MR. HOOSE:  Your Honor.

 6              THE COURT:  All right.  All right.

 7              THE WITNESS:  No, you guys are putting me through this

 8    for what?  Why do I have to keep going through this?

 9              THE COURT:  All right.  Let's stop there.  Put a

11:56AM 10    question to the witness.

11    BY MR. HOOSE:

12    Q.   You know why I brought you back here?

13    A.   No, I don't.

14    Q.   Do you know the question that I'm going to ask you?

15    A.   No, I don't.  Can you just ask it so I can get off the

16    stand.

17    Q.   I will ask the question.  Was Jassy working as a

18    prostitute on the days immediately before she died?

19              MR. RICHARDSON:  Objection.

11:56AM 20    A.   Are you kidding me?

21              MR. RICHARDSON:  Objection.

22              THE COURT:  Overruled.

23    Q.   That's my question.

24    A.   What the fuck you looking at?

25    Q.   I'm asking you a question.

**Add. 69**

```
 1    A.    What did you say?

 2    Q.    Was Jassy working as a prostitute in the time period

 3    shortly before she died?

 4    A.    No.

 5    Q.    I think last week when we spoke I asked you some questions

 6    about being interviewed by the Boston Police.  Do you remember

 7    that?

 8    A.    (Pause.)  Yes.

 9    Q.    Okay.  And one of the questions that -- and this was on

10    March 1, shortly after her death, correct?

11    A.    I don't remember.

12    Q.    All right.  Last week I showed you a document which was a

13    transcript of what you said to Detective Schroeder.  Do you

14    remember that?

15    A.    Why do I have to do this?

16          THE WITNESS:  Your Honor, why do I have to do this?

17          THE COURT:  Well, I'm --

18          THE WITNESS:  Come on.  This is unfair.

19          THE COURT:  I'm --

20          THE WITNESS:  You guys, come on.  You don't think my

21    life is ruined enough?  Now I got to sit here and look at him

22    staring at me.  What is this?  This is not okay.  What about my

23    mental health?  When this is over, how am I supposed to move on

24    with my life?  Retraumatizing me over and over.  You already

25    got my name in the Herald.  Everybody's still talking about me
```

11:57AM (line 10)
11:58AM (line 20)

**Add. 70**

1   and now you want to ask me a question which has nothing to do

2   with why she's dead.

3          THE COURT:  All right.  Let's see if we can wrap this

4   up.

5          THE WITNESS:  Yes.  Hurry up.  Don't ask me anything

6   stupid, please.

7   Q.   Did you tell Detective Schroeder in your interview on

8   March 1 of 2019 that Jassy was working as a prostitute on an

9   as-needed basis, mostly on the weekends?

11:59AM 10  A.   I plead the Fifth.

11  Q.   Did you say that or did you not?

12  A.   I plead the Fifth.

13         MR. HOOSE:  Okay.  That's all I have, Your Honor.

14         THE COURT:  All right.  Any cross?

15         MR. RICHARDSON:  No, Your Honor.

16         THE COURT:  All right.  Thank you.  You may step down.

17         All right.  Ladies and gentlemen, let me give you an

18  instruction, just to make sure you understand this.

19         The fact that a witness made a statement or may have

11:59AM 20  made a statement on an earlier occasion that might be different

21  from what she said on the witness stand may be considered for

22  whatever weight you choose to give it in assessing her

23  credibility, but -- and this is important -- that prior

24  statement, if you believe it was made, may not be considered

25  for the truth of its contents.

**Add. 71**

```
 1              So to try to explain the difference, let's say that --
 2    I'll use a hypothetical not related to this case.  A witness
 3    says on the witness stand that a car was a Ford.  On a prior
 4    occasion she said it was a Toyota.  You can consider the fact
 5    that the witness said two different things in assessing the
 6    witness's credibility, but that prior statement cannot be taken
 7    as true.  So in my hypothetical there is no evidence that the
 8    car was a Toyota.  There's evidence that the car was a Ford.
 9    There's evidence that the witness changed her story for
10    whatever weight you would want to give to that, but there's no
11    evidence that the car was a Toyota.
12              All right.  Anything further for today?
13              MR. HOOSE:  I need to be heard further on this, Your
14    Honor.
15              THE COURT:  All right.  Let's use the -- do we need to
16    let the jury out or --
17              MR. HOOSE:  I think it would be better to do that.
18              THE COURT:  All right.  We'll take a quick recess.
19              THE CLERK:  All rise.
20    (Jury exits).
21              THE COURT:  Mr. Hoose.
22              MR. HOOSE:  Yes, Judge, I specifically object to that
23    instruction you just gave.
24              THE COURT:  What's wrong with it?
25              MR. HOOSE:  Because the statement should be
```

12:00PM (line 10)
12:01PM (line 20)

**Add. 72**

1    independently admissible under Rule 807.

2         THE COURT:  That's overruled.

3         We have rules about prior inconsistent statements, as

4    I'm sure you know.  In the federal system, a prior inconsistent

5    statement made under oath is outside the definition of hearsay

6    under Rule 801(d)(1)(A) and is, therefore, independently

7    admissible.  There's no evidence that the statement to the

8    police was made under oath and, therefore, it can only be used

9    to assess the witness's credibility.  I'm not going to use the

12:02PM 10   catch-all exception of Rule 807 to do a complete end run around

11   the rules of hearsay.  So overruled.

12        MR. HOOSE:  I want to offer for the record the segment

13   of her interview with the Boston Police Department, and I will

14   say again, as I stated this morning, this is under conditions

15   that I suggest are highly likely to be trustworthy, and I also

16   want to offer the audio segment of her saying to Detective

17   Schroeder that Jassy was working as a prostitute on an

18   as-needed basis.  I think this is critical stuff for the

19   defense, Your Honor, and I object to it being excluded or

12:03PM 20   limited in any way.

21        THE COURT:  All right.  You can make that as an offer

22   of proof, the written statement and the audio portion of that.

23        Matt, what's the next -- well, let's -- we have a

24   number of things that need to be marked.  We'll deal with the

25   marking tomorrow, but we can make that part of the record.

**Add. 73**

1                         UNITED STATES DISTRICT COURT
                            DISTRICT OF MASSACHUSETTS
2

3

4       UNITED STATES OF AMERICA,         )
                                          )
5       vs.                               )   Criminal Action
                                          )
6       LOUIS D. COLEMAN, III,            )   No. 19-10113-FDS
                          Defendant       )
7                                         )
                                          )
8                                         )

9

10      BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11
                                JURY TRIAL DAY 12
12

13

14
                    John Joseph Moakley United States Courthouse
15                            Courtroom No. 10
                              1 Courthouse Way
16                            Boston, MA 02210

17
                                  May 26, 2022
18                                 8:30 a.m.

19

20

21

22
                              Valerie A. O'Hara
23                          Kathleen Mullen Silva
                            Official Court Reporters
24              John Joseph Moakley United States Courthouse
                          1 Courthouse Way, Room 3204
25                            Boston, MA 02210
                          E-mail: vaohara@gmail.com

**Add. 74**

1  a rebuttal case, assuming that the case plays out in the way

2  you expect?

3          MR. RICHARDSON:  I think it depends if there's any

4  rebuttal, I think it will be very short, but it kind of depends

5  on what comes out today.

6          THE COURT:  Okay.  Remind me, Dr. Isenschmid, what's

7  the general scope of his testimony?

8          MR. HOOSE:  He's a toxicologist, your Honor.  He will

9  testify about cocaine, he will an offer an opinion as to the

08:48AM 10  likely time that the cocaine was ingested, and some opinions

11  about the use of cocaine and alcohol together.

12          THE COURT:  All right.  So that will be the plan then.

13  We will accomplish today whatever we can accomplish, which

14  presumably won't take the full trial day.  I'll tell the jury

15  they're going to have Friday off.  We may or may not have a

16  witness on Tuesday morning, and assuming we do not, we'll go

17  directly into closing arguments, jury charge, and deliberation,

18  and we'll do a charge conference tomorrow.  Okay.  Anything,

19  Ms. Peachy?  You stood up faster than Mr. Zolynski.

08:49AM 20          MS. PEACHY:  Ms. Hutton is still on the stand, and as

21  I brought to your attention yesterday, there were several

22  exhibits that the government objected to that I wanted to try

23  to introduce through Ms. Hutton.  The list is shortened since

24  yesterday, but what remains first are the medical records.  The

25  government sent these, what we proposed back to us with some

**Add. 75**

```
 1    added redactions suggested.  There are three proposed

 2    redactions that we do not agree on.

 3             THE COURT:  Okay.  Why don't we work through that.  I

 4    have the original version that was handed to me I think

 5    yesterday.

 6             MS. PEACHY:  So the first one is on page 9.  The

 7    government would like redacted the sentence at the bottom of

 8    that page, "Her sleep issue last night... multiple awakenings

 9    and DFA, a worrisome possibility of bipolar escalation of
10    mood."

11             THE COURT:  Okay.  What's DFA an acronym for?

12             MS. PEACHY:  I honestly don't know, your Honor, but I

13    believe this is relevant to her diagnosis and treatment, which

14    I know that the Court has kind of limited this type of evidence

15    to.  It mentions the possibility of further diagnosis, and so

16    we think that part is relevant.

17             THE COURT:  Okay.  And this is from 2015?  Is that

18    part of the same record?

19             MS. PEACHY:  Yes, it is.

20             MS. NUZUM:  Yes, your Honor.  Do you want us to

21    respond as we go along?

22             THE COURT:  Yes.

23             MS. NUZUM:  This redaction, the government thinks that

24    this is cumulative, the reference to bipolar escalation.

25    There's plenty of references to bipolar diagnosis throughout
```

The numbers "08:50AM" appear beside line 10 and "08:51AM" beside line 20.

**Add. 76**

```
 1    the records without this, and the concept of her multiple

 2    awakenings in 2015 being relevant to bipolar escalation at that

 3    point in time with this DFA that nobody knows what it means in

 4    the middle, the government just thinks this isn't relevant or

 5    necessary.  The fact that she has a bipolar diagnosis is

 6    reflected in multiple other places.  What was going on with her

 7    sleep one night in 2015 is really not relevant.

 8             THE COURT:  That may be true, but I'll allow it.

 9    That's on page 9.

10             MS. PEACHY:  The next one is on page 10, your Honor.

11    The eight or nine lines at the bottom, starting with diet,

12    which, you know, I guess we don't really mind so much about

13    redacting diet and activity, but what we do want in, I think

14    should come in are the additional instructions, which is part

15    of the treatment that's been prescribed or recommended to her,

16    "Additional instructions:  1, continue medication as

17    prescribed; 2, if you have problems sleeping, try a

18    hydroxyzine.  If you need to do this, consult your medication

19    doctor, if your sleep deteriorates, do not use any street

20    drugs," et cetera.

21             So we think those additional instructions there are

22    part of the treatment that's being recommended and that that

23    should be part of the record.

24             THE COURT:  Ms. Nuzum.

25             MS. NUZUM:  Again, the objection is this was from
```

Add. 77

1    2015.  It's regarding at this point a mood disorder, substance

2    abuse diagnosis, and this is the instruction being given at

3    that point in time with that particular diagnosis.

4         The government just doesn't believe that this is

5    relevant at this point.  The government notes there's an

6    additional note here that there's a question of bipolarity, but

7    this is an open issue, so this is reflective of a different

8    diagnosis earlier in time before the bipolar issue that has

9    been allowed in this case was even solidified, so we don't

08:53AM 10    think this is actually relevant to the diagnosis at play here.

11         THE COURT:  I'll allow this as well.  It occurs to me,

12    since there is no expert who is going to talk about what these

13    records mean, the defense witness can say these are the records

14    and can read from them verbatim, and your cross-examination can

15    say, for example, this is from 2015, right, but it has to be

16    verbatim.  She's not obviously a medical professional or

17    someone who can interpret it, the point being both on direct

18    and cross, all you can really do is point out what they say.

19         MS. PEACHY:  That's all I was going to do, your Honor.

08:54AM 20         THE COURT:  Ms. Peachy.

21         MS. PEACHY:  Last one.

22         THE COURT:  I thought you said there were four?

23         MS. PEACHY:  I'm sorry, I misspoke, there were three,

24    good news, there's only three.  Page 14, again, the bottom

25    unredacted portion starting with brief intervention note.

**Add. 78**

1    Again, we don't really care that much about the top five lines,

2    but the service date, and then the box that's checked off that

3    says, "Patient refused brief intervention."  Again, this is

4    part of the treatment that she's receiving.  It's relevant to

5    the treatment that she's receiving or not complying with, and

6    so we think that this should be part of the record.

7            MS. NUZUM:  The government's view this is not part of

8    the treatment, this is her declining to meet with a social

9    worker.

08:55AM 10        THE COURT:  All right.  I think that's a little far

11    afield.  Let's redact that one on page 14.  Okay.  Anything

12    else on Ms. Hutton's testimony?

13            MR. SHINE:  Your Honor, just the one.  We anticipate

14    not a rigorous cross of Ms. Hutton, but if the Court is so

15    inclined to allow Ms. Hutton's non-expert opinion, or

16    apparently she's drafted some charts and maps relative to the

17    telephone pinging.  I was going to ask if that is admitted as

18    an exhibit, although we still oppose it, that Mr. Richardson be

19    allowed to cross on those as his expertise in that area far

08:56AM 20    exceeds mine.

21            THE COURT:  My understanding is what she's going to do

22    in some form or another is to say I plotted these additional

23    points.

24            MR. SHINE:  Yes.

25            THE COURT:  I'm not going to let her opine on

**Add. 79**

```
 1                     UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA,          )
                                         )
 5    vs.                                ) Criminal Action
                                         )
 6    LOUIS D. COLEMAN, III,             ) No. 19-10113-FDS
                          Defendant      )
 7                                       )
                                         )
 8                                       )

 9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11                         JURY TRIAL DAY 13

12

13                      JURY CHARGE CONFERENCE

14

15          John Joseph Moakley United States Courthouse
                         Courtroom No. 10
16                        1 Courthouse Way
                          Boston, MA 02210
17

18                          May 27, 2022
                             9:06 a.m.
19

20

21

22

23                        Valerie A. O'Hara
                        Official Court Reporter
24       John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                        Boston, MA 02210
                     E-mail: vaohara@gmail.com
```

**Add. 80**

1    and respect people's travel or holiday plans.

2              Again, one way or another by the time the

3    evidence closes Tuesday and you argue, and, of course,

4    they'll be a renewed opportunity at the close of all the

5    evidence if additional instructions are required, but you

6    obviously have the right to know exactly how I'm going to

7    instruct the jury.

8              I will permit you to incorporate verbatim

9    sections of any instructions in your closing argument.  In

11:21AM 10   other words, I will permit you to say I expect

11   Judge Saylor will instruct you and then read something

12   verbatim.  I think that's fair.  No elaboration on that,

13   obviously, and you don't have to do it, but I will permit

14   it as long as it's verbatim and taken from obviously the

15   final written instructions, which you will have.

16             All right.  Let's take up the renewed motion for

17   a mistrial, which I have read.  Let me start with the

18   testimony of Dr. Vershvovsky.  I did strike her comment

19   and instructed the jury to disregard it.  I was not asked

11:22AM 20   to give a different instruction to the jury, a mistrial

21   was requested.

22             If the defense wishes, I can either repeat that

23   instruction or give a different version of it, that is, I

24   think under the heading of a strategic choice for the

25   defense to either call attention to it or not.

**Add. 81**

1          I have indicated I will not permit the government

2     to argue given the circumstances here that she was still

3     alive when she was dragged into the apartment.

4          So to the extent the defense is asking for a

5     mistrial based on that statement in whole or in part, I'll

6     deny it, and I will consider any further instruction.

7          As to the testimony of Ms. Mondesir, just to I

8     guess repeat or state how we got to that point, when she

9     first testified, I had not yet resolved the issue of

11:23AM 10   whether or not I would permit any evidence whether the

11    victim had ever engaged in prostitution activities.  I was

12    inclined to disallow it because it seemed to me to be

13    clearly in violation of Rule 412.

14          I elected, as set forth in the record, to change

15    my mind and decided to permit what was effectively

16    reputation testimony or a character trait construed in a

17    very broad fashion, and the way it played out is she was

18    recalled to ask basically a single question.

19          She was, obviously, a hostile witness.  Her

11:24AM 20   answers to the questions were not responsive necessarily.

21    She was angry, obviously.  I'm sure her anger was

22    increased by the fact she had to sit outside on the bench

23    for a couple of extra hours, but she was angry.  She said

24    what she said.  There was no request to strike anything

25    she said, no request for an instruction to disregard it,

**Add. 82**

1    no request for an instruction to control her in some way,

2    no request for a recess.

3            After a number of questions, counsel still had

4    not asked her the one question that she was there to

5    answer, and when she was asked it, she denied having said

6    it, was confronted with her prior inconsistent statement

7    and said in effect that she took the Fifth Amendment, and

8    she was then excused.

9            Obviously, the record is what it is.  I'm

11:25AM 10    paraphrasing it.  Again, I was not requested at that point

11    to do anything further with regard to her testimony.  I

12    instructed the jury sui sponte on the meaning of what it

13    meant when a witness was confronted with a prior

14    inconsistent statement, which was an accurate statement of

15    the law that I stand by.

16            As to whether her assertion as to the Fifth

17    Amendment was in good faith or not, I note simply that

18    prostitution is a crime, aiding and abetting is a crime,

19    failing to report, it's surely a crime, and it's by no

11:26AM 20    means clear to me that that was a bad faith assertion of a

21    Fifth Amendment right.

22            In any event, again, if the defense wants me to

23    give some kind of curative instruction to the jury or

24    strike it, strike anything that she said, I will consider

25    that, but I was not asked to do so at the time, so I'm

**Add. 83**

          1    going to deny the renewed motion for a mistrial based on

          2    that, that is, whether it's Dr. Vershvovsky or

          3    Ms. Mondesir's testimony or comments, and I'm prepared to

          4    consider whatever curative instruction is requested or

          5    instruction to disregard something and to strike it from

          6    the record and so forth, but I have not been so asked at

          7    this point.  Counsel.

          8              MR. HOOSE:  Judge, I do want to be heard on this.

          9              MS. NUZUM:  Your Honor, may the government

11:27AM  10    request that this portion be sealed and the courtroom be

         11    cleared if this is going to get into anything that was not

         12    that narrow topic?

         13              THE COURT:  I don't see why we need to get into

         14    anything that's not in the record.  Again, the defense has

         15    made an offer of proof of certain other information, and

         16    I'm not admitting it, and I don't think we need to get

         17    into that, but Mr. Hoose.

         18              MR. HOOSE:  Judge, I just want to put on the

         19    record as to how this resulted from my perspective, and if

11:28AM  20    I am wandering into something that should be sealed, I

         21    don't have any objection to the court being sealed.

         22              THE COURT:  Well, let's talk about what happened

         23    in court.

         24              MR. HOOSE:  All right.  Well, what happened in

         25    court is we had a witness that was completely out of

**Add. 84**

1    control, and I have to inject here, your Honor, that I did

2    everything humanly possible to avoid this.  I knew that

3    this is exactly what we were going to be dealing with.  We

4    all knew that she had made this statement to the Boston

5    Police Department under terms that I would suggest are far

6    more likely to lead to reliability than any I have ever

7    encountered.

8         I offered, suggested that we stipulate to her

9    testimony.  I can't force the government to stipulate.  I

11:28AM 10   thought that they would do so just to avoid the scene that

11    we had yesterday.  They declined to do so.

12         At some point, I think it was Mr. Richardson

13    suggested that, well, she meant that she was prostituting

14    only with regulars.  I would have been happy to consider

15    accommodating that in a stipulation just to avoid what we

16    dealt with yesterday.

17         MR. RICHARDSON:  I'm sorry, your Honor, I'm not

18    sure that was in open court.

19         THE COURT:  All right.  Continue, Mr. Hoose.

11:29AM 20   MR. HOOSE:  I'm sorry, I don't remember what was

21    in open court at this point or not.  I later suggested

22    that I believe this statement was admissible under

23    Rule 807.  I continue to press that, your Honor.  You said

24    in your ruling that it wasn't a sworn statement.  There's

25    no requirement under 807 that it be a sworn statement, and

**Add. 85**

1     I suggested that the government could not oppose my

2     motion.  They declined.

3            Again, I can't make them do this.  I was left

4     with no choice but to bring Ms. Mondesir in.  As you know,

5     we had tried to get this evidence before the jury in

6     several different forms, and the Court's ruling limited us

7     to this particular statement, so I had no choice but to

8     have her take the witness stand.

9            When she arrived here yesterday morning with FBI,

11:30AM 10  I didn't even recognize her.  An FBI agent approached me,

11    at least, I think she was an FBI agent, and told me she

12    was there, that she was in the room, if I wanted to go in

13    and talk to her.  I went in and tried to talk to her, and,

14    frankly, my goal was simply to say, look, I know this is

15    unpleasant for you, this is all I want to ask you, this

16    one question, if you can just agree that you said this,

17    we'll be done and have you on your way.

18           I didn't even get my mouth open before her male

19    companion said, "You have no right to be in here.  What

11:31AM 20  are you doing here?"  I told him why I was there.  "She

21    has nothing to say to you.  Please leave the room."  So I

22    had no opportunity to even talk to her, again, to try to

23    avoid the situation that happened yesterday.

24           Now, I know that none of us really wanted that

25    situation, but I'm articulating this because I'm, frankly,

**Add. 86**

1   trying to deflect the notion that the defense is somehow

2   to blame for this.  I think we're the least to blame, but

3   I'm not really interested in having a discussion as to

4   blame.

5           As to what happened in court, your Honor, and

6   with all due respect to the Court, I have a great deal of

7   respect for you as a Judge and for this court.  I think it

8   is your obligation to control witnesses.  I don't think I

9   have to tell you, Judge, you should call a recess, and,

11:32AM 10   frankly, I was about to ask for a recess when you said,

11   "Wrap it up, put a question."

12           Apparently, wrongly, I interpreted that as to we

13   know where you're going and we're going to let this in

14   without me going through what I did with her the week

15   before.

16           You know, your Honor, that I know how to get

17   evidence in as past recollection recorded because I did it

18   with this witness the week before.  I can't imagine that

19   you or anybody in this courtroom wanted me to try to

11:32AM 20   approach her to do that yesterday.

21           Frankly, I think she would have physically

22   assaulted me if I had gone up to her.  So I took the

23   Court's direction, I put the question, and I sat down

24   assuming that the Court was going to admit it as past

25   recollection recorded without me going through the same

**Add. 87**

1    exercise that I went through the week before, and,

2    frankly, she had already acknowledged the week before that

3    that document was -- that the things in that document were

4    accurate, so that's additional ground as to why it should

5    be admitted.

6         But having said all of that, where we are left

7    now, regardless of who is to blame for it, is we now have

8    this jury, who has evidence before it that everybody in

9    this courtroom knows is false, and I'm not going to

11:33AM 10   articulate what it is because we all know what it is, and

11    I think that it is incumbent upon if not the government,

12    and I think it is incumbent on the government, it's

13    incumbent on the Court to not let this jury go to the

14    deliberation room with false evidence.

15        It has to be corrected, and the way it should be

16    corrected is to simply admit for all other reasons I've

17    already articulated that five-line statement that I think

18    everybody anticipated was going to constitute the evidence

19    as to that aspect of the case.

11:34AM 20       THE COURT:  The evidence that's false is her

21    denial that she had made that statement?  I want to be

22    sure what the false evidence is.

23        MR. HOOSE:  The evidence that is false is that

24    Ms. Correia was not working as a --

25        THE COURT:  No, I'm not going to accept that as

**Add. 88**

1    false.  If you want to say that the evidence we all know

2    is false that she made the statement to the Boston Police,

3    that's one thing, but, anyway, go ahead.

4         MR. HOOSE:  I say it's false, your Honor, because

5    it's corroborated not only by the statement that she made

6    to the Boston Police but by all the other evidence that

7    the Court excluded on this point.  We had a number of

8    items in the bucket on this.  We had the stuff from

9    Georgia.

11:35AM 10         MS. NUZUM:  Objection.

11         MR. RICHARDSON:  Objection.

12         THE COURT:  Sustained.  And I don't agree it's

13    false.  I don't think the information from Georgia or, you

14    know, the text messages you've been talking about, I mean,

15    you're arguing inferences from those things, but they

16    don't say what you keep saying they say.  But, anyway, I'd

17    rather not close the courtroom.  Let's talk about -- let's

18    talk about what happened and what, if anything, you want

19    me to say to the jury going forward.

11:35AM 20         MR. HOOSE:  Well, I don't know what I want you to

21    say to the jury because, frankly, whatever you say to the

22    jury is not going to be sufficient to cure the damage.

23    The only thing that's going to be sufficient to cure the

24    damage is to admit that statement for all the reasons that

25    I have given or to declare a mistrial.

**Add. 89**

          1              THE COURT:  All right.  As to whether it's past

          2      recollection recorded, that requires, of course, the

          3      witness to say that she has no memory, and that predicate

          4      was not laid.  It is certainly my obligation to control

          5      the court, and for that matter, to ensure a fair trial.

          6      It's also defense counsel's obligation to request relief.

          7      I don't think I've denied a single request for a sidebar

          8      or for a recess to be heard.  If you had requested me to

          9      strike it, I would strike it.

11:36AM  10              It's hard for me to know what are your strategic

         11      choices, how you want to handle a witness, do you want me

         12      to be involved or not?  I was prepared, of course, to do

         13      so.  I wasn't asked to do so.  I wanted certainly for you

         14      to get to the point.

         15              When you ask questions to an exceedingly hostile

         16      witness like are you the same person who testified before,

         17      it's likely you're going to get an exceedingly hostile

         18      response, and I didn't know how this was going to play

         19      out, whether she was going to deny her prior statement or

11:37AM  20      not, but, in any event, what happened has happened.

         21              The question is do you want me to do something

         22      going forward?  I'm going to deny the request for a

         23      mistrial.  If you want me to strike it, I will strike

         24      certainly portions of her testimony, instruct the jury to

         25      disregard it, give a curative instruction, but it's your

**Add. 90**

1    strategic choice as to how you want me to handle that

2    going forward.

3            I'm prepared to do anything within reason, and I

4    don't accept the premise, changing subjects slightly, I do

5    not accept the premise that evidence that we all know is

6    false is before the court.  I don't accept that, and that

7    somehow is, you know, tainting this proceeding.  I don't

8    agree with that.

9            Just to circle back to where I began, it is by no

11:38AM 10    means clear in any way, shape or form that this evidence

11    was admissible, that I should have admitted it.

12            Again, I have been deeply troubled about this

13    issue for weeks because it seemed to me to violate

14    Rule 412 and to permit the defendant to trash the victim's

15    name and reputation, and it wasn't clear to me that that

16    was appropriate or fair, and finally decided I would put a

17    thumb on -- well, I would rule in favor of the defense on

18    that issue, but I do have to say it's by no means clear

19    that any of this is admissible.

11:39AM 20            Does the government want to say anything in

21    response?  Mr. Richardson.

22            MR. RICHARDSON:  No, your Honor, other than I

23    suppose to respond to the notion that having opposed the

24    introduction of this evidence at all, we somehow are

25    responsible for what happened in court.

**Add. 91**

```
 1              THE COURT:  All right.  Well, I will -- the

 2     evidence is not closed.  Defense has not rested.  If I

 3     have a request, a reasonable request for, again, to

 4     strike, to disregard anything connected with that, I will

 5     certainly entertain it and would be in all likelihood

 6     prepared to give it, but I'll leave that to defense to

 7     make whatever choice it wants to make in that regard.

 8              One last thing.  Assuming that issue is over and

 9     I am denying the renewed motion for a mistrial, I'm

11:40AM 10     inferring that there's no issue with the verdict form,

11     which is just a one-line guilty, not guilty form.  If

12     that's incorrect, please let me know.

13              As I indicated, I was convinced that resulting in

14     death is an element of an aggravated offense, not simply a

15     sentencing enhancement, so it's framed accordingly.

16     Anything further from the government?

17              MS. NUZUM:  I have nothing further at this time

18     from the government.

19              THE COURT:  Okay.  From the defense?

11:41AM 20              MR. HOOSE:  Judge, what's left, we, this morning

21     submitted a thumb drive to Mr. McKillop in an effort to --

22     you had indicated previously you were giving a chance to

23     clean up the record on some of these issues.

24              THE COURT:  Yes.

25              MR. HOOSE:  So we submitted a thumb drive to
```

**Add. 92**

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA,          )
                                         )
 5    vs.                                )  Criminal Action
                                         )
 6    LOUIS D. COLEMAN, III,             )  No. 19-10113-FDS
                          Defendant      )
 7                                       )
                                         )
 8                                       )

 9

10    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV

11
                            JURY TRIAL DAY 14
12

13

14
                John Joseph Moakley United States Courthouse
15                         Courtroom No. 10
                           1 Courthouse Way
16                         Boston, MA 02210

17
                             May 31, 2022
18                            8:15 a.m.

19

20

21

22

23                      Valerie A. O'Hara
                      Official Court Reporter
24        John Joseph Moakley United States Courthouse
                    1 Courthouse Way, Room 3204
25                       Boston, MA 02210
                    E-mail: vaohara@gmail.com
```

**Add. 93**

1   we clear the courtroom, so I'm going to ask that everyone

2   not affiliated with the government or the defense or the

3   court, if you could leave the Court briefly, I'm going to

4   conduct a brief proceeding under seal.

5        MR. ZOLYNSKI:  Your Honor, may I inquire as to the

6   instruction on consciousness of guilt?  I didn't catch what

7   the Court changed and didn't change.

8        THE COURT:  I didn't change anything.

9        (SEALED HEARING WAS HELD.)

09:00AM 10   THE CLERK:  All rise for the jury.

11        (JURORS ENTERED THE COURTROOM.)

12        THE COURT:  Ladies and gentlemen, welcome back.  I

13   hope you had a nice weekend.  I'm sorry to have kept you

14   waiting for a bit of time.  We had some last minute things

15   we had to take up.  I appreciate your patience.

16        Also to let you know, ███████████████ in seat

17   Number 14 sent us a text last night that her car caught

18   fire in Vermont and that she was trapped up there, so I

19   think I'm going to let her go, so we're down to one

09:25AM 20   alternate, but that's why we impanel alternates.

21        Let me turn to the defense.  Is there further

22   evidence?

23        MR. HOOSE:  Good morning, your Honor.  The defense

24   rests and renews its motion pursuant to Rule 29.

25        THE COURT:  All right.  That motion is denied.

**Add. 94**

```
 1                      UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3

 4    UNITED STATES OF AMERICA,         )
                                        )
 5    vs.                               )  Criminal Action
                                        )
 6    LOUIS D. COLEMAN, III,            )  No. 19-10113-FDS
                       Defendant        )
 7                                      )
                                        )
 8                                      )

 9

10    BEFORE:   THE HONORABLE F. DENNIS SAYLOR, IV

11                            JURY TRIAL DAY 14

12

13

14
               John Joseph Moakley United States Courthouse
15                         Courtroom No. 10
                           1 Courthouse Way
16                         Boston, MA 02210

17
                              May 31, 2022
18                             8:15 a.m.

19

20

21

22

23                         Valerie A. O'Hara
                          Official Court Reporter
24           John Joseph Moakley United States Courthouse
                       1 Courthouse Way, Room 3204
25                         Boston, MA 02210
                       E-mail: vaohara@gmail.com
```

**Add. 95**

14-92

1  shows.  What she was trying to do and what Mr. Alqasir told

2  you she was trying to do or wanted to do was to get him

3  through her app as her driver.  Nowhere did she say I want

4  a free ride, threaten him, attack him, do anything of the

5  sort.

6       Finally, there is an argument that the defendant

7  or that the government chose the crime to charge the

8  defendant with.  Well, actually what the defendant is

9  charged with is a crime he chose to commit.  It may be that

11:44AM 10  this turned out to be, I think the language was "the worst

11  night of his life."  It turned out to be Jassy's last night

12  of her life.

13       THE COURT:  All right.  Thank you.  Why don't we

14  stand and stretch while the clerk delivers the

15  instructions.

16              JURY INSTRUCTIONS

17       THE COURT:  Ladies and gentlemen, you should each

18  have your own copy of the written jury instructions.  I'm

19  going to read them aloud to you, and you can read along

11:46AM 20  with me as I read them.  You can take notes on them, and

21  you can take your copy into the jury room with you.

22       You will recall at the beginning of the case, I

23  gave you some preliminary instructions.  I don't think

24  there's anything here that's inconsistent, but if there is,

25  these instructions should control your deliberation and

**Add. 96**

1    verdict.

2             All right.  If you would turn to page 2 and please

3    follow along with me.

4             It is your duty to find the facts from the

5    evidence admitted in this case.  To those facts, you must

6    apply the law as I give it to you.  The determination of

7    the law is my duty as the Judge.  It is your duty to apply

8    the law exactly as I give it to you, whether you agree with

9    it or not.

11:47AM 10        In following my instructions, you must follow all

11   of them and not single out some and ignore others.  They

12   are all important.

13            You must not interpret these instructions or

14   anything I may have said or done as a suggestion by me as

15   to what verdict you should return -- that is a matter

16   entirely for you to decide.

17            Every person accused of a crime is presumed to be

18   innocent unless and until his guilt is proved beyond a

19   reasonable doubt.  The presumption is not a mere formality.

11:47AM 20   It is a fundamental principle of our system of justice.

21            The presumption of innocence means that the burden

22   of proof is always on the government to prove that the

23   defendant is guilty of the crime with which he is charged

24   beyond a reasonable doubt.

25            The burden never shifts to the defendant.  It is

**Add. 97**

1    always the government's burden to prove each of the

2    elements of the crime charged beyond a reasonable doubt.

3    The defendant does not have to prove that he is innocent,

4    or even present any evidence.

5            The presumption of innocence alone may be

6    sufficient to raise a reasonable doubt and to require the

7    acquittal of the defendant.  You may not convict the

8    defendant of any crime charged against him if the

9    government fails, or is unable, to prove every element of

11:48AM 10    that crime beyond a reasonable doubt.

11            You may not convict the defendant based on

12    speculation or conjecture.

13            You may not convict the defendant if you decide

14    that it is equally likely that he is guilty or not guilty.

15    If you decide that the evidence would reasonably permit

16    either of two conclusions -- either that he is guilty as

17    charged, or that he is not guilty -- you must find the

18    defendant not guilty.

19            You may not convict the defendant if you decide

11:48AM 20    that it is only probable, or even strongly probable that he

21    is guilty.  A mere probability of guilt is not guilt beyond

22    a reasonable doubt.

23            The law does not require that the government prove

24    guilt beyond all possible doubt; proof beyond a reasonable

25    doubt is sufficient to convict.  There are very few things

**Add. 98**

1    in this world that we know with absolute certainty, and in

2    criminal cases, the law does not require proof that

3    overcomes every possible doubt.

4         Again, the defendant is presumed to be innocent,

5    and the government bears the burden of proving him guilty

6    beyond a reasonable doubt.  If, after fair and impartial

7    consideration of all the evidence, you have a reasonable

8    doubt as to the defendant's guilt, it is your duty to

9    acquit him.  On the other hand, if, after fair and

11:49AM 10    impartial consideration of all of the evidence, you are

11    satisfied beyond a reasonable doubt as to his guilt, you

12    should vote to convict him.

13         Like all defendants, the defendant in this case

14    has a constitutional right not to testify.  You should not

15    consider or even discuss that fact in your deliberations.

16    No inference of guilt, or of anything else, may be drawn

17    from the fact that the defendant did not testify.  For any

18    of you to draw such an inference would be wrong; indeed, it

19    would be a violation of your oath a juror.

20         Your verdict must be based solely upon the

21    evidence.  It would be improper for you to base your

22    verdict on anything that is not evidence.

23         You may not base your verdict on any personal

24    feelings, prejudices, or sympathies you may have about the

25    defendant or about the nature of the crime with which he is

**Add. 99**

1    charged.

2        As I told you at the beginning of the case, you

3    should take particular care to ensure that your verdict is

4    not based, even in part, on any assumptions or biases based

5    on race, ethnicity, or gender, including any assumptions or

6    biases that may not be open or obvious.

7        You may not consider or be influenced by any

8    possible punishment that may be imposed on the defendant.

9        Again, your verdict must be based solely on the

11:50AM 10    evidence and according to the law.

11        The evidence in this case consists of the sworn

12    testimony of witnesses, both on direct and

13    cross-examination, the exhibits that have been received

14    into evidence, and any facts to which the parties have

15    agreed or stipulated.  You should consider all of the

16    evidence, no matter what form it takes, and no matter which

17    party introduced it.

18        Whether the government has sustained its burden of

19    proof does not depend upon the number of witnesses it has

11:51AM 20    called, or upon the number of exhibits it has offered, but

21    instead upon the nature and quality of the evidence

22    presented.

23        Certain things are not evidence.

24        Arguments and statements by lawyers are not

25    evidence.  The lawyers are not witnesses.  What they say in

1   their opening statements, closing arguments, and at other

2   times is intended to help you interpret the evidence, but

3   it is not evidence.  If the facts as you remember them from

4   the evidence differ from the way the lawyers have stated

5   them, your memory of the facts should control.

6          Questions by lawyers, standing alone, are not

7   evidence.  Again, the lawyers are not witnesses.  The

8   question and the answer taken together are the evidence.

9          Objections by lawyers are not evidence.  Lawyers

11:51AM 10   have a duty to their clients to object when they believe a

11   question or an exhibit is improper under the rules of

12   evidence.  You should not be influenced by any objection or

13   by my ruling on it, and you should not speculate or guess

14   about what the answer might have been or what an exhibit

15   might have said.

16          Anything that I have struck or instructed you to

17   disregard is not evidence and may not be considered by you.

18          The indictment is not evidence.

19          Anything you may have seen or heard when the court

11:52AM 20   was not in session is not evidence.  You must decide the

21   case solely on the evidence received at trial.  As I

22   advised you at the beginning of the case, it is

23   particularly important that you not conduct any research on

24   your own, and that you not read or watch or listen to

25   anything on the Internet or in news media about the case.

1          Evidence may take the form of either "direct

2    evidence" or "circumstantial evidence."  "Direct evidence"

3    is direct proof of a fact, such as testimony from an

4    eyewitness that the witness saw something.  "Circumstantial

5    evidence" is indirect evidence; that is, proof of a fact

6    (or facts)from which you could draw a reasonable inference

7    that another fact exists, even though it has not been

8    proved directly.

9          You are entitled to consider both direct and

11:53AM 10    circumstantial evidence.  The law permits you to give equal

11    weight to both.  It is for you to decide how much weight to

12    give to any particular piece of evidence, whether direct or

13    circumstantial.

14          Although you may consider only the evidence

15    presented in the case, you are not limited to the plain

16    statements made by witnesses or contained in the documents.

17    In other words, you are not limited solely to what you saw

18    and heard as the witnesses testified.

19          You are also permitted to draw reasonable

11:53AM 20    inferences from the facts if you believe those inferences

21    are justified in light of common sense and personal

22    experience.  An inference is simply a deduction or

23    conclusion that may be drawn from the facts that have been

24    established.  Any inferences you draw must be reasonable

25    and based on the facts as you find them.  Inferences may

1    not be based on speculation or conjecture.

2            A particular item of evidence is sometimes

3    received for a limited purpose only.  That is, it can be

4    used by you only for one particular purpose and not for any

5    other purpose.  I have told you when that occurred and

6    instructed you on the purposes for which the item that can

7    and cannot be used.

8            Some of the evidence has been received in the form

9    of stipulations.  A stipulation simply means that the

11:54AM 10   government and the defendant accept the truth of a

11   particular proposition or fact.

12            Because there is no disagreement, there is no need

13   for evidence as to that issue apart from the stipulation.

14   You may accept the stipulation as a fact to be given

15   whatever weight you choose.

16            You do not have to accept the testimony of any

17   witness if you find that the witness is not credible.  You

18   must decide which witnesses to believe, considering all of

19   the evidence and drawing upon your common sense and

11:54AM 20   personal experience.  You may believe all of the testimony

21   of a witness, or some of it, or none of it.  You alone are

22   the judges of the witnesses' credibility.

23            In deciding whether to believe testimony of the

24   witnesses, you may want to take into consideration such

25   factors as their conduct and demeanor while testifying; any

**Add. 103**

1   apparent fairness or unfairness they may have displayed;

2   any interest they may have in the outcome of the case; any

3   prejudice or bias they may have shown; their opportunities

4   for seeing and knowing the things about which they have

5   testified; the reasonableness and unreasonableness of the

6   events that they have related to you in their testimony;

7   and any other evidence that tends to support or contradict

8   their versions of the events.

9          The testimony of a witness may be discredited or

11:55AM 10   impeached by showing that he or she previously made

11   statements that are inconsistent with his or her present

12   testimony.  If a witness made inconsistent statements about

13   any significant matter, you have a right to distrust the

14   testimony of that witness in other respects.  You may

15   reject all of the testimony of that witness or give it such

16   credibility as you may think it deserves.

17          Sometimes, of course, people make innocent

18   mistakes, particularly as to unimportant details; not every

19   contradiction or inconsistency is necessarily important.

11:55AM 20   Again, you alone are the judge of the witnesses'

21   credibility.

22          You have heard evidence that the defendant made

23   certain statements to government agents or to others.

24          It is for you to decide whether the defendant made

25   any such statement, and, if so, how much weight to give it.

Add. 104

1    In making that decision, you should consider all of the

2    evidence concerning the statement, including the

3    circumstances under which the statement may have been made,

4    and any facts or circumstances tending to corroborate or

5    contradict the contents of the statement.

6           You have heard the testimony of law enforcement

7    officers.  The fact that a witness may be employed as a law

8    enforcement officer does not mean that his or her testimony

9    is necessarily deserving of more or less consideration or

11:56AM 10    greater or lesser weight than that of any other witness.

11           Again, it is for you to decide whether to accept

12    the testimony of any witness and what weight, if any, to

13    give to that testimony.

14           You have heard testimony from persons who were

15    permitted to explain certain technical issues or to express

16    certain opinions about certain subjects.  A witness who has

17    special knowledge, skill, experience, training, or

18    education on a particular topic may testify and provide an

19    explanation or state an opinion concerning such matters.

11:57AM 20           You may accept or reject that testimony, in whole

21    or in part.  In weighing the testimony, you should consider

22    the witness's education and experience and the soundness of

23    the reasons given for the opinion.  You should also

24    consider the credibility of the testimony, as you would any

25    witness.

**Add. 105**

1          You have heard testimony that law enforcement

2     conducted certain testing procedures, and you have heard

3     the results for those tests.  You may consider that

4     testimony as you would any other evidence, and give it such

5     weight as you believe it may deserve under the

6     circumstances.  You may make reasonable inferences from the

7     fact that certain tests were inconclusive, that certain

8     tests were not conducted, or that certain investigative

9     techniques were not used.  Any such inferences, however,

10    should not be based on speculation or conjecture about what

11    the results of such tests or techniques might have been.

12    There is no legal requirement that the government use any

13    specific investigative tests or techniques or all possible

14    tests or techniques to prove its case.

15         As I indicated at the beginning of the trial, you

16    have been permitted to take notes.  You should bear in mind

17    that not everything that is written down is necessarily

18    what was said.  When you return to the jury room to discuss

19    the case, do not assume simply because something appears in

11:58AM 20    somebody's notes that it necessarily took place in court.

21    Notes are an aid to recollection, nothing more; the fact

22    that something is written down does not mean that it is

23    necessarily accurate.

24         The numbers assigned to the exhibits are for

25    convenience and in order to ensure an orderly procedure.

**Add. 106**

14-103

        1    You should draw no inference from the fact that a

        2    particular exhibit was assigned a particular number or that

        3    there may be gaps in the number sequence.

        4        This case, like most criminal cases, began with an

        5    indictment.  You will have that indictment with you while

        6    you deliberate in the jury room.  The indictment is not

        7    evidence or proof of guilt, and you may not draw any

        8    adverse inference from it.  It is simply an accusation --

        9    it is the means by which the defendant is charged with a

11:59AM 10    crime and brought before this court.  The defendant has

       11    pleaded not guilty to the charge set forth in the

       12    indictment.

       13        I am now going to give you some instructions on

       14    the nature of the offense charged in the indictment and the

       15    elements of that offense that the government must prove

       16    beyond a reasonable doubt.

       17        Throughout these instructions, I will use the

       18    word, "victim."  I'm doing so only for the sake of

       19    convenience.  You should not draw any inference or

11:59AM 20    conclusion from my use of that word.  In particular, you

       21    should not assume from that word that the crime charged

       22    necessarily occurred or that the defendant has to prove

       23    that he is innocent.  Again, the burden is on the

       24    government to prove his guilt beyond a reasonable doubt.

       25        The indictment charges the defendant with the

**Add. 107**

1    crime of kidnapping resulting in death.  For the sake of

2    convenience, I will refer to the crime as "kidnapping."

3              For you to find the defendant guilty of

4    kidnapping, you must be convinced that the government has

5    proved each of the following things beyond a reasonable

6    doubt:

7              First, that the defendant unlawfully seized,

8    confined, inveigled, decoyed, kidnapped, abducted, or

9    carried away the victim;

12:00PM 10         Second, that the defendant held or detained the

11   victim against her will for ransom or reward or otherwise;

12             Third, that the defendant caused the

13   transportation of the victim in interstate commerce;

14             Fourth, that the defendant acted knowingly and

15   willfully; and

16             Fifth, that the defendant's acts resulted in the

17   death of the victim.

18             The first element of the crime of kidnapping that

19   the government must prove is that the defendant unlawfully

20   seized, confined, inveigled, decoyed, kidnapped, abducted,

21   or carried away the victim.

22             "Unlawfully" simply means contrary to law.

23             "Seize," "confine," "kidnap," "abduct" and "carry

24   away" all involve the physical or bodily taking, seizure,

25   or carrying away of a victim.

1        "Inveigle" and "decoy" both involve the

2   non-forcible taking of a victim, in which a defendant

3   entices or lures the victim in some way into accompanying

4   him or remaining with him.

5        To "inveigle" means to entice, cajole, or tempt a

6   victim.  That may include deceitful means, such as false

7   promises or representations, although such false promises

8   or representations are not required.

9        To "decoy" means to entice or lure a victim by

12:01PM 10   means of some fraud, trick or temptation.

11       The fact that the victim may have accompanied the

12   defendant voluntarily at first does not necessarily mean

13   that a kidnapping did not occur.  Even if the victim

14   accompanied the defendant voluntarily at first,

15   circumstances might have changed, and the defendant at some

16   later point may be found to have seized, confined,

17   inveigled, decoyed, kidnapped, abducted, or carried away

18   the victim.

19       The second element of the crime of kidnapping that

12:02PM 20   the government must prove is that the defendant "held or

21   detained" the victim against her will for ransom or reward

22   or otherwise.

23       A victim may be held or detained against her will

24   if she is restrained against her will if she is restrained

25   or restricted in her movement without her consent, such

1    that she is not free to leave the location or space in

2    which she is held or detained.

3         It is not necessary that a victim be held or

4    detained by mechanical restraints, such as locks, chains,

5    or similar methods.  A victim may also be held or detained

6    by physical force, threats, or coercion.

7         As I will explain in a moment, under some

8    circumstances, a victim may also be held or detained

9    against her will if she is deceived or tricked into

12:03PM 10   accompanying or remaining with the defendant, or does so

11   because of the defendant's false pretenses.

12        There is no specific amount of time that a victim

13   must be held or detained.  The victim must, however, be

14   held or detained for an appreciable period against her

15   will.

16        The government must prove that the defendant held

17   or detained the victim "against her will."

18        To hold or detain someone "against her will" is to

19   do so without her consent.

12:03PM 20       If a victim's apparent "consent" is obtained by

21   deceit, trickery, or false pretenses, it is not a valid

22   form of consent.  A victim may be found to have been held

23   or detained against her will if she is deceived or tricked

24   into accompanying or remaining with the defendant or

25   induced to do so by false pretenses.  Put another way, if a

1   victim agrees to accompany a defendant or remain in his

2   company, because he has deceived or tricked her as to his

3   true purpose and intent, she has not actually assented to

4   accompany or remain with him and may be found to have been

5   held or detained against her will.  Nonetheless, if the

6   victim has given valid consent, she has not been held or

7   detained against her will.

8            Again, the government must prove that the

9   defendant held or detained the victim against her will for

12:04PM 10   "ransom, reward, or otherwise."

11            Here, the government alleges that the victim was

12   held not for "ransom or reward," but "otherwise"  -- that

13   is, for one or more other purposes.

14            The term "otherwise" can include holding or

15   detaining a person (1) for purposes of sexual gratification

16   or (2) to prevent detection of a crime or a report to law

17   enforcement.

18            The third element of the crime of kidnapping that

19   the government must prove is that the defendant willfully

12:04PM 20   caused the transportation of the victim in interstate

21   commerce.

22            "Interstate commerce" includes travel between one

23   state and another state.  A victim is transported in

24   interstate commerce if she moves across straight lines from

25   one state into another.

1          The government does not have to prove that the

2     defendant knew that state lines were crossed.  As long as

3     the defendant willfully caused the victim's transportation

4     and she crossed a state line as a result, this element may

5     be satisfied.

6          This element may be satisfied regardless of

7     whether the victim was alive when transported across a

8     state boundary.

9          The fourth element of the crime of kidnapping that

12:05PM 10   the government must prove is that the defendant acted

11    knowingly and willfully.

12         The defendant acted "knowingly" if he acted with

13    knowledge and awareness of his actions, and did not act out

14    of ignorance, mistake, neglect, or accident.

15         The defendant acted "willfully" if he acted

16    voluntarily and intentionally and with the specific intent

17    to do something the law forbids or with the specific intent

18    to fail to do something the law requires to be done -- that

19    is, with a bad purpose either to disobey or to disregard

12:05PM 20   the law.

21         The specific crime that the government must prove

22    that the defendant committed knowingly and willfully is the

23    crime of kidnapping resulting in death and not any other

24    crime.

25         In assessing the defendant's intent, you may

1    consider evidence that he took certain actions or engaged

2    in certain conduct after the crime was alleged to have been

3    committed.  Such actions or conduct may indicate that the

4    defendant thought he was guilty of one or more crimes and

5    was trying to avoid detection and punishment.  You are not

6    required to draw such an inference, but you may do so if it

7    is reasonable to do so under the circumstances.  Mere

8    flight, without more, is not necessarily indicative of

9    feelings of guilt.  It is up to you to decide what weight,

12:06PM 10    if any, to give to any such evidence.

11            The fifth element of the crime of kidnapping that

12    the government must prove is that the defendant's acts

13    resulted in the victim's death.

14            To satisfy this element, the government must prove

15    that the victim is dead, and that her death resulted from

16    the willful and intentional conduct of the defendant.  To

17    establish that the defendant's conduct resulted in the

18    death of the victim, the government must prove that but for

19    the defendant's actions, the victim would not have died.

12:07PM 20            The indictment charges that the offense was

21    committed "on or about" a certain date.  Although it is not

22    necessary -- although it is necessary for the government to

23    prove beyond a reasonable doubt that the offense you are

24    considering was committed on or reasonably near the date

25    alleged in the indictment, it is not necessary for the

**Add. 113**

1    government to prove that the offense was committed

2    precisely on the date charged.

3            I come now to the last part of the instructions,

4    the rules for your deliberations.  When you retire, you

5    will discuss the case with the other jurors to reach

6    agreement if you can do so.  You shall permit your

7    foreperson to preside over your deliberations, and your

8    foreperson will speak for you here in court.  Your verdict

9    must be unanimous -- that is, all of you must agree on the

12:07PM 10   verdict.

11           Each of you must decide the case for yourself, but

12    you should do so only after considering all the evidence,

13    discussing it fully with the other jurors, and listening to

14    the views of the other jurors.

15           Do not be afraid to change your opinion if you

16    think you are wrong, but do not come to a decision simply

17    because other jurors think it is right.

18           It important that you reach a verdict if you can

19    do so conscientiously.  You should not hesitate to

20    reconsider your views from time to time and to change them

21    if you are persuaded that this is appropriate.

22           It is important that you attempt to return a

23    verdict, of course, but only if each of you can do so after

24    having made your own conscientious determination.  Do not

25    surrender an honest conviction as to the weight and effect

1    of the evidence simply to reach a verdict.

2         I now want to explain to you what is called the

3    verdict form.  This is simply the written notice of the

4    decision you will make in this case.  It's a single piece

5    of paper.  It has the caption, the name of the case, it

6    says "Verdict Form," and it says, "Count One, Kidnapping

7    Resulting in Death," and there's a place to check "not

8    guilty" or "guilty" and then a place for the foreperson to

9    sign and date the verdict form.

12:09PM 10         After you've reached a unanimous agreement on your

11    verdict, your foreperson will fill in the form that has

12    been given to you, sign and date it, and advise the jury

13    officer outside your door that you are ready to return to

14    the courtroom.

15         After you return to the courtroom, your foreperson

16    will deliver the completed verdict form as directed in open

17    court.

18         If it becomes necessary during your deliberations

19    to communicate with me, you may send through the jury

12:09PM 20    officer a note signed by your foreperson or by one or more

21    members of the jury.  No member of the jury should ever

22    attempt to communicate with me on anything concerning the

23    case except by a signed writing, and I will communicate

24    with any member of the jury on anything concerning the case

25    only in writing or orally here in open court.  If you send

1    out a question, I will consult with the parties as promptly

2    as possible before answering it, which may take some time.

3    You may continue with your deliberations while waiting for

4    the answer to any question.

5          When you are communicating with me, please do not

6    tell me -- or anyone else -- how the jury stands

7    numerically or toward which decision the jury is leaning.

8          All right.  A few matters left to discuss.  First,

9    once you get the case, you are the ones who determine your

12:10PM  10   schedule.  Again, you can take as little or as much time as

11   you think is necessary and appropriate to reach your

12   decision.

13         Lunch should be waiting for you in your

14   deliberation space, which, again, I think is Courtroom 20

15   on the seventh floor.

16         If I have not heard from you by about ten minutes

17   to five or so, I will reconvene and check and see where you

18   are.  If you're close, we can keep going for a little

19   while.  The building begins to shut down after awhile.  We

20   can only go so late into the evening, but we're here

21   tomorrow, we're here the day after that, and, again, it's

22   entirely up to you how much time you take.

23         If you have a question concerning your physical

24   comfort, if you're too hot or too cold or something like

25   that, you need to refresh your water, you don't need to

**Add. 116**

 1   send a signed note to communicate with me, but anything

 2   other than your physical comfort does require a signed note

 3   so I can discuss it with the parties, and, again, that may

 4   take some time to respond to whatever question or

 5   communication you might have.

 6          I have one matter that I don't enjoy doing, but I

 7   have to.  We impaneled 15 jurors at the beginning, but only

 8   two, I'm sorry, only 12 are permitted to deliberate and

 9   vote.  As you know, we lost two jurors in the course of the

12:11PM 10   trial, and there's no guarantee that we're going to keep

11   all 12 of you.  So I have to designate one of you as the

12   alternate juror, and I'm going to designate the person who

13   was impaneled last when we first impanelled the jury, and

14   that's ███████████ in seat 9.

15          To make matters worse, you have to be segregated

16   from the other jurors while they deliberate, and you're not

17   free to leave because, again, we may lose someone depending

18   on how long this takes.

19          Before I forget, I'm going to discharge

12:12PM 20   ██████████████, who, again, was unable to be here today.

21          The last thing I need to do is to appoint a

22   foreperson.  The role of the foreperson is very limited.

23   It's to make sure that the deliberations are conducted in

24   an orderly fashion, to make sure everyone is having a

25   chance to be heard, and then to make sure that the verdict

**Add. 117**

1   form accurately reflects the jury's verdict and to sign it

2   and date it and return it here in open court.

3          The foreperson's views are entitled to no extra

4   weight.  You are very much a jury of equals, and all 12 of

5   you have an equal say in the outcome of the case, although,

6   of course, your verdict has to be unanimous, so I'm going

7   to designate ████████ in seat 6 as the jury foreperson,

8   and I instruct you to permit her, again, to preside over

9   your deliberations, and she will be charged with making

12:13PM 10   sure the form accurately reflects your verdict.

11          Again, thank you for your patience and cooperation

12   throughout this process, and I instruct you to begin your

13   deliberations.  We will collect the physical evidence and

14   get that up to you.  You should also have a disk with an

15   electronic display so you can review that evidence, if you

16   wish.  That may take a few moments to make sure we have

17   everything and it's in the right order, and Mr. McKillop

18   will show you to Courtroom 7, Matt?

19          THE CLERK:  Courtroom 20.

12:14PM 20          THE COURT:  Courtroom 20 on the seventh floor.

21   With that, again, I instruct you to begin your

22   deliberations, and if I've not heard you by ten minutes of

23   five, we'll collect ourselves and see where you are at that

24   point.

25          MR. ZOLYNSKI:  Judge, very briefly, before the

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2


3


4    UNITED STATES OF AMERICA,            )
                                          )
5                                         )  Criminal Action
     v.                                   )
6                                         )  No. 19-10113-FDS
     LOUIS D. COLEMAN III,                )
7                      Defendant          )


8


9


10   BEFORE:  THE HONORABLE F. DENNIS SAYLOR IV


11


12                      SENTENCING HEARING


13


14

            John Joseph Moakley United States Courthouse
15                      Courtroom No. 10
                        1 Courthouse Way
16                  Boston, Massachusetts 02210


17

                        October 11, 2022
18                        2:01 p.m.


19


20


21              Kathleen Mullen Silva, RPR, CRR
                    Official Court Reporter
22        John Joseph Moakley United States Courthouse
                 1 Courthouse Way, Room 7209
23               Boston, Massachusetts 02210
                 E-mail: kathysilva@verizon.net
24


25        Mechanical Steno - Computer-Aided Transcript

```
1
     APPEARANCES:
2
     For the United States:
3
          United States Attorney's Office, by ROBERT E. RICHARDSON,
4    ASSISTANT UNITED STATES ATTORNEY, and KENNETH G. SHINE,
     ASSISTANT UNITED STATES ATTORNEY, and ELIANNA J. NUZUM,
5    ASSISTANT UNITED STATES ATTORNEY, 1 Courthouse Way, Suite 9200,
     Boston, Massachusetts 02110;
6

7
     For the Defendant:
8
          Federal Public Defender Office, by JANE F. PEACHY, ESQ.,
9    and WADE ZOLYNSKI, ESQ., 51 Sleeper Street, Boston,
     Massachusetts 02210;
10
          Sasson Turnbull Ryan & Hoose, by DAVID P. HOOSE, ESQ.,
11   100 Main Street, Northampton, Massachusetts 01060.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Add. 120**

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  Court is now in session in the matter of
 3   United States v. Coleman, Criminal No. 19-10113.
 4          Would counsel please identify themselves for the
 5   record starting with the government.
 6          MR. SHINE:  Your Honor, Kenneth Shine.  I represent
 7   the United States of America.
 8          MR. RICHARDSON:  Good afternoon, Your Honor.  Robert
 9   Richardson, also representing the United Sates.
10          MS. NUZUM:  Good afternoon, Your Honor.  Elianna Nuzum
11   for the United States.
12          THE COURT:  Good afternoon all.
13          MR. HOOSE:  David Hoose for Mr. Coleman.
14          MS. PEACHY:  Good afternoon.  Jane Peachy for
15   Louis Coleman.
16          MR. ZOLYNSKI:  Good afternoon, Judge.  Wade Zolynski
17   for Mr. Coleman.
18          THE COURT:  Good afternoon all.
19          This is the sentencing of Louis D. Coleman III.  I've
20   received and read the presentence report as revised through
21   October 4, the defendant's sentencing memorandum filed October
22   1, the government's sentencing memorandum filed October 5, with
23   exhibits.  And, of course, I presided over the trial.  To my
24   knowledge, no other materials have been submitted to the court.
25   Is there anything else I should have seen that I have not?
```

```
 1   Mr. Shine?

 2         MR. SHINE:  On behalf of the government, no, Your

 3   Honor.  You have all our materials.

 4         THE COURT:  Ms. Peachy?

 5         MS. PEACHY:  Nothing further, Your Honor.

 6         THE COURT:  Ms. Peachy, I know you've had an

 7   opportunity to review the presentence report.  Have you gone

 8   over it with the defendant?

 9         MS. PEACHY:  Yes, Your Honor, we have.

10         THE COURT:  Is that correct, Mr. Coleman?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Okay.  Are there victims present who wish

13   to be heard in this proceeding?

14         MS. NUZUM:  Yes, Your Honor.  There are at least five

15   members of the victim's family that would like to be heard

16   today.

17         THE COURT:  All right.  What I propose that we do is I

18   will deal with the objections to the presentence report, do the

19   guideline calculation, we will then hear from the victims, and

20   then I'll hear from both counsel and give the defendant his

21   right of allocution.

22         All right.  Let me turn first to the objections.  Most

23   of the objections were either -- either resulted in an

24   amendment to the presentence report or concerned

25   characterizations of the facts of the case that I don't need to
```

Add. 122

```
 1    resolve for sentencing purposes.
 2         The only issue is the guideline calculation, whether
 3    the base offense level is 43 or 36.  It's, I think, an entirely
 4    moot and technical point.  The statute does not provide a range
 5    of sentences.  It provides only for life imprisonment.  I have
 6    no discretion to impose anything else.
 7         But in any event, the basic guideline question is
 8    whether this -- the actions here would constitute first degree
 9    murder had they happened in the territorial or maritime
10    jurisdiction of the United States.  The statute in question
11    provides that a killing committed in the perpetration of a
12    kidnapping is first degree murder, which means under Section
13    2A4.1 of the guidelines, level 43 is the appropriate guideline
14    level.  And so I'm going to overrule the objection.  Again,
15    it's purely a technical issue under the circumstances.
16         And I don't think I need to resolve any other
17    objections.  Am I correct, Ms. Peachy?
18         MS. PEACHY:  That's correct, Your Honor.  But please
19    note our continuing objection to the guideline issue.
20         THE COURT:  Yes.
21         All right.  Turning to the guideline calculation then,
22    the base offense level, which is also the final offense level,
23    is 43.  His criminal history score is 0.  His Criminal History
24    Category is I.  That produces a guideline range of life
25    imprisonment, a supervised release range of two to five years,
```

Add. 123

```
 1   a fine range of $50,000 to $500,000, a special assessment of
 2   $100.  Restitution is mandatory if requested.
 3           Where do we stand to that issue, Mr. Shine?
 4           MR. SHINE:  We will be requesting an order of
 5   restitution, Your Honor.  However, at this time the amount has
 6   not been determined.  We'd ask the court to hold that in
 7   abeyance until we get a final amount.
 8           THE COURT:  My understanding is I can defer entering
 9   the restitution order, and I will do that.
10           Ms. Peachy.
11           MS. PEACHY:  I would just ask that we have an
12   opportunity to respond to the government's request once it's
13   filed --
14           THE COURT:  Yes, of course.
15           MS. PEACHY:  -- and submit it to the court?
16           THE COURT:  Yes.
17           MS. PEACHY:  Thank you.
18           THE COURT:  All right.  With that, then, let's turn to
19   the victim statements.  Ms. Nuzum.
20           MS. NUZUM:  Thank you, Your Honor.  You'll hear first
21   from Joaquin Correia, Jassy's father.  He'll be speaking
22   through an interpreter.
23           THE COURT:  Okay.  If I could have the people speaking
24   to take the witness stand.  No?
25           THE CLERK:  The podium.
```

Add. 124

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Massachusetts ▾

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) |
| Louis D. Coleman, III | ) |

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 1:19CR10113-FDS

USM Number: 09325-015

David P. Hoose, Jane F. Peachy, Wade Zolynski
_____
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)    1
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping Resulting in Death | 2/24/2019 | 1 |

The defendant is sentenced as provided in pages 2 through ___7___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

    It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/11/2022
_____
Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV
_____
Signature of Judge

F. Dennis Saylor, IV Chief Judge U.S.D.C.
_____
Name and Title of Judge

10/11/2022
_____
Date

## Add. 125

AO 245B (Rev. 09/19)  Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:   Louis D. Coleman, III
CASE NUMBER:   1:19CR10113-FDS

Judgment — Page __2__ of __7__

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

Life.

☑ The court makes the following recommendations to the Bureau of Prisons:

Defendant serve prison term at the Federal Penitentiary Tucson. If not available or appropriate, a facility as close as possible to Arizona or Southern California.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m. on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

## Add. 126

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

Judgment—Page __3__ of ___7___

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

 5 years supervised release.

# MANDATORY CONDITIONS

1.   You must not commit another federal, state or local crime.
2.   You must not unlawfully possess a controlled substance.
3.   You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☐ The above drug testing condition is suspended, based on the court's determination that you
             pose a low risk of future substance abuse. *(check if applicable)*
4.   ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.   ☐ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.   ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.   ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# Add. 127

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3A — Supervised Release

| | Judgment—Page | 4 | of | 7 |

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

# Add. 128

Case: 23-1322   Case: 1:19-cr-10113-DS3   Document: 373   Filed: 04/11/22   Page: 5 of 7   Entry ID: 6614422
AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

Judgment—Page <u>5</u> of <u>7</u>

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# SPECIAL CONDITIONS OF SUPERVISION

1.  You are to reside for a period of up to six months in a Residential Re-Entry Center, or until appropriate housing is approved by the Probation Office, and must observe the rules of that facility.

2.  You must not knowingly have any contact, direct or indirect, with the victim's family members.

3.  You must participate in a mental health treatment program as directed by the Probation Office.

4.  You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5.  You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6.  You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

7.  You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (see Special Condition # 3), based on the ability to pay or availability of third-party payment.

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page  6  of  7

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until  1/92023 . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the    ☐ fine    ☐ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

## Add. 130

Case: 23-1322     Case: 19-cr-10113-FDS   Document 373   Filed 10/11/22   Page 7 of 7   Entry ID: 6614422
AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __7__ of __7__

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $ __100.00__ due immediately, balance due

☐ not later than _____ , or
☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

## Add. 131

AO 245C (Rev. 09/19) – Amended Judgment in a Criminal Case
Sheet 1

Case: 23-1322    Case: 1:19-cr-10113-FDS    Document 467    Filed 03/28/2024    Page 1 of 5    Entry ID: 6614422    (NOTE: Identify Changes with Asterisks (*))

# UNITED STATES DISTRICT COURT

District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| Louis D. Coleman, III | ) Case Number: 1:19CR10113-FDS |
| | ) USM Number: 09325-015 |
| Date of Original Judgment: 10/11/2022 | ) David P. Hoose, Jane F. Peachy, Wade Zolynski |
| *(Or Date of Last Amended Judgment)* | ) Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)    1 _____
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping Resulting in Death | 2/24/2019 | 1 |

        The defendant is sentenced as provided in pages 2 through ____7____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

        It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

3/16/2023
Date of Imposition of Judgment

/s/ F. Dennis Saylor, IV
Signature of Judge

F. Dennis Saylor, IV          Chief Judge U.S.D.C.
Name and Title of Judge

3/16/2023
Date

**Add. 132**

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment — Page __2__ of __7__

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Life.

☑    The court makes the following recommendations to the Bureau of Prisons:

Defendant serve prison term at the Federal Penitentiary Tucson. If not available or appropriate, a facility as close as possible to Arizona or Souther California.

☑    The defendant is remanded to the custody of the United States Marshal.

☐    The defendant shall surrender to the United States Marshal for this district:

☐    at _____   ☐ a.m.   ☐ p.m.   on _____ .

☐    as notified by the United States Marshal.

☐    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐    before 2 p.m. on _____ .

☐    as notified by the United States Marshal.

☐    as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

## Add. 133

|   | Judgment—Page | 3 | of | 7 |
|---|---|---|---|---|

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :
 5 years supervised release

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☐   The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑   You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☐   You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐   You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐   You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

## Add. 134

Judgment—Page __4__ of __7__

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____   Date _____

Add. 135

Case: 23-1322     Case 1:19-cr-10113-FDS   Document 467     Filed 03/28/05   Page 5 of 8     Entry ID: 6614422
AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3D — Supervised Release                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment—Page __5__ of __7__

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

## SPECIAL CONDITIONS OF SUPERVISION

1. You are to reside for a period of up to six months in a Residential Re-Entry Center, or until appropriate housing is approved by the Probation Office, and must observe the rules of that facility.

2. You must not knowingly have any contact, direct or indirect, with the victim's family members.

3. You must participate in a mental health treatment program as directed by the Probation Office.

4. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

7. You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (see Special Condition # 3), based on the ability to pay or availability of third-party payment.

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page    6    of    7

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 100.00 | $ 61,362.68 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Representative of the Estate of Jassy Correia, for benefit of her  Minor Child. | $50,000.00 | $50,000.00 | First |
| Massachusetts Victim's Compensation Fund. | $8,800.00 | $8,800.00 | Second (Joint) |
| Federal Crime Victims Fund | $2,562.68 | $2,562.68 | Second (Joint) |
| **TOTALS** | $            61,362.68 | $            61,362.68 | |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for     ☐  fine     ☐ restitution.

☐ the interest requirement for the     ☐  fine     ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

# Add. 137

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___7___ of ___7___

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☑  Lump sum payment of $ ___100.00___  due immediately, balance due

      ☐  not later than _____ , or
      ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate. |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)
fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution
and court costs.

Case: 23-1322     Case: 1:19-cr-10113-DS3     Document 2467     Filed 03/31/23 05/20/2023 of 5 Entry ID: 6614422
AO 245C (Rev. 09/19) – Criminal Judgment
Sheet 8 — Reason for Amendment                                                                                            Not for Public Disclosure

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS
DISTRICT:       District of Massachusetts

# REASON FOR AMENDMENT
**(Not for Public Disclosure)**

**REASON FOR AMENDMENT:**

☐  Correction of Sentence on Remand (18 U.S.C.
3742(f)(1) and (2))

☐  Reduction of Sentence for Changed Circumstances
 (Fed. R. Crim. P. 35(b))

☐  Correction of Sentence by Sentencing Court (Fed.
R.Crim. P. 35(a))

☐  Correction of Sentence for Clerical Mistake (Fed.
R.Crim. P. 36)

☐  Modification of Supervision Conditions (18 U.S.C. § 3563(c) or
3583(e))

☐  Modification of Imposed Term of Imprisonment for Extraordinary and
Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐  Modification of Imposed Term of Imprisonment for Retroactive
Amendment(s)to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐  Direct Motion to District Court Pursuant to
     ☐  28 U.S.C. § 2255 or       ☐  18 U.S.C. § 3559(c)(7)

☑  Modification of Restitution Order (18 U.S.C. § 3664)

# Add. 139

AO 245C (Rev. 09/19) Amended Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT

District of Massachusetts   [▼]    **SECOND**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **AMENDED JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| Louis D. Coleman, III | ) Case Number: 1:19CR10113-FDS |
| | ) USM Number: 09325-015 |
| Date of Original Judgment: <u>10/11/2022</u> | ) <u>David P. Hoose, Jane F. Peachy, Wade Zolynski</u> |
| *(Or Date of Last Amended Judgment)* | ) Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   <u>1</u>
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1201(a)(1) | Kidnapping Resulting in Death | 2/24/2019 | 1 |

     The defendant is sentenced as provided in pages 2 through <u>  9  </u> of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

     It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

<u>          4/6/2023          </u>
Date of Imposition of Judgment

<u>      /s/ F. Dennis Saylor, IV      </u>
Signature of Judge

<u>    F. Dennis Saylor, IV     Chief Judge U.S.D.C.  </u>
Name and Title of Judge

<u>          4/6/2023          </u>
Date

**Add. 140**

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
Sheet 2 — Imprisonment                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment — Page   2   of   9  

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of :

Life.

☑   The court makes the following recommendations to the Bureau of Prisons:

Defendant serve prison term at the Federal Penitentiary Tucson. If not available or appropriate, a facility as close as possible to Arizona or Souther California.

☑   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:

     ☐   at  _____   ☐ a.m.   ☐ p.m.    on  _____ .

     ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

     ☐   before 2 p.m. on  _____ .

     ☐   as notified by the United States Marshal.

     ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on  _____   to  _____

at  _____   with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By  _____
DEPUTY UNITED STATES MARSHAL

# Add. 141

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

Judgment—Page ___3___ of ___9___

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :
5 years supervised release

# MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
    - ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑  You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☐  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

# Add. 142

| | Judgment—Page | 4 | of | 9 |

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____    Date _____

# Add. 143

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# SPECIAL CONDITIONS OF SUPERVISION

1. You are to reside for a period of up to six months in a Residential Re-Entry Center, or until appropriate housing is approved by the Probation Office, and must observe the rules of that facility.

2. You must not knowingly have any contact, direct or indirect, with the victim's family members.

3. You must participate in a mental health treatment program as directed by the Probation Office.

4. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

5. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

6. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

7. You shall be required to contribute to the costs of evaluation, treatment, programming, and/or monitoring (see Special Condition # 3), based on the ability to pay or availability of third-party payment.

AO 245C (Rev. 09/19) – Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page 6 of 9

DEFENDANT: Louis D. Coleman, III
CASE NUMBER: 1:19CR10113-FDS

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| TOTALS | $ 100.00 | $ 61,362.68 | $ | $ | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Representative of the Estate of Jassy Correia, for benefit of her Minor Child. | $50,000.00 | $50,000.00 | First |
| Massachusetts Victim's Compensation Fund. | $8,800.00 | $8,800.00 | Second (Joint) |
| Federal Crime Victims Fund | $2,562.68 | $2,562.68 | Second (Joint) |
| TOTALS | $ 61,362.68 | $ 61,362.68 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

## Add. 145

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 5A — Criminal Monetary Penalties

DEFENDANT:
CASE NUMBER:

## ADDITIONAL TERMS FOR CRIMINAL MONETARY PENALTIES

The Defendant is required to pay $25.00 in restitution per quarter, provided such schedule is subject to change based on a material change in financial circumstances, and further provided that the government is not precluded from identifying and applying other assets of defendant to satisfy the restitution obligations.

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page  8  of  9

DEFENDANT:  Louis D. Coleman, III
CASE NUMBER:  1:19CR10113-FDS

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☑  Lump sum payment of $  100.00  due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B** ☐  Payment to begin immediately (may be combined with  ☐ C, ☐ D, or ☐ F below); or

**C** ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
_____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
term of supervision; or

**E** ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due
during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons'
Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>*(including defendant number)* | Total Amount | Joint and Several<br>Amount | Corresponding Payee,<br>if appropriate. |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)
fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution
and court costs.

## Add. 147

AO 245C (Rev. 09/19) – Criminal Judgment
Sheet 8 — Reason for Amendment

| | |
|---|---|
| DEFENDANT: Louis D. Coleman, III | Judgment — Page <u>9</u> of <u>9</u> |
| CASE NUMBER: 1:19CR10113-FDS | |
| DISTRICT: District of Massachusetts | |

# REASON FOR AMENDMENT
### (Not for Public Disclosure)

**REASON FOR AMENDMENT:**

☐ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))

☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))

☐ Correction of Sentence by Sentencing Court (Fed. R.Crim. P. 35(a))

☐ Correction of Sentence for Clerical Mistake (Fed. R.Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. § 3563(c) or 3583(e))

☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))

☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))

☐ Direct Motion to District Court Pursuant to
  ☐ 28 U.S.C. § 2255 or    ☐ 18 U.S.C. § 3559(c)(7)

☑ Modification of Restitution Order (18 U.S.C. § 3664)